Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Teresa L. Huggins (Bar. No. 263257)
  thuggins@bakermarquart.com
Sam Meehan (Bar No. 307934)
  smeehan@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California, 90017
Telephone:  (424) 652-7800
Facsimile:  (424) 652-7850

*Attorneys for Defendant Tony Bobulinski*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited,<br><br>        Plaintiff,<br><br>v.<br><br>TONY BOBULINSKI<br><br>        Defendant. | Case No.2: 20-CV-06759 RGK (JC)<br><br>**DEFENDANT TONY BOBULINSKI'S OPPOSITION TO PLAINTIFF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. R. Gary Klausner<br>Date: October 19, 2020<br>Time: 9:00 a.m.<br>Courtroom:   850<br><br>Complaint Filed: July 28, 2020 |

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND ..............................................................................3

    A.  CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business ........3

    B.  Bobulinski Enters into the Note and Pledge Agreement with CBG.......................................................................................................4

    C.  Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands............5

        1.  Remark Purchases CBG's Assets, Violating the Pledge Agreement..................................................................................6

        2.  Bobulinski is Forced to File a Proof of Debt in the Cayman Liquidation ......................................................................7

        3.  Bobulinski Files Suit Against Roseman for Fraud....................10

        4.  The JOLs Seek to Enforce the Cayman Judgment ....................10

III.  LEGAL STANDARD .......................................................................................11

IV.  ARGUMENT ...................................................................................................11

    A.  The Motion Should be Denied Pursuant to Local Rule 7-3................11

    B.  The Motion is Premature under Federal Rule of Civil Procedure 56(d)...................................................................................................13

    C.  Summary Judgment is Inappropriate Because Several Genuine Issues of Material Fact Exist as the Enforceability of the Foreign Judgment ..........................................................................................15

        1.  The Cayman Judgment Was Based on Fraud............................15

        2.  The Cayman Judgment Is Repugnant to Public Policy .............16

        3.  The Foreign Proceeding Was Contrary to the Parties' Agreement................................................................................18

        4.  The Cayman Proceeding Violated Due Process........................19

V.  CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alcatel-Lucent USA, Inc. v. Dugdale Commc'ns, Inc.,*
 2009 WL 3346784 (C.D. Cal. Oct. 13, 2009) ...................................................12

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation,*
 323 F.3d 767 (9th Cir. 2003) ...........................................................................13

*de Fontbrune v. Wofsy,*
 409 F. Supp. 3d 823 (N.D. Cal. 2019) ...........................................3, 15, 16, 20

*Howell v. Liddell,*
 2020 WL 949557 (E.D. Cal. Feb. 27, 2020) .............................................11, 13

*Java Oil Ltd. v. Sullivan,*
 168 Cal. App. 4th 1178 (2008)..........................................................................18

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.,*
 676 F.3d 841 (9th Cir. 2012) ............................................................................11

*Metropolitan Creditors Serv. v. Sadri,*
 15 Cal.App.4th 1821 (1993)..............................................................................17

*Ohno v. Yasuma,*
 723 F.3d 984 (2013) ..........................................................................................17

*Pentz v. Kuppinger,*
 31 Cal. App. 3d 590 (1973) ..........................................................................3, 16

*Purdue v. CBC Restaurant Corp.,*
 2019 WL 7166979 (C.D. Cal. Nov. 9, 2019) ...................................................12

*Reeves v. Sanderson Plumbing Prods., Inc.,*
 530 U.S. 133 (2000) ..........................................................................................11

*Singer v. Live Nation Worldwide, Inc.,*
 2012 WL 123146 (C.D. Cal. Jan 13, 2012) ................................................11, 12

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*
 809 F.2d 626 (9th Cir. 1987)............................................................................11

*Texas Partners v. Conrock Co.,*
 685 F.2d 1116 (9th Cir. 1982) ..........................................................................13

*United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley, California,*
 2014 WL 3704041 (N.D. Cal. 2014)..................................................................13

*World Granite and Marble Corp. v. Wil-Freds Const., Inc.,*
 1996 WL 763230 (N.D. Ill. Nov. 25, 1996)......................................................17

*Zell v. InterCapital Income Sec., Inc.*,
    675 F.2d 1041 (9th Cir. 1982)...................................................................13, 14

Statutes

Cal. Civ. Proc. § 1715(b)(2) .........................................................................18

Code Civ. Proc. § 1716(c)(1)(B), (C), (D), (G)..............................2, 15, 16, 18, 19

Rules

C.D. Cal. Local Rule 7-3 ..........................................................................11, 12

Fed.R.Civ.P. 56(a) ..................................................................................11

Fed.R.Civ.P. 56(d) ..............................................................................11, 13

Case No. 2:20-CV-06759 RGK (JC)

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# I. INTRODUCTION

On July 28, 2020, Plaintiff China Branding Group Limited (in official liquidation), by and through its Joint Official Liquidators, Hugh Dickinson and David Bennett (together, "Plaintiff" or "CBG"), filed the instant matter, seeking recognition of a Cayman Islands Judgment denying Defendant Tony Bobulinski's ("Defendant" or "Bobulinski) proof of debt claim in CBG's underlying liquidation proceeding, and three cost certificates arising therefrom. Less than two months later, without meeting and conferring, before this Court had set a scheduling order, and before Bobulinski had a chance to conduct *any* discovery or respond to the Complaint, CBG moved for summary judgment. According to CBG, the mere fact that it obtained a foreign judgment is *de facto* proof that a U.S. court must enforce it. Not so. Bobulinski is entitled and intends to challenge the underlying judgment on several grounds and requires discovery to do so. As it did in the Cayman Islands, CBG hopes to short-circuit this process without affording Bobulinski a meaningful opportunity to test the propriety of its conduct. This Court's rules, the Federal Rules of Civil Procedure and California's Uniform Foreign Country Money Judgments Recognition Act ("UFCMJRA") all guarantee Bobulinski a fair opportunity to challenge the underlying judgment and necessitate that summary judgment be denied.

Civil Local Rule 7-3 *requires* that a party moving for summary judgment meet and confer with the opposing party seven days before filing the motion. CBG admittedly failed to do so, even when alerted to the requirement. Moreover, courts have long held that a motion for summary judgment must be denied where the opposing party has not had adequate time to conduct discovery. Here, not only has Bobulinski had no time to conduct discovery, discovery and initial disclosures have not even begun. The Court has not set a scheduling order or held a scheduling conference, and Bobulinski has not even responded to the Complaint.

But discovery is critical here because significant and material questions of triable fact remain as to whether the foreign judgment at issue can be recognized and

1

enforced.  A U.S. court cannot enforce a judgment that is based on fraud, repugnant to the public policy of California or the United States, contrary to the agreement between the parties under which the dispute in question was to be determined, or incompatible with the requirements of due process of law.  Code Civ. Proc. § 1716(c)(1)(B), (C), (D), (G).  All four bases are at issue here.

In 2015, in order to induce Bobulinski to loan CBG $650,000, CBG's CEO Adam Roseman ("Roseman") told Bobulinski, *inter alia*, that: (1) CBG owned certain assets in the United States that would secure Bobulinski's loan; (2) Bobulinski would be a senior secured creditor and would receive a 2.5 multiplier of his principal "no matter what"; and (3) Bobulinski would have the right to sign off on any sale of CBG or its assets.  Based upon these promises, Bobulinski entered into a Senior Secured Convertible Promissory Note ("Note") and Pledge Agreement with CBG and would not have entered into those agreements absent those assurances.

Then, in February 2016, a third-party company, Remark, sent a letter of intent to acquire CBG for $23.5 million. CBG's largest shareholder, SIG (which had veto rights) opposed the sale, and a CBG board meeting was held in March 2016 to discuss SIG's opposition.  In April 2016, CBG sent false notices regarding its inability to pay outstanding debts (which were not even due) and thereby manufactured a sham liquidation.  Four days later, CBG's largest creditor, Hickory Grove, LLC, initiated the Cayman Liquidation.  Bobulinski suspected and suspects that CBG and Hickory Grove conspired to create a sham Event of Default to avoid SIG's veto of any sale, and initiated the underlying liquidation proceedings to sell CBG's assets to Remark without Bobulinski's consent. CBG (and others) misrepresented to the Cayman court facts underlying the liquidation and related to Bobulinski's creditor rights, and Bobulinski was not allowed to conduct any meaningful discovery into the sham proceeding or its origins. These transactions and other conduct in the Cayman Islands proceeding raise foundational questions about

the bases for the underlying liquidation, the (bad) actors involved, and propriety of the judgment that necessitate discovery in this litigation.

Indeed, the underlying judgment upholding the denial of Bobulinski's proof of debt claim that CBG obtained in the Cayman Islands was based largely on extrinsic fraud by CBG and potentially others that deprived the court of the true state of affairs. But for this sham liquidation, Bobulinski would have been able to litigate his claim in California per the forum selection clause negotiated by the parties, instead of in the unfair and abbreviated Cayman Islands proceeding. The evidentiary record behind all of these occurrences needs to be developed before any judgment can be enforced here. *See de Fontbrune v. Wofsy*, 409 F. Supp. 3d 823, 839 (N.D. Cal. 2019) (extrinsic fraud sufficient to deny enforcement of foreign judgment may be shown where false testimony prevents a foreign court from knowing "the true state of affairs"); *Pentz v. Kuppinger*, 31 Cal. App. 3d 590, 597 (1973). Plaintiff's premature motion should be denied in its entirety.

## II.  FACTUAL BACKGROUND

### A.  CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business

CBG was a Cayman Island corporation, whose primary business was to provide live event and media content into the Chinese marketplace. (Response Separate Statement of Undisputed Facts ("Response SSUF") ¶ 1.)  In or around 2015, CBG needed to find working capital to fund its growth.  (*Id*. ¶ 2.)  As a result, Roseman, the founder and CEO of CBG, urgently sought ways to quickly infuse funding into the company. (*Id*. ¶ 3.)

On or about March 5, 2015, Roseman emailed his long-time friend and business associate, Bobulinski, seeking a short-term bridge loan for CBG. (Declaration of Tony Bobulinski ("Bobulinski Decl.") ¶ 2, Ex. A.)  Roseman wrote that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge

1  loan principal and interest secured in first position." (*Id.*)  Bobulinski expressed

2  interest in helping his friend, and subsequent communications took place. (*Id.* ¶ 3.)

3  During these conversations between Roseman and Bobulinski, Roseman told

4  Bobulinski that CBG owned the rights and interests in certain assets, including a

5  content library, license agreements, and physical assets (including production

6  equipment) (the "Collateral").  (*Id.*)

7          Roseman at all times acted consistently with his statements that the Collateral

8  was owned by CBG.  For example, Roseman offered to take Bobulinski to "come see

9  the Culver studio" in a March 20, 2015 email. (*Id.* ¶ 4, Ex. B.)  Roseman also repeated

10 these same statements during a March 25, 2015 in-person meeting at the Peninsula

11 Hotel in Beverly Hills, when he went into further detail explaining CBG's purported

12 assets to Bobulinski. (*Id.* ¶ 5.)  Wanting to move quickly, Roseman informed

13 Bobulinski that he would take a loan on whatever terms Bobulinski asked for or

14 needed. (*Id.*) Believing that CBG owned the Collateral, Bobulinski required that his

15 loan be senior secured by all of CBG's assets.  (*Id.*)  Roseman also promised

16 Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal

17 loan amount, no matter what.  (*Id.*)

18         Roseman agreed to these terms, assuring Bobulinski that: any loan he provided

19 would be senior secured by all of CBG's assets; if CBG was sold, his loan would be

20 senior in order of funding; and, Bobulinski would be entitled to a 2.5 multiplier of his

21 principal loan amount, no matter what.  (*Id.* ¶ 6.)  He also assured Bobulinski that

22 their understanding would be properly documented by the law firm Sheppard Mullin

23 Richter & Hampton, LLP, counsel for CBG.  (*Id.* ¶ 7.)  At Roseman's insistence and

24 relying on Roseman's representations as to the assets in CBG's possession,

25 Bobulinski did not retain separate counsel.  (*Id.*)

26         **B.    Bobulinski Enters into the Note and Pledge Agreement with CBG**

27         On or about April 15, 2015, Bobulinski entered into the Secured Convertible

28 Promissory Note and a Pledge Agreement (the "Pledge Agreement"), based on

Roseman's assurances that the Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal no matter what, and that Bobulinski would have the right to approve any sale of CBG.  (*Id.* ¶ 8, Exs. C (Note) and D (Pledge Agreement).)  Bobulinski entered into the Note and the Pledge Agreement because of these assurances and would not have entered into them otherwise.  (*Id.* ¶ 8.)  Importantly, Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any Collateral. (*Id.* Ex. D.)

### C.   Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands

In the fall of 2015, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark").  (Bobulinski Decl. ¶ 9.) On February 18, 2016, Remark executed a Letter of Intent, stating its interest in buying CBG.  (Kendall Decl., Ex. B (Cayman Judgment) ¶ 15.) The offer was for $23.5 million. (*Id.*)  CBG's shareholder, SIG, who had veto rights, opposed the sale. (Bobulinski Decl., ¶ 10.)

Thereafter, on March 17, 2016, a board meeting was held wherein CBG's directors, including Roseman, Robert Roche, and Jacob Fisch, discussed SIG's opposition to the sale.  (*Id.*) Bobulinski suspected and suspects that CBG and Hickory Grove conspired to initiate sham liquidation proceedings to their benefit. (*Id.* ¶ 12.)  Indeed, on April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent out false and/or fraudulent correspondence to its Noteholders regarding its inability to pay its outstanding debts, despite the fact that the Promissory Notes signed by Bobulinski and all other Noteholders did not have any debts due. (*Id.* ¶¶ 10-11, Ex. C (Note)). This writing was sent by Jacob Fisch at the direction of CBG, and in concert with one of CBG's co-directors, Robert Roche (for whom Fisch worked).  (*Id.* ¶ 12.)  Roche was an owner and principal of CBG's largest creditor, Hickory Grove. (*See Id.*; Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 16, 54.)  This writing purportedly created an "Event of Default" under the Notes

so that Hickory Grove could initiate the wind-up process leading to the underlying Cayman Judgment. (*See Id.,* ¶ 11; Kendall Decl., Ex. B (Cayman Judgment) ¶ 17.) On April 28, 2016, just four days after the principles of CBG and Hickory Grove manufactured this false Event of Default, Hickory Grove indeed initiated the wind-up proceeding. (*Id.*)

Ultimately, the JOLs were appointed to begin the liquidation process of CBG (the "Cayman Liquidation"), pursuant to a winding up order dated August 18, 2016, issued in the Cayman Islands. (*Id.* ¶¶ 17-18.) Bobulinski, aware of and suspecting of the collusion, was deprived of a meaningful opportunity to obtain further facts about the initiation of the liquidation proceedings. (Bobulinski Decl., ¶ 17.)

### 1. Remark Purchases CBG's Assets, Violating the Pledge Agreement

Indeed, discovery is necessary to understand the underlying transgressions surrounding the underlying Cayman Liquidation, the actors involved, and the underlying motives, all which affect the validity of the underlying Judgment. (Declaration of Teresa L. Huggins ("Huggins Decl.") ¶ 5.) At all times relevant, Hickory Grove owned 33% of RAAD, the company which, as discussed below, purportedly owned the "Collateral" which was supposed to be security for Bobulinski's loan.[1]  (Kendall Decl., Ex. B (Cayman Judgment) ¶ 80.) CBG and Hickory Grove's creation of the Event of Default and the subsequent wind-up process deprived SIG of its controlling interest, laying the foundation for Hickory Grove to transfer its interests in RAAD to CBG, and for CBG to sell these assets to Remark pursuant to the APA Agreement.  (Kendall Decl., Ex. B (Cayman Judgment) ¶ 80; Bobulinski Decl., ¶ 12.)

Indeed, as a condition precedent to the APA, it was agreed that Hickory Grove and RAAD's two other shareholders, Roseman's wife and the Roseman Family Trust, would transfer their shares in RAAD to CBG for **consideration of $10**.

---

[1] The other two-thirds of RAAD were owned by Roseman's wife, through her company Tarpido Enterprises, LLC, and the Roseman Family Trust.

(Kendall Decl., Ex. B (Cayman Judgment) ¶ 80.) Thus, Hickory Grove, within a week of its "loan" to CBG of $670,000, initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD, the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10. (*Id.*)

As a further condition precedent to that agreement, all of CBG's Noteholders were required to enter into respective distribution agreements (the "Distribution Agreements"), which would subordinate their claims to CBG's general body of unsecured creditors. (*Id.*) The Distribution Agreements also negated the pledge agreements of all Noteholders, which included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent. (*Id.* ¶¶ 19-20; Bobulinski Decl. ¶ 8, Ex. D (Pledge Agreement).) All the Noteholders signed their Distribution Agreements, except Bobulinski. (Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶ 14.) Therefore, Bobulinski's Pledge Agreement remained effective, and Bobulinski had the contractual right to stop any deal by CBG to transfer its assets. (Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶¶ 8, 10 Ex. D (Pledge Agreement).)

Despite this, CBG pushed for the deal with Remark to close. (Kendall Decl., Ex. B (Cayman Judgment) ¶ 21.) On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG and, one day later, CBG entered into the APA to sell all of its assets to Remark, including its shares of RAAD, which apparently continued to own the Collateral securing Bobulinski's (and presumably the other Noteholders') loans. (*Id.* ¶ 80.)

### 2.  **Bobulinski is Forced to File a Proof of Debt in the Cayman Liquidation**

Remark's takeover of CBG constituted a "Liquidity Event" under the Note and therefore, according to Roseman and Bobulinski's agreement, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the

sale to Remark, for a total of $1,625,000.  (Bobulinski Decl. ¶ 8, Ex. C (Note) ¶ 10.)
However, because of the sham Cayman Liquidation, Bobulinski was forced to submit
his proof of debt claim in the Cayman court to preserve his rightful interests. (*Id.* ¶
15-16.) But for this sham liquidation aimed at undermining the managing interest of
CBG's veto-holding shareholder SIG, Bobulinski would have been able to litigate his
claim in California per his forum selection clause and take extensive discovery on the
underlying transactions that led to the liquidation. (*Id.*; Huggins Decl. ¶ 5.)

Based on his belief that he was a senior secured creditor of CBG, whose loan
was secured by the Collateral, and because he never signed the Distribution
Agreement, Bobulinski submitted a Proof of Debt to the JOLs during the Cayman
Liquidation for $1,625,000, plus legal fees, the total which included the principal Note
amount plus the 2.5 multiplier Roseman promised.  (*Id.* ¶ 15.)  Ultimately, the JOLs
rejected the Proof of Debt, claiming that Bobulinski was only owed a balance of the
principal $650,000 and concluding that Bobulinski's Note was not secured by the
Collateral.  (Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 36, 100.)  This dispute was
the basis for the legal proceeding in the "Cayman Litigation."

During the Cayman Litigation, the JOLs hired purported expert, Mark C.
Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues
including the APA.  (Kendall Decl., Ex. B (Cayman Judgment) ¶ 113.)  The APA
was the agreement by which all of CBG's assets and interest in its subsidiaries were
sold to Remark.  Dosker reported the following:

> To the extent, if any, that CBG previously owned any assets in the United
> States consisting of 'content library', 'license agreements' or 'production
> equipment', they were sold as part of all the assets sold pursuant to the
> APA as approved by the Grand Court of the Cayman Islands.  The APA
> does not identify any such assets of CBG in the United States consisting
> of 'content library', 'license agreements' or 'production equipment'.''; and

> [T]he Pledge Agreement clearly states that what is pledged are assets of
> CBG – not assets of any subsidiary of CBG... CBG did not own any
> license agreements or media content... Since CBG did not own those,
> they are not within the scope of the pledge in the Pledge Agreement.

1    (Kendall Decl., Ex. B (Cayman Judgment) ¶ 113.)

2        Based on Dosker's report, the JOLs argued that CBG never owned the

3    Collateral. Rather, it was owned by RAAD, an entity that Roseman had never told

4    Bobulinski about in any of their discussions. (Bobulinski Decl. ¶¶ 3-6) When

5    Bobulinski argued that his loan was secured by the Collateral, the JOLs argued:

6        [T]here is no evidence that [CBG] had any assets falling within the
         operative part of the definition of Collateral in the Pledge,.. the
7        Company carries on business as an investment company… As such,
         the Company had relatively few assets.

8    (Kendall Decl., Ex. B (Cayman Judgment ¶ 221).)

9        In direct contravention of his representations to Bobulinski, Roseman made this

10   argument as well.  (*See*, *e.g.*, Kendall Decl., Ex. B (Cayman Judgment ¶ 222.) This

11   argument also served as the basis for why the Cayman Court asserted that CBG did

12   not breach Section 7 of Bobulinski's Pledge Agreement requiring his consent before

13   CBG could transfer its assets to Remark.  The JOLs justified closing the Remark

14   transaction without Bobulinski's approval and signature by arguing that CBG had

15   simply transferred shares of RAAD and had not transferred the assets comprising the

16   Collateral.  (Kendall Decl. (Cayman Judgment) ¶ 222.)  While Roseman represented

17   that CBG's content library and license agreements were in the United States, he did

18   not distinguish which "content library and license agreements" in the U.S. belonged to

19   RAAD as opposed to CBG.  (Kendall Decl., Ex. B (Cayman Judgment ¶ 148).)

20       The Cayman Court rejected Bobulinski's appeal on January 23, 2019.

21   However, the court did not allow any meaningful development of the factual record

22   to challenge the underpinnings of the Cayman Liquidation or the actors involved.

23   Bobulinski was not entitled to standard trial discovery in the Cayman Litigation,

24   making it essentially impossible for him to adequately present his case. (Bobulinski

25   Decl. ¶ 17.)  Bobulinski was unable to develop a record as to the legitimacy of the

26   bases for the liquidation, the actors involved, the veracity of CBG's representations

27   upon which the Court relied, and CBG's ulterior motive to deprive shareholders of

28   their voting rights, subordinate debts, and acquire and transfer shares of RAAD. (*Id.*)

1  Bobulinski has a litany of specific requests that he is ready to propound, and that are

2  vital to his affirmative defenses. (*See,* Huggins Decl., ¶ 5.)

3       After Bobulinski's Proof of Debt was rejected, the JOLs sought cost

4  certificates against Bobulinski.  (Kendall Decl. ¶ 5.)  Ultimately, the Cayman court

5  issued three cost certificates against Bobulinski: (1) a November 13, 2018, for

6  $56,431.82, (2) a $57,208.58 on January 8, 2019, and (3) a February 5, 2019, default

7  cost certificate in the amount of $562,170.94 (together, "Cost Certificates").  (*Id.*)

8            3.    **Bobulinski Files Suit Against Roseman for Fraud**

9       On July 10, 2019, Bobulinski filed a complaint against Roseman in California

10  Superior Court.  After removal, on July 10, 2019, Bobulinski filed a first amended

11  complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx

12  (the "Roseman Matter"). (Bobulinski Decl. ¶ 19.) Bobulinski has two current causes

13  of action against Roseman based on his first amended complaint in the Roseman

14  Matter: (1) fraud in the inducement; and (2) negligent misrepresentation.  (*Id.*)

15            4.    **The JOLs Seek to Enforce the Cayman Judgment**

16       On July 28, 2020, by and through the JOLs, CBG sued Bobulinski in the

17  instant matter, alleging that the United States should recognize the Cayman

18  Judgment under the UFCMJRA or under the principles of comity.  Based on this

19  Court's August 31, 2020 order, Bobulinski has until September 30, 2020 to respond

20  to the Complaint.  (Dkt. 22.)  Bobulinski has yet to file a responsive pleading.

21       On September 18, 2020, nearly two weeks before Bobulinski's responsive

22  pleading was due, CBG filed this Motion.  CBG's counsel did not attempt to meet and

23  confer before it was filed.  (Huggins Decl. ¶ 2.)  On September 21, 2020, counsel for

24  Bobulinski notified CBG's counsel of their failure to abide by the meet and confer

25  requirement imposed by Local Rule 7-3, and that the motion was premature pursuant

26  to Federal Rule of Civil procedure 56.  (*Id.* ¶¶ 3-6.)  To date, CBG's counsel has not

27  addressed this failure and refuses to withdraw the Motion.  (*Id.* ¶ 7.)

28

### III.  **LEGAL STANDARD**

Summary judgment is only appropriate when there exists no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012).  "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  The trial "court must draw all reasonable inferences in favor of the nonmoving party," and may not weigh evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Summary judgment may be denied where the moving party fails to comply with Central District Local Rule 7-3's meet and confer requirement.  *See* C.D. Cal. Local Rule 7-3; *Singer v. Live Nation Worldwide, Inc.*, No. SACV 11–0427 DOC (MLGx), 2012 WL 123146, at *2 (C.D. Cal. Jan 13, 2012) (denying summary judgment when defendant failed to meet and confer).  In addition, where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may defer consideration of the motion or deny it altogether.  *See* Fed.R.Civ.P. 56(d); *Howell v. Liddell*, No. 2:19-cv-0578 TLN KJN P, 2020 WL 949557, at *2 (E.D. Cal. Feb. 27, 2020) (denying summary judgment as "premature" where opposing party had insufficient discovery).

### IV.  **ARGUMENT**

#### A.  **The Motion Should be Denied Pursuant to Local Rule 7-3**

Plaintiff's motion must be denied for failure to meet and confer.  Seven days before moving for summary judgment in the Central District, the moving party "shall first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution."  C.D. Cal. Local Rule 7-3.  District courts have discretion to refuse to consider a motion for summary judgment filed in violation of Local Rule 7-3's meet and confer requirement.  *Singer*, 2012 WL 123146, at *2 (C.D. Cal. Jan 13, 2012) (denying a motion for summary

judgment when defendant failed to meet and confer and merely sent a letter regarding the motion three days before it was filed).  "The meet and confer requirements of Local Rule 7-3 are in place for a reason . . . nothing short of strict compliance with the local rules" is expected.  *Alcatel-Lucent USA, Inc. v. Dugdale Commc'ns, Inc.*, 2009 WL 3346784, at *4 (C.D. Cal. Oct. 13, 2009)  (denying a motion when moving party first contacted nonmovant the day the papers were filed).  Very recently, this Court denied a motion for class certification on the basis that it failed to comply with Local Rule 7-3, and disregarded explanations for the failure offered on reply.  *Purdue v. CBC Restaurant Corp.*, 2019 WL 7166979, at *1-2 (C.D. Cal. Nov. 9, 2019).

Here, CBG has failed to meet and confer in violation of the local rules. (Huggins Decl., ¶¶ 2-6.)  CBG made no attempt to meet and confer with Bobulinski before filing its Motion, and, when Bobulinski made Plaintiff aware of the local rule meet and confer requirement, Plaintiff refused to take the Motion off calendar.  (*Id*., ¶ 7.)  As in *Purdue*, anything CBG could say on Reply to explain this fatal deficiency (and Bobulinski is aware of no such thing) should be disregarded.

In *Singer*, the court denied a summary judgment motion filed six days before Christmas when the movant's attorney sent a letter to nonmovant's counsel a mere three days before filing the motion.  *Singer*, 2012 WL 123146, at *3.  CBG has not afforded Bobulinski even that modicum of courtesy.  As noted in *Alcatel-Lucent USA*, the local rules are in place for a reason.  *Alcatel-Lucent USA,* 2009 WL 3346784, at *4.  The meet and confer requirement encourages parties to informally resolve disputes and preserve valuable judicial resources.  CBG has entirely bypassed this rule—and professional courtesy—by filing a dispositive motion with no notice whatsoever.  Furthermore, as this Court held in *Purdue,* there are "numerous conflicts manifest in the parties' briefing [which] make clear that many of the parties' disputes were suitable for exactly the type of extensive meet and confer mandated by Local Rule 7-3 before the parties' sought the Court's intervention on each of these issues." *Purdue,* 2019 WL 7166979, at *2. The Motion should be denied on this basis alone.

B. **The Motion is Premature under Federal Rule of Civil Procedure 56(d)**

Plaintiff's failure to meet and confer is reason enough to deny the Motion. It should also be denied because it was filed prematurely, before Bobulinski has had a chance to conduct any discovery or even respond to the Complaint.

A motion for summary judgment made before the nonmoving party has had adequate time for discovery is "premature," and must be denied. *See* Fed. R. Civ. 56(d); *Howell*, 2020 WL 949557, at *2 (E.D. Cal. Feb. 27, 2020) (denying summary judgment as "premature" where nonmoving party had not had adequate access to discovery); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982) ("[Plaintiffs] should be afforded reasonable access to potentially favorable information prior to the granting of summary judgment, because on summary judgment all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the summary judgment motion."); *Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1049 (9th Cir. 1982) (reversing grant of summary judgment as premature before "plaintiff ha[d] been afforded reasonable discovery"); *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley, California*, 2014 WL 3704041, at *3 (N.D. Cal. 2014) (where the court "recently extended all case deadlines, including discovery deadlines ... the [c]ourt would be spinning its wheels by considering a summary judgment motion when the parties have not had time to develop an adequate factual record"). Unless the nonmoving party has "not diligently pursued discovery of the evidence," courts "generously grant Rule 56(d) motions." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773-74 (9th Cir. 2003).

Bobulinski would be highly prejudiced were the Court to address this Motion on the merits now. This matter is in its infancy. Bobulinski has yet to even file a responsive pleading, much less undertake any discovery. After sitting on its cost awards for over a year, CBG is now forcing Bobulinski to litigate a surprise dispositive motion at this implausibly early stage in proceedings. Under the standard

articulated in *Zell*, summary judgment is inappropriate here because Bobulinski has not been "afforded reasonable discovery." *Zell*, 675 F.2d at 1049.

And Bobulinski needs discovery here. There are valid and viable foundational questions about the bases for the underlying liquidation, the (bad) actors involved, and the true state of affairs all of which necessitate discovery in this litigation. Indeed, the underlying judgment upholding the denial of Bobulinski's proof of debt claim that CBG obtained in the Cayman Islands was based largely on intentional misrepresentations by CBG and Roseman that deprived the Court of the true state of affairs, compounded by the denial of critical discovery into these issues.

Moreover, the underlying liquidation that forced Bobulinski to submit his proof of debt claim in the Cayman court to preserve his rightful interests was initiated by CBG, in concert with others (including Hickory Grove) under what Bobulinski intends to prove were nefarious circumstances constituting extrinsic fraud. This wind-up process forced CBG's Promissory Note holders to subordinate their loans, undermined the management rights of its veto-holding shareholder, SIG, and laid the foundation for the transfer of RAAD assets from CBG to Remark. This despite the fact that CBG's largest creditor, Hickory Grove, was a one-third partner in RAAD and initiated the wind-up process. But for this farce liquidation, which Bobulinski will prove was manufactured by CBG and Hickory Grove, Bobulinski would have been able to litigate his claim per the forum selection clause negotiated by the parties. The simple fact is that CBG has rushed to file a premature motion for summary judgment before the parties engaged in any semblance of discovery. The factual record for these occurrences needs to be developed before any judgment can be enforced here. For example, Bobulinski intends to take discovery on the genesis of Hickory Grove's wind-up petition in the Cayman Islands and whether the liquidation was a sham liquidation, as well as other discovery regarding the internal deliberations and communications between and among CBG, Hickory Grove, their counsel and later the

1  JOLs to probe the legitimacy of the process and potential extrinsic fraud.  Summary

2  judgment is premature at this stage and this Motion must be denied.

3      C.  **Summary Judgment is Inappropriate Because Several Genuine Issues**

4          **of Material Fact Exist as the Enforceability of the Foreign Judgment**

5          1.  **The Cayman Judgment Was Based on Fraud**

6      A foreign money judgment cannot be enforced where it is based on fraud.  Cal.

7  Civ. Proc. § 1716(c)(1)(B).  Specifically, the UFCMJRA provides for nonrecognition

8  of a foreign-country judgment if fraud deprived the losing party of an adequate

9  opportunity to present its case.  *Id.*  The Uniform Law Commission's commentary on

10 this provision indicates that the type of fraud that can serve as grounds for

11 nonrecognition is "extrinsic fraud," in which the "conduct of the prevailing party that

12 deprived the losing party of an adequate opportunity to present its case."

13     Here, *de Fontbrune v. Wofsy* is instructive.  There, plaintiff sued defendants for

14 publishing volumes of a book that reproduced copyright-protected photographs of

15 Picasso's works.  *de Fontbrune*, 409 F. Supp. 3d at 828.  The plaintiff prevailed and

16 the French court issued a French legal device, called an *astreinte*, that would subject

17 defendants to damages for any further acts of infringement.  Ten years later, after

18 plaintiff had transferred its copyrights, plaintiff discovered copies of the same book in

19 a French bookstore and initiated legal proceedings to liquidate the *astreinte*.  *Id.*

20 Defendants did not appear and contended they were not properly served.  In early

21 2012, the enforcement division of the French trial court, the JEX, granted an award of

22 $2 million to the plaintiff.  *Id.*

23     The next year, plaintiff brought a suit against defendants in California state

24 court to enforce the judgment under the UFCMRJA.  *Id.*  Defendant argued that

25 plaintiffs deceived the French court as to their ownership of the underlying intellectual

26 property and, as a result of that deception, wrongfully obtained a judgment liquidating

27 the *astreinte*. *Id.* at 839.  The U.S. district court held that such facts "could constitute

28 extrinsic fraud," since the French court did not know "the true state of affairs," and

refused to enforce the judgment at the summary judgment stage on that basis.  *Id.* (citing *Pentz*, 31 Cal. App. 3d at 597 (refusing to enforce judgment where party did not have an opportunity to inform court of alimony payments critical to that case)).

Here, as in *de Fontbrune* and *Pentz*, Bobulinski is contending that the Cayman Judgment is based upon extrinsic.  Roseman did not fully inform the Cayman court of the true nature and effect of CBG's agreements with Bobulinski. More importantly, the initiation of the Cayman Liquidation also appeared to be premised upon a sham Event of Default. Based in part upon its reliance on CBG's (and potential others') extrinsic fraud as to the triggering events behind the liquidation, the Cayman court did not sufficiently consider these issues or allow for meaningful discovery on them.

Bobulinski is currently suing Roseman for fraud in the inducement and negligent misrepresentation, and the case is ongoing.  The outcome of the Roseman Matter could be determinative of this one, given the extent of Roseman's fraud. Because this case is in its infancy, Bobulinski has not prepared an exhaustive list of necessary discovery but he is prepared to propound a series of discovery requests to support his affirmative defenses to this action. (Huggins Decl. ¶ 5.)  Further, Bobulinski has even asked Plaintiff's counsel for a stay to allow him to obtain discovery in the that case that may be producible in this case.  (*Id.* ¶¶ 6-7.)  The JOLs have not responded to that request.  (*Id.*)

### 2. The Cayman Judgment Is Repugnant to Public Policy

The UFCMJRA provides that a court is not required to recognize a foreign judgment when "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States." *See* Cal. Code Civ. Proc. § 1716(c)(1)(C) ("A court of this state shall not recognize a foreign-country judgment if… the… claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States.")  Repugnancy under California's UFCMJRA measures not simply whether the foreign judgment or cause of action is contrary to California public policy, but

whether either is so offensive to public policy as to be prejudicial to recognized standards of morality and to the general interests of the citizens. *Ohno v. Yasuma*, 723 F.3d 984 (2013); *see also Metropolitan Creditors Serv. v. Sadri*, 15 Cal.App.4th 1821 (1993) (State's public policy exception to enforcement of sister state cause of action applies when sister state law violates recognized standards of morality and general interest of state citizens).

In *World Granite and Marble Corp. v. Wil-Freds Const., Inc*., 1996 WL 763230 (N.D. Ill. Nov. 25, 1996), the court found that an Italian judgment procured through fraudulent representations and premised on incorrect information could not be enforced. The court reasoned that "[p]ublic policy (and this Court) does not, and cannot, countenance attempts by litigants to circumvent judicial rulings by obtaining favorable foreign judgments through the use of false or incomplete information and registering those foreign judgments with United States courts." *Id.* at *4.

Here, Bobulinski intends to discover and prove that the Cayman Judgment is based on CBG's false representations as to the nature of Bobulinski's creditor status and the false pretenses upon which the liquidation was based. In addition, CBG was sold out from under Bobulinski, despite a contractual agreement that he had the right to any sale. Then, Hickory Grove, CBG's largest creditor, initiated the liquidation and transferred all of its interest in RAAD (the apparent owner of all collateral promised to Bobulinski) to CBG for pennies on the dollar. Thereafter, the JOLs sold the transferred assets of RAAD to Remark, before determining that Bobulinski was not a secured creditor. Such actions do indeed violate the standards of morality and general interest of the citizens of California, and preclude enforcement of the Cayman Judgment in the U.S. *See World Granite and Marble Corp*., 1996 WL 763230.

Also, as a procedural matter, courts have long held a foreign money judgment should not be enforced where it is based on laws that are "'prejudicial to… the general interests of the citizens.'" *See Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th

1178, 1189 (2008).  In the United States, "[t]he American Rule [that a party pays its own attorneys' fees] has been perpetuated because it represents a democratic ideal. Unfettered access to the courts for all citizens with genuine legal disputes has become a cornerstone of the American concept of justice." *Id.* at 1190.  Allowing CBG to enforce a foreign judgment for prevailing on Bobulinski's righteous appeal contravenes U.S. public policy which "reflects an equitable principle that penalizing a party for merely defending or prosecuting a lawsuit is unfair." *Id.*; *see also* Cal. Civ. Proc. § 1715(b)(2) ("This chapter does not apply to a foreign-country judgment… to the extent that the judgment is… a fine or other penalty.").  While *Java Oil* allowed the domestication of a fee award based upon a malicious and/or fraudulent filing, the awards here punish Bobulinski merely for objecting to a sham liquidation and asserting his rights as a creditor.  The costs at issue were already being paid out of CBG's liquidation estate (harming Bobulinski's potential return), Bobulinski was already forced to incur significant expense out of his own pocket to assert his rights and Bobulinski's claim was at least partially recognized as valid.  To shift fees to Bobulinski by essentially the same amount as the JOLs claimed Bobulinski was entitled to be paid back for his debt would unduly penalize him for asserting his rights as a creditor in a liquidation.  This is completely repugnant to the laws of the forum to which the parties agreed.  The Cayman Judgment cannot be enforced for this additional reason.

        3.  **The Foreign Proceeding Was Contrary to the Parties' Agreement**

        A foreign judgment cannot be enforced if "[t]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court." Cal. Civ. Proc. § 1716 (c)(1)(D); *see also* Commentary to 2005 UFCMJRA ¶ 9 ("Subparagraph (c)(1)(D) of Section 1716 allows the forum court to refuse recognition of a foreign-country judgment when the parties had a valid agreement, such as a valid forum

selection clause . . . , providing that the relevant dispute would be resolved in a forum other than the forum issuing the foreign-country judgment.").

Here, the Note Bobulinski entered into with CBG clearly provides that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding."  (Bobulinski Decl. ¶ 9, Ex. C (Note) ¶ 10.4(a).)

Bobulinski never approved any sale of CBG, and never agreed to have any aspect of the Note or Pledge Agreement decided by a Cayman court.  (Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-22; Bobulinski Decl. ¶ 9.)  The Cayman court's involvement only occurred after CBG sent out false letters indicating it could not meet its debts to its Noteholders, thus manufacturing an "Event of Default."  Four days later, Hickory Grove initiated the wind-up process.  Thus, Bobulinski had no choice but to seek to enforce his rights and assert his creditor's claim under the Cayman courts, despite the forum selection clause in his Note mandating that any claims under the Note must be litigated in California.  (Bobulinski Decl. ¶ 9, Ex. C (Note); ¶ 11.)  Once that claim was denied, Bobulinski's only recourse was to appeal to the Cayman appellate courts, contrary to the forum selection clause negotiated between the parties.  (*Id.*)  Plaintiff cannot prevail in enforcing a foreign judgment obtained in violation of the statute. *See* Cal. Civ. Proc. § 1716 (c)(1)(D).

### 4.  **The Cayman Proceeding Violated Due Process**

A foreign judgment should also not be enforced if the "specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law."  Cal. Civ. Proc. § 1716(c)(1)(G).  "This grounds for nonrecognition is 'reserved for challenges as to the integrity or fundamental fairness with regard to the particular proceeding leading to the foreign country judgment.'" *de Fontbrune,* 409 F. Supp. 3d at 845.

In *de Fontbrune*, the defendants argued that the underlying French proceeding violated due process, *inter alia*, because plaintiffs misrepresented that they still owned the underlying intellectual property rights to copyright-protected photographs of Picasso's works, and, as a result of that deception, wrongfully obtained a judgment to liquidate an *astreinte* of 10,000 francs per violation.  The U.S. district court held that such facts "could constitute extrinsic fraud," since the French court did not know "the true state of affairs," and refused to enforce the judgment at the summary judgment stage on that basis.  *Id.* at 839.

Here, these same principles should apply, and the Cayman Judgment should not be enforced as it was acquired based on a proceeding that was incompatible with due process of law, and without fundamental fairness to Bobulinski. He was unable to develop a full factual record of the evidence the Court relied on in its decision and was not able to impeach the underpinnings of the Cayman Liquidation.   As in *de Fontbrune,* such actions clearly could "constitute extrinsic fraud" and deprived the Cayman Court from knowing the "true state of affairs."  The Motion should be denied.

## V.   CONCLUSION

For all the foregoing reasons, CBG's Motion for Summary Judgment should be denied in its entirety.

DATED:  September 28, 2020            BAKER MARQUART LLP


                                     By:   */s/ Teresa L. Huggins*
                                            Ryan G. Baker
                                            Teresa L. Huggins

                                            *Attorneys for Defendant Tony Bobulinski*

Case No. 2:20-CV-06759 RGK (JC)
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT