Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Teresa L. Huggins (Bar. No. 263257)
  thuggins@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California, 90017
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

*Attorneys for Defendant Tony Bobulinski*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited,<br><br>            Plaintiff,<br><br>v.<br><br>TONY BOBULINSKI<br><br>            Defendant. | Case No.2: 20-CV-06759 RGK (JC)<br><br>**DEFENDANT TONY BOBULINSKI'S STATEMENT OF GENUINE DISPUTE OF MATERIAL FACTS AND STATEMENT OF UNCONTROVERTED MATERIAL FACTS**<br><br>Judge:  Hon. R. Gary Klausner<br>Date: October 19, 2020<br>Time: 9:00 a.m.<br>Courtroom:   850<br><br>Complaint Filed: July 28, 2020 |

| Plaintiff's Statement of Material Facts | Tony Bobulinski's Statement of Genuine Dispute of Material Facts |
|---|---|
| 1.) Plaintiff China Branding Group Limited (In Official Liquidation) is a company in liquidation proceedings in the Cayman Islands, which acts by and through its Joint Official Liquidators in the Cayman Islands.<br><br>Declaration of Peter Kendall ("Kendall Decl."), ¶ 1. | Undisputed. |
| 2.) The Defendant Tony Bobulinski claims to be a creditor of Plaintiff China Branding with respect to business loans he made to it in 2015 and 2016.<br><br>Kendall Decl., ¶ 2. | Undisputed for purposes of this motion only. |
| 3.) In April 2017 Mr. Bobulinski submitted a "Proof of Debt" in the liquidation proceeding, claiming secured claim of US $1,765,000; the JOLs only allowed unsecured claim in the amount US$650,000.<br><br>Kendall Decl., ¶ 2. | Undisputed that Bobulinski's Proof of Debt totaled $1,765,000, which included legal fees to which Bobulinski should have been entitled for enforcing his rights under his Promissory Note after he was forced to file a "Proof of Debt" when CBG's largest creditor Hickory Grove initiated a wind-up proceeding. (*See* Declaration of Tony Bobulinski Decl. ¶ 8, (Exh. C (Note)); Bobulinski Material Facts Nos. 21-27, 40-14 below.) |
| 4.) In July 2017, Mr. Bobulinski filed suit with the Grand Court of the Cayman Islands challenging the JOLs' determination in a proceeding entitled *In the Matter of China Group Limited (In Official Liquidation)*, Cause No. FSD 52 of 2016 (RMJ) ("the Cayman Islands Action").<br><br>Kendall Decl., ¶ 4. | Undisputed that Bobulinski was forced to file a challenge to the JOLs' determination after CBG's creditor Hickory Grove initiated a wind-up proceeding that led to the challenged JOL determinations. (*See* Bobulinski Material Fact Nos. 21-27, 40-41 below.) |

| | |
|---|---|
| 5.) In pretrial proceedings in the Cayman Islands Action, the court issued two cost orders against Mr. Bobulinski, the first dated November 13, 2018 in the amount of US$56,431.82, and the second on January 8, 2019 in the amount of US$57,208.58.<br><br>Kendall Decl., ¶ 5. | Disputed. Assumes facts not in evidence. China Branding Group ("CBG") has introduced no competent or sufficient evidence regarding any "pretrial proceedings" in the underlying Cayman Islands litigation or the bases for any "pre-trial cost orders." Plaintiff has also introduced no evidence of any "cost orders" or that the "cost orders" were issued by the "the court." In fact, the purported "cost orders" attached as Exhibit A to the Kendall Declaration indicate they are not "cost orders" but "Cost Certificate[s]" and were signed by a "Taxing Officer" not the court. |
| 6.) In December 2018 and December 2019, Mr. Bobulinski made payments totaling $41,417.82 to the JOLs in partial satisfaction of the first cost order. The second cost order remains unpaid in its entirety.<br><br>Kendall Decl., ¶ 5. | Disputed. Assumes facts not in evidence. CBG has introduced no competent or sufficient evidence regarding any "pre-trial cost orders," payments or otherwise acknowledgment of any "pre-trial cost orders," or on what bases the "pre-trial cost orders" were issued. |
| 7.) A contested 5-day hearing was conducted in the Caymans Islands Action in October 2018, followed by written submissions by the parties; judgment was issued on January 23, 2019, rejecting Mr. Bobulinski's claims in their entirety.<br><br>Kendall Decl., ¶ 6. | Disputed. Asserts a legal conclusion; assumes facts not in evidence. The hearing was not "contested" in the sense that Bobulinski was denied the opportunity to develop an underlying factual record to present his case. Bobulinski attempted to conduct discovery typical to that available to litigants in U.S. Courts, where the forum selection clause in Bobulinski's Promissory Note determined it would be litigated. Discovery would have allowed Bobulinski to, among other things, present to the Court a full picture of the negotiations between Bobulinski and Roseman, and CBG, to discover the |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | | nature of the initiation of the sham Cayman Liquidation that forced Bobulinski into the Cayman courts and to learn more about the internal deliberative process of all relevant parties that led to the results in the Cayman Liquidation. (Bobulinski Decl. ¶¶ 8, 17 (Exh. C (Note)). |
| 7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19 | 8.) On February 5, 2019, the Cayman Islands Grand Court issued a third order of costs against Mr. Bobulinski in the amount of US$562,170.94 for the JOLs' costs in contesting the Cayman Islands Action. The third cost order is unpaid in its entirety.<br><br>Kendall Decl., ¶ 7. | Disputed.  Assumes facts not in evidence.  CBG has introduced no competent or sufficient evidence regarding the basis for the purported February 5, 2019 "order of costs."  The Cayman Judgement attached to the Kendall Declaration as Exhibit B makes no mention of an order of costs or right to an order of costs.  Plaintiff has also not introduced the purported "order of costs" or that the "order of costs" was issued by the "Cayman Islands Grand Court." In fact, the document attached as Exhibit C to the Kendall Declaration is not an "order of costs" but a "Default Costs Certificate" that was not signed or issued by the "Cayman Islands Grand Court" but instead a registrar of the "Financial Services Division." |
| 20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 9.) The judgment and costs orders in the Cayman Islands Action are final and enforceable.<br><br>Kendall Decl., ¶ 8. | Disputed.  Asserts a legal  conclusion; assumes facts not in evidence.<br>CBG has introduced no competent or sufficient evidence regarding the basis for the purported "cost orders."  The Cayman Judgement attached to the Kendall Declaration as Exhibit B makes no mention of an order of costs or right to an order of costs.  Plaintiff has also not introduced the purported "order of costs" or provided evidence that the "order of costs" was issued by the "Cayman Islands |
| 28 | | |

| | |
|---|---|
| | Grand Court" or recognized as a "foreign country money judgment." |
| 10.) The post-judgment interest rate on Cayman Islands judgments issued in United States dollars is 2.375%.<br><br>Kendall Decl., ¶ 9. | Undisputed and immaterial. |

### Tony Bobulinski's Statement of Material Facts

| | |
|---|---|
| 1. China Branding Group was a Cayman Island corporation, whose primary business was to provide live event and media content into the Chinese marketplace. | Declaration of Peter Kendall ("Kendall Decl."), Ex. B (January 23, 2019 Cayman Judgment ("Cayman Judgment") ¶ 3. |
| 2. In or around 2015, CBG needed to find working capital to fund its growth. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 10. |
| 3. As a result, Roseman, the founder and CEO of CBG, urgently sought ways to quickly infuse funding into the company. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 21. |
| 4. On or about March 5, 2015, Roseman emailed his long-time friend and business associate, Tony Bobulinski, seeking a short-term bridge loan for CBG. | Declaration of Tony Bobulinski ("Bobulinski Decl.") ¶ 2, Ex. A.) |
| 5. In that email, Roseman claimed that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position." | Bobulinski Decl., ¶ 2, Ex. A |

| | | |
|---|---|---|
| 6. | During these conversations between Roseman and Bobulinski, Roseman told Bobulinski that CBG owned the rights and interests in certain assets, including a content library, license agreements, and physical assets (including production equipment) (the "Collateral"). | Bobulinski Decl., ¶ 3. |
| 7. | Roseman acted consistently with his statements that the Collateral was owned by CBG. For example, Roseman offered to take Bobulinski to "come see the Culver studio" in a March 20, 2015 email. | Bobulinski Decl., ¶ 4., Ex. B. |
| 8. | Roseman also repeated these same statements during a March 25, 2015 in-person meeting at the Peninsula Hotel in Beverly Hills, when he went into further detail explaining CBG's purported assets to Bobulinski. | Bobulinski Decl., ¶ 5. |
| 9. | Roseman informed Bobulinski that he would take a loan on whatever terms Bobulinski asked for or needed. | Bobulinski Decl., ¶ 5. |
| 10. | Bobulinski required that his loan be senior secured by all of CBG's assets. | Bobulinski Decl., ¶ 5. |
| 11. | Roseman also promised Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal loan amount, no matter what. | Bobulinski Decl., ¶ 5. |
| 12. | Roseman agreed to these terms, assuring Bobulinski that any loan he provided would be senior secured by all of CBG's assets and, if CBG was sold, his loan would be senior in order of funding, and that he would be entitled to | Bobulinski Decl., ¶¶ 5-6. |

| | | |
|---|---|---|
| 1<br>2 | a 2.5 multiplier of his principal loan amount, no matter what. | |
| 3<br>4<br>5<br>6 | 13. Roseman also assured Bobulinski that their understanding would be properly documented by the law firm Sheppard Mullin Richter & Hampton, LLP, counsel for CBG. | Bobulinski Decl., ¶ 7. |
| 7<br>8 | 14. At Roseman's insistence Bobulinski did not retain separate counsel. | Bobulinski Decl., ¶ 7. |
| 9<br>10<br>11<br>12 | 15. On or about April 15, 2015, Bobulinski entered into a Senior Secured Promissory Note (the "Note") and a Pledge Agreement (the "Pledge Agreement"). | Bobulinski Decl. ¶ 8, Exs. C (Note) and D (Pledge Agreement). |
| 13<br>14<br>15<br>16<br>17<br>18<br>19 | 16. Bobulinski entered into the Note and the Pledge Agreement based on Roseman's assurances that the Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal no matter what, and that Bobulinski would have the right to approve any sale of CBG, and would not have entered into them otherwise. | Bobulinski Decl., ¶ 8. |
| 20<br>21<br>22 | 17. Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any part of the Collateral. | Bobulinski Decl. ¶ 8, Ex. D. |
| 23<br>24<br>25<br>26 | 18. In the fall of 2015, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark"). | Bobulinski Decl. ¶ 9. |
| 27<br>28 | 19. On February 18, 2016, Remark executed a Letter of Intent stating its | Kendall Decl., Ex. B (Cayman Judgment) ¶ 15. |

| | |
|---|---|
| interest in buying CBG for $23.5 million. | |
| 20. CBG's shareholder, SIG, who had veto rights, opposed the sale. | Bobulinski Decl., ¶ 10. |
| 21. On March 17, 2016, a CBG board meeting was held wherein CBG's directors, including Roseman, Robert Roche, and Jacob Fisch discussed SIG's opposition to the sale. | Bobulinski Decl., ¶ 10. |
| 22. On April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent out correspondence to its Noteholders regarding its inability to pay its outstanding debts, despite the fact that the Promissory Notes signed by Bobulinski and all other Noteholders did not have any debts due. | Bobulinski Decl., ¶¶ 10-11, Ex. C (Note)). |
| 23. This writing was sent Jacob Fisch at the direction of CBG, and in concert with one of CBG's co-directors, Robert Roche (for whom Fisch worked). | Bobulinski Decl., ¶ 12. |
| 24. Roche was an owner and principal of CBG's largest creditor, Hickory Grove LLC. | Bobulinski Decl., ¶ 12; Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 16, 54.) |
| 25. The April 24, 2016 email from Fisch to the effect that CBG could not meet its obligations under the notes, purported to be an "admission in writing" which, if it was such an admission, would create an "Event of Default" under the Bobulinski Promissory Note and other similar Notes, opening the door for creditors to initiate wind-up proceedings. | Bobulinski Decl., ¶ 11; Kendall Decl., Ex. B (Cayman Judgment) ¶ 17.) |

7

Case No. 2:20-CV-06759 RGK (JC)
STATEMENT OF GENUINE DISPUTE OF MATERIAL FACTS AND STATEMENT OF UNCONTROVERTED

| | | |
|---|---|---|
| 1<br>2<br>3 | 26. On April 28, 2016, Hickory Grove presented a creditor's winding up petition against CBG to the Cayman Court. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 17. |
| 4<br>5<br>6<br>7<br>8 | 27. The Joint Official Liquidators ("JOLs") were appointed to begin the liquidation process of CBG (the "Cayman Liquidation"), pursuant to a winding up order dated August 18, 2016 issued in the Cayman Islands. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 17-18. |
| 9<br>10<br>11<br>12 | 28. At all times relevant, Hickory Grove owned 33% of RAAD, the company which purportedly owned the "Collateral" which was supposed to be security for Bobulinski's loan to CBG. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 13<br>14<br>15<br>16 | 29. On September 20, 2016 CBG entered into an agreement to sell all of its assets to Remark in an Asset and Securities Purchase ("APA") Agreement. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 17<br>18<br>19<br>20<br>21<br>22 | 30. As a condition precedent to the APA, it was agreed that Hickory Grove and RAAD's two other shareholders, a company owned by Roseman's wife and the Roseman Family Trust, would transfer their shares in RAAD to CBG for consideration of $10. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 23<br>24<br>25<br>26<br>27 | 31. Hickory Grove, within a week of its "loan" to CBG of $670,000, initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD, the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |

| | | |
|---|---|---|
| 1 2 3 4 5 6 | 32. It was a further condition precedent to the APA for all of CBG's Noteholders to enter into respective distribution agreements (the "Distribution Agreements"), which would subordinate their claims to CBG's general body of unsecured creditors. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 7 8 9 10 11 12 | 33. The Distribution Agreements also had the result of negating the pledge agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent. | Bobulinski Decl. ¶ 8, Ex. D (Pledge Agreement). |
| 13 14 | 34. All the Noteholders signed their Distribution Agreements except Bobulinski. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶ 14. |
| 15 16 17 18 | 35. Therefore, Bobulinski's Pledge Agreement remained effective, and Bobulinski had the contractual right to stop any deal by CBG to transfer its assets. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶¶ 8, 10 Ex. D (Pledge Agreement).) |
| 19 20 | 36. Despite this, CBG pushed for the deal with Remark to close. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 21. |
| 21 22 23 | 37. On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 24 25 26 27 | 38. One day later, CBG entered the APA to sell all of its assets to Remark, including its shares of RAAD, which continued to own the Collateral securing Bobulinski's Note. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |

| | |
|---|---|
| 39. Remark's takeover of CBG constituted a "Liquidity Event" under the Note and therefore, according to Roseman and Bobulinski's agreements, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the sale to Remark for a total of $1,625,000. | Bobulinski Decl. ¶ 8, Ex. C (Note); ¶ 10.) |
| 40. Because the Cayman Liquidation that was initiated under apparent false pretenses by CBG and Hickory Grove, Bobulinski was forced to submit his proof of debt claim in the Cayman court to preserve his rightful interests. | Bobulinski Decl. ¶¶ 15-16. |
| 41. The JOLs rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the principal $650,000 and concluding that Bobulinski's Note was not secured by the Collateral.  This dispute was one of the bases for the legal proceeding in the Cayman Litigation. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 36, 100.) |
| 42. During the Cayman Litigation, the JOLs hired purported expert, Mark C. Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues including the APA. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶108, 113. |
| 43. In the Cayman Litigation, the JOLs argued that CBG never owned the Collateral. Rather, it was owned by RAAD, an entity that Roseman had never told Bobulinski about in any of their discussions. The JOLs argued:<br><br>"[T]here is no evidence that [CBG] had any assets falling within the operative part of the definition of Collateral in the | Bobulinski Decl. ¶¶ 3-6; Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 221. |

| | |
|---|---|
| Pledge,.. the Company carries on business as an investment company… As such, the Company had relatively few assets." | |
| 44. In direct contravention of his representations to Bobulinski, Roseman made this argument as well. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 222. |
| 45. While Roseman represented that CBG's content library and license agreements were in the United States, he did not distinguish which "content library and license agreements" in the U.S. belonged to RAAD as opposed to CBG. | Kendall Decl., Ex. B (Cayman Judgment ¶ 148).) |
| 46. The Cayman Court issued a judgment, rejecting Bobulinski's appeal on January 23, 2019. | Kendall Decl., Ex. B (Cayman Judgment). |
| 47. During the Cayman Litigation, Bobulinski was denied the opportunity to conduct meaningful discovery or develop the factual record to challenge the underpinnings of the Cayman Liquidation or the actors involved. Bobulinski was not entitled to standard trial discovery in the Cayman Litigation, making it essentially impossible for him to adequately present his case. | Bobulinski Decl. ¶ 17. |
| 48. Bobulinski was not able to develop a record as to the legitimacy of the bases for the liquidation, the actors involved, the veracity of CBG's representations upon which the Court based its decision, and CBG's true motives for the liquidation. | Bobulinski Decl. ¶ 17. |

| | | |
|---|---|---|
| 1 2 3 4 5 6 7 8 9 | 49. On July 10, 2019, Bobulinski filed a complaint against Roseman in California Superior Court. After removal, on July 10, 2019, Bobulinski filed a first amended complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx (the "Roseman Matter"). Bobulinski has two current causes of action against Roseman based on his first amended complaint in the Roseman Matter: (1) fraud in the inducement; and (2) negligent misrepresentation. | Bobulinski Decl. ¶ 19. |
| 10 11 12 13 14 | 50. Because this case is in its infancy, Bobulinski has not prepared an exhaustive list of necessary discovery but he is prepared to propound a series of discovery requests to support his affirmative defenses to this action. | Declaration of Teresa Huggins ("Huggins Decl.") ¶ 5. |
| 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | 51. Bobulinski has identified the following discoverable facts and information which are required at a minimum to develop an adequate record: non-privileged communications between the JOLs and all parties relevant to the Cayman Liquidation proceedings, including, among others, communications between the JOLs and: Hickory Grove, LLC, Robert Roche, Jacob Fisch, RAAD, Remark, and Adam Roseman; documentation of the purported April 2016 Hickory Grove loan to CBG for $670,000 purportedly provided just prior to the initiation of liquidation proceedings by Hickory Grove, including proof that the loan was perfected, internal deliberations by CBG regarding the loan, communications and other paper trails between CBG and | Huggins Decl., ¶ 5. |

| | | |
|---|---|---|
| | Hickory Grove, Roseman and Roche, Roseman and Fisch, and other agents for CBG and Hickory Grove, respectively regarding the loan; the internal deliberations and communications of CBG and related third parties that led to the Hickory Grove "loan" and subsequent wind-up proceeding; the JOL deliberations and communications with witnesses and others demonstrating their deliberations and communications regarding the JOLs' bases for assessing the propriety of the liquidation; communications, board minutes, internal and external emails, and other documents evidencing CBG's and the JOL's internal deliberations about Bobulinski's senior secured status, the approval of his loan terms, and other issues related to his status in considering Bobulinski's proof of debt claim; the non-privileged communications including, but not limited to, emails, memoranda, notes, and other communications between the JOLs and all CBG related parties, including Roseman, Fisch, Roche, and CBG's largest creditors and shareholders; and, other internal documentation of the JOLs indicating the extent to which the JOLs relied upon misrepresentations as to the propriety of the bases for the liquidation and other facts related to Bobulinski's status as a senior secured creditor, the amount Bobulinski was owed, and Bobulinski's right to approve of any sale of CBG's or its related entities' assets. | |
| | 52. On September 18, 2020, nearly two weeks before Bobulinski was required | Huggins Decl., ¶ 2. |

| | |
|---|---|
| to file a responsive pleading, CBG filed the instant Motion. Counsel for CBG did not attempt to meet and confer on the Motion before it was filed. | |
| 53. On September 21, 2020, counsel for Bobulinski notified CBG's counsel of their failure to abide by the meet and confer requirement imposed by Local Rule 7-3. | Huggins Decl., ¶¶ 3-6. |
| 54. To date, CBG's counsel has not addressed this failure and refuses to withdraw the Motion. | Huggins Decl., ¶ 7. |

DATED: September 28, 2020            BAKER MARQUART LLP


                                     By:  */s/ Teresa L. Huggins*
                                          TERESA L. HUGGINS

14     Case No. 2:20-CV-06759 RGK (JC)
STATEMENT OF GENUINE DISPUTE OF MATERIAL FACTS AND STATEMENT OF UNCONTROVERTED