1  Ryan G. Baker (Bar No. 214036)
    rbaker@bakermarquart.com
2  Teresa L. Huggins (Bar. No. 263257)
3   thuggins@bakermarquart.com
   BAKER MARQUART LLP
4  777 S. Figueroa St. Suite 2850
5  Los Angeles, California 90017
   Telephone:  (424) 652-7800
6  Facsimile:   (424) 652-7850
7
   *Attorneys for Defendant Tony Bobulinski*
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12 | CHINA BRANDING GROUP | Case No. 2:20-CV-06759 RGK (JC)
13 | LIMITED (IN OFFICIAL | **OPPOSITION TO APPLICATION**
   | LIQUIDATION), by and through its | **FOR PREJUDGMENT RIGHT TO**
14 | Joint Official Liquidators, Hugh | **ATTACH ORDER**
   | Dickson of Grant Thornton Specialist |
15 | Services (Cayman), Limited and David | Judge:  Hon. R. Gary Klausner
16 | Bennett of Grant Thornton Recovery & | Magistrate Judge: Jacqueline Chooljian
   | Reorganisation Limited, |
17 |                | *[Filed Concurrently with Declaration of*
   |        Plaintiff, | *Tony Bobulinski; Declaration of Teresa*
18 |                | *L. Huggins]*
   | v. |
19 |                |
   | TONY BOBULINSKI. | Date:  October 13, 2020
20 |        Defendant. | Time:  9:30 a.m.
21 |                | Courtroom:  750
22

23

24

25

26

27

28

1

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ............................................................................4

        A.      CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business .........4

        B.      Bobulinski Enters into the Note and Pledge Agreement with
                CBG.......................................................................................................5

        C.      Bobulinski Finds a Buyer and CBG Manufactures an Event of
                Default and the Subsequent Liquidation in the Cayman Islands ...........6

                1.      Remark Purchases CBG's Assets, Violating the Pledge
                        Agreement.............................................................................7

                2.      Bobulinski is Forced to File a Proof of Debt in the
                        Cayman Liquidation ............................................................8

                3.      Bobulinski Files Suit Against Roseman for Fraud ....................11

                4.      The JOLs Seek to Enforce the Cost Certificates .......................11

III.    LEGAL STANDARD ........................................................................................11

IV.     ARGUMENT ....................................................................................................13

        A.      Attachment Is An Extraordinary Remedy .........................................13

        B.      Plaintiff Has Not Established a Claim That Can Be Attached .............13

        C.      Plaintiff Cannot Establish a Probability of Prevailing on the
                Merits on its UFCMJRA Claim ........................................................14

                1.      The Cayman Judgment Was Based on Fraud............................15

                2.      The Cayman Judgment Is Repugnant to Public Policy .............16

                3.      The Foreign Proceeding Was Contrary to the Parties'
                        Agreement...........................................................................18

                4.      The Cayman Proceeding Violated Due Process .......................19

        D.      Comity Does Not Apply ...................................................................20

        E.      CBG's Claimed Attachment Amount Must Be Reduced by The
                Amounts CBG Owes Bobulinski ........................................................22

        F.      The Court Should Continue the Hearing, If It Needs More
                Evidence .............................................................................................22

V.      CONCLUSION .................................................................................................23

# **TABLE OF AUTHORITIES**

Cases

*AO Alfa-Bank v. Yakovlev*,
    21 Cal. App. 5th 189 (2018)..................................................................14

*Asvesta v. Petroutsas*,
    580 F.3d 1000 (9th Cir. 2009)............................................................21

*Barceloux v. Dow*,
    174 Cal. App. 2d 170 (1959)..............................................................13

*Chuidian v. Philippine National Bank*,
    734 F. Supp. 415 (C.D. Cal. 1990)......................................................21

*de Fontbrune v. Wofsy*,
    409 F. Supp. 3d 823 (N.D. Cal. 2019) ................................3, 15, 16, 20

*Hamilton Beach Brands, Inc. v. Metric and Inch Tools, Inc.*,
    614 F. Supp. 2d 1056 (C.D. Cal. 2009)...............................................12

*In re Stephanie M.*,
    7 Cal. 4th 295 (1994)..........................................................................21

*Java Oil Ltd. v. Sullivan*,
    168 Cal. App. 4th 1178 (2008)............................................................18

*United States Liability Insurance Co. v. Superior Court for Los Angeles County*,
    252 Cal. App. 2d 557 (1967)..............................................................13

*Lorber Industry of California v. Turbulence, Inc.*,
    175 Cal. App. 3d 532 (1985)..............................................................14

*Metropolitan Creditors Service v. Sadri*,
    15 Cal. App. 4th 1821 (1993)........................................................17, 21

*Ohno v. Yasuma*,
    723 F. 3d 984 (9th Cir. 2013)........................................................14, 17

*Pacific Decision Sciences Corp. v. Superior Court*,
    121 Cal. App. 4th 1100 (2004)........................................................1, 12

*Pentz v. Kuppinger*,
    31 Cal. App. 3d 590 (1973)............................................................3, 16

*Thunderbird Resorts, Inc. v. Zimmer*,
    Case No. 15-cv-1304-JAH (BGSb)
    2018 WL 4700499 (S.D. Cal. Sept. 30, 2018) .............................13, 22

*VFS Financing, Inc. v. CHF Express, LLC*,
    620 F. Supp. 2d 1092 (C.D. Cal. 2009)...............................................22

*Waxman v. Kealoha*,
    296 F. Supp. 1190 (D. Haw. 1969) .....................................................21

1

*World Granite and Marble Corp. v. Wil-Freds Construction, Inc.*,
  Case No. 96-C-6441
  1996 WL 763230 (N.D. Ill. Nov. 25, 1996) ............................................. 17, 18

2

3

<u>Statutes</u>

4

C.C.P. § 1715 ............................................................................................. 14, 18, 21

5

C.C.P. § 1716 ........................................................................................ 2, 15, 17, 19

6

C.C.P. §§ 1723 .................................................................................................... 20

7

C.C.P. § 481.010 ................................................................................................ 12

8

C.C.P. § 483.015 ...................................................................................... 3, 12, 22

9

C.C.P. § 484.090 ................................................................... 1, 4, 12, 13, 14, 22

10

C.C.P. § 490.010 .................................................................................................. 4

11

C.C.P. § 490.020 .................................................................................................. 4

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

Plaintiff China Branding Group's ("CBG's")[1] application for prejudgment right to attach order ("Attachment") against Defendant Tony Bobulinski ("Bobulinski") fails to meet the basic requirements under California's attachment statute and should be denied in its entirety.

California's attachment law is subject to strict statutory construction. Failure to adhere means the claim fails as a matter of law. *Pacific Decision Sciences Corp. v. Sup. Ct.,* 121 Cal. App. 4th 1100, 1106 (2004). In order for a California court to issue an attachment, the plaintiff must establish that it has a claim subject to be attached. C.C.P. § 484.090. Plaintiff here seeks to enforce three Cayman Islands cost certificates ("Cost Certificates") for fees and costs its Joint Official Liquidators ("JOLs") purportedly incurred in litigating against Bobulinski during CBG's 2016 liquidation ("Cayman Liquidation"). But Plaintiff has failed to establish that the Cost Certificates are a "foreign money judgment" under U.S. law. Absent this critical showing, Plaintiff cannot succeed on its Attachment as a matter of law.

In addition, to succeed on its Attachment, Plaintiff must show a likelihood of prevailing on the merits of its claim. C.C.P. § 484.090, *et seq*. But Plaintiff cannot prevail on either of its two causes of action under the (1) Uniform Foreign Country Money Judgments Recognition Act ("UFCMJRA"), and (2) principles of comity. This failure is also fatal to its Attachment.

Indeed, a U.S. court cannot enforce a judgment that is based on fraud; repugnant to the public policy of California or the United States; contrary to the agreement between the parties under which the dispute in question was to be

---

[1] CBG refers to Plaintiff China Branding Group (In Official Liquidation), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited.

1   determined; or incompatible with the requirements of due process of law.  C.C.P. §

2   1716(c)(1)(B), (C), (D), (G).  All four bases are at issue here.

3         In 2015, in order to induce Bobulinski to loan CBG $650,000, CBG's CEO,

4   Adam Roseman ("Roseman") told Bobulinski, *inter alia*, that: (1) CBG owned

5   certain assets in the United States that would secure Bobulinski's loan; (2) Bobulinski

6   would be a senior secured creditor and would receive a 2.5 multiplier of his principal

7   "no matter what"; and (3) Bobulinski would have the right to sign off on any sale of

8   CBG or its assets.  Based on these promises, Bobulinski entered a Senior Secured

9   Convertible Promissory Note ("Note") and Pledge Agreement ("Pledge Agreement")

10   with CBG and would not have entered those agreements absent those assurances.

11         Then, in February 2016, a third-party company, Remark Media Inc.

12   ("Remark"), sent a letter of intent to acquire CBG for $23.5 million.  CBG's largest

13   shareholder, SIG, who had veto rights, opposed the sale, and a CBG board meeting

14   was held in March 2016 to discuss SIG's opposition.  In April 2016, CBG sent false

15   notices regarding its inability to pay outstanding debts (which were not even due) and

16   thereby manufactured a sham liquidation.  Four days later, CBG's largest creditor,

17   Hickory Grove, LLC, initiated the Cayman Liquidation.  Bobulinski suspected and

18   suspects that CBG and Hickory Grove conspired to create a sham Event of Default to

19   avoid SIG's veto of any sale, and initiate the underlying liquidation proceedings to

20   their benefit, laying the foundation for CBG's sale of its assets to Remark pursuant to

21   an Asset and Securities Purchase ("APA") Agreement approved by the court-

22   appointed JOLs without Bobulinski's consent.  CBG (and others) misrepresented to

23   the Cayman court facts underlying the liquidation and related to Bobulinski's creditor

24   rights, and Bobulinski was not allowed to conduct any meaningful discovery into the

25   sham proceeding or its origins. These transactions and other conduct in the Cayman

26   Islands proceeding raise foundational questions about the bases for the underlying

27   liquidation, the (bad) actors involved, and propriety of the judgment that necessitate

28   discovery in this litigation.

1    Indeed, the underlying judgment upholding the denial of Bobulinski's proof
2  of debt claim that CBG obtained in the Cayman Islands was based largely on
3  extrinsic fraud by CBG and potentially others that deprived the court of the true
4  state of affairs.  In addition to robbing SIG of its veto rights, this conduct also
5  robbed Bobulinski of his agreed-upon right to litigate his debt in California.  But for
6  this sham liquidation, Bobulinski would have been able to litigate his claim in
7  California per the forum selection clause negotiated by the parties, instead of in the
8  unfair and abbreviated Cayman Islands proceeding.  The evidentiary record behind
9  all of these occurrences needs to be developed before any judgment can be enforced
10  here.  *See de Fontbrune v. Wofsy*, 409 F. Supp. 3d 823, 839 (N.D. Cal. 2019)
11  (extrinsic fraud sufficient to deny enforcement of foreign judgment may be shown
12  where false testimony prevents a foreign court from knowing "the true state of
13  affairs"); *Pentz v. Kuppinger*, 31 Cal. App. 3d 590, 597 (1973).

14    CBG's Attachment also fails because the amount it seeks to attach,
15  $659,429.79, far exceeds the amount it is legally entitled to attach.  Under the
16  Attachment Law, the amount CBG seeks to attach must be reduced by the amount
17  that Bobulinski is owed under an enforceable money judgment, and any amount that
18  he has claimed in defense.  *See* C.C.P. § 483.015 (amount to be secured by
19  attachment is amount defendant owes plaintiff reduced by the "amount of any
20  money judgment in favor of the defendant and against the plaintiff that remains
21  unsatisfied and is enforceable" and the "amount of any claim of the defendant
22  asserted as a defense in the answer. . . if the defendant's claim is one upon which an
23  attachment could be issued had an action been brought on the claim when it was not
24  barred by the statute of limitations").  Here, CBG, by its own admission, owes
25  Bobulinski $650,000, not including the amounts Bobulinski claims it owes for its
26  contractual breaches, asserted in his Answer, but has failed to reduce the amount
27  it seeks to attach by these amounts.  *See* Declaration of Peter Kendall ("Kendall
28  Decl.") ¶ 3; *see also* Answer, Seventh Affirmative Defense (Offset).

1   Bobulinski respectfully requests that the Attachment be denied with
2   prejudice, and that the Court award attorneys' fees and costs incurred in defending
3   against the Attachment to Bobulinski. *See* C.C.P. §§ 490.010, 490.020. In the
4   alternative, the Court should allow Bobulinski to submit additional evidence of the
5   fraud and illegal acts described herein before determining whether the extraordinary
6   and harsh remedy of attachment should levy. *See* C.C.P. § 484.090.

## II.   FACTUAL BACKGROUND

### A.   CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business

9   CBG was a Cayman Island corporation, whose primary business was to
10  provide live event and media content into the Chinese marketplace. Kendall Decl.,
11  Ex. B (January 23, 2019 Cayman Judgment ("Cayman Judgment")) ¶ 3. In or around
12  2015, CBG needed to find working capital to fund its growth. *Id.* ¶ 10. As a result,
13  Roseman, the founder and CEO of CBG, urgently sought ways to quickly infuse
14  funding into the company. *Id.* ¶ 21.

15  On or about March 5, 2015, Roseman emailed his long-time business associate
16  and friend, Bobulinski, seeking a short-term bridge loan for CBG. Declaration of
17  Tony Bobulinski ("Bobulinski Decl.") ¶ 2, Ex. A. Roseman wrote that the loan was
18  to be "a senior secured loan to be paid off in first priority" and "secured by all our
19  assets (content licenses, our production library and our fixed production equipment in
20  our 10k square foot studio in Culver City) and all bridge loan principal and interest
21  secured in first position." *Id.* Bobulinski expressed interest in helping his friend, and
22  subsequent communications took place. *Id.* ¶ 3. During these conversations between
23  Roseman and Bobulinski, Roseman told Bobulinski that CBG owned the rights and
24  interests in certain assets, including a content library, license agreements, and
25  physical assets (including production equipment) (the "Collateral"). *Id.*

26  Roseman at all times acted consistently with his statements that the Collateral
27  was owned by CBG. For example, Roseman offered to take Bobulinski to "come see
28  the Culver studio" in a March 20, 2015 email. Bobulinski Decl. ¶ 4, Ex. B. Roseman

also repeated these same statements during a March 25, 2015 in-person meeting at the Peninsula Hotel in Beverly Hills, when he went into further detail explaining CBG's purported assets to Bobulinski. *Id*. ¶ 5.  Wanting to move quickly, Roseman informed Bobulinski that he would take a loan on whatever terms Bobulinski asked for or needed.  *Id*.  Believing that CBG owned the Collateral, Bobulinski required that his loan be senior secured by all of CBG's assets.  *Id*.  Roseman also promised Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal loan amount, no matter what.  *Id*.

Roseman agreed to these terms, assuring Bobulinski that: any loan he provided would be senior secured by all of CBG's assets; if CBG was sold, his loan would be senior in order of funding; and, Bobulinski would be entitled to a 2.5 multiplier of his principal loan amount, no matter what. *Id*. ¶ 6.  He also assured Bobulinski that their understanding would be properly documented by the law firm Sheppard Mullin Richter & Hampton, LLP, counsel for CBG. *Id*. ¶ 7.  At Roseman's insistence and having no reason not to trust his friend relying on Roseman's representations as to the assets in CBG's possession, Bobulinski did not retain separate counsel. *Id*.

**B.    Bobulinski Enters into the Note and Pledge Agreement with CBG**

On or about April 15, 2015, Bobulinski entered into the Secured Convertible Promissory Note and the Pledge Agreement, based on Roseman's assurances that the Note was secured by the Collateral, he would receive a 2.5 multiplier of his principal no matter what, and Bobulinski would have the right to approve any sale of CBG. *Id.* ¶ 8, Exs. C (Note) and D (Pledge Agreement).  Bobulinski entered into the Note and the Pledge Agreement because of these assurances and would not have entered into them otherwise. *Id*. ¶ 8.  Importantly, Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any Collateral.  *Id.,* Ex. D.

/ / /

/ / /

### C.   Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands

In the fall of 2015, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc.  Bobulinski Decl. ¶ 9.  On February 18, 2016, Remark executed a Letter of Intent, stating its interest in buying CBG.  Kendall Decl., Ex. B (Cayman Judgment) ¶ 15. The offer was for $23.5 million.  *Id.*  CBG's shareholder, SIG, who had veto rights, opposed the sale.  Bobulinski Decl. ¶ 10.

Thereafter, and of particular import for the need of discovery in this litigation, and the prematurity of Plaintiff's Attachment, on March 17, 2016, a board meeting was held wherein CBG's directors, including Roseman, Robert Roche ("Roche"), and Jacob Fisch ("Fisch"), discussed SIG's opposition to the sale.  *Id.*  Bobulinski suspected and suspects that CBG and Hickory Grove conspired to initiate sham liquidation proceedings to their benefit.  *Id.* ¶ 12.  Indeed, on April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent out false and/or fraudulent correspondence to its Noteholders regarding its inability to pay its outstanding debts, despite the fact that the Promissory Notes signed by Bobulinski and all other Noteholders did not have any debts due.  *Id.* ¶¶ 10-11, Ex. C (Note).  This writing was sent by Fisch at the direction of CBG, and in concert with one of CBG's co-directors, Roche (for whom Fisch worked).  *Id*. ¶ 12.  Roche was an owner and principal of CBG's largest creditor, Hickory Grove.  *See id.*; Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 16, 54.  This writing purportedly created an "Event of Default" under the Notes so that Hickory Grove could initiate the wind-up process leading to the underlying Cayman Judgment.  *See Id.* ¶ 11; Kendall Decl., Ex. B (Cayman Judgment) ¶ 17.  On April 28, 2016, just four days after the principles of CBG and Hickory Grove manufactured this false Event of Default, Hickory Grove indeed initiated the wind-up proceeding.  *Id.*

Ultimately, the JOLs were appointed to begin the liquidation process of CBG, pursuant to a winding up order dated August 18, 2016, issued in the Cayman Islands.

*Id.* ¶¶ 17-18.  Bobulinski, aware of and suspecting of the collusion, was deprived of a meaningful opportunity to obtain further facts about the initiation of the liquidation proceedings.  Bobulinski Decl. ¶ 17.

### 1.   Remark Purchases CBG's Assets, Violating the Pledge Agreement

Indeed, discovery is necessary to understand the underlying transgressions surrounding the underlying Cayman Liquidation, the actors involved, and the underlying motives, all which affect the validity of the underlying Judgment. Declaration of Teresa L. Huggins ("Huggins Decl.") ¶ 4.  At all times relevant, Hickory Grove owned 33% of RAAD, the company which, as discussed below, purportedly owned the "Collateral" which was supposed to be security for Bobulinski's loan.[2]  Kendall Decl., Ex. B (Cayman Judgment) ¶ 80.  CBG and Hickory Grove's creation of the Event of Default and the subsequent wind-up process deprived SIG of its controlling interest, laying the foundation for Hickory Grove to transfer its interests in RAAD to CBG, and for CBG to sell these assets to Remark pursuant to the APA Agreement.  *Id.* ¶ 80; Bobulinski Decl. ¶ 12.

Indeed, as a condition precedent to the APA, it was agreed that Hickory Grove and RAAD's two other shareholders, Roseman's wife and the Roseman Family Trust, would transfer their shares in RAAD to CBG for **consideration of $10**. Kendall Decl., Ex. B (Cayman Judgment) ¶ 80.  Thus, Hickory Grove, within a week of its "loan" to CBG of $670,000, initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD, the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10.  *Id.*

As a further condition precedent to that agreement, all of CBG's Noteholders were required to enter into respective distribution agreements (the "Distribution Agreements"), which would subordinate their claims to CBG's general body of unsecured creditors.  *Id.*  The Distribution Agreements also negated the pledge

---

[2] The other two-thirds of RAAD were owned by Roseman's wife, through her company Tarpido Enterprises, LLC, and the Roseman Family Trust.

agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement that prevented CBG from transferring assets without the Noteholders' consent.  *Id*. ¶¶ 19-20; Bobulinski Decl. ¶ 8, Ex. D (Pledge Agreement). All the Noteholders signed their Distribution Agreements, except one – Bobulinski. Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶ 14.  Therefore, Bobulinski's Pledge Agreement remained effective, and Bobulinski had the contractual right to stop any deal to transfer CBG's assets.  Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶¶ 8, 10 Ex. D (Pledge Agreement).

Despite this, CBG pushed for the deal with Remark to close.  Kendall Decl., Ex. B (Cayman Judgment) ¶ 21.  On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG, and one day later, CBG entered into the APA to sell all of its assets to Remark, including its shares of RAAD, which apparently continued to own the Collateral securing Bobulinski's (and presumably the other Noteholders') loans.  *Id*. ¶ 80.

### 2. Bobulinski is Forced to File a Proof of Debt in the Cayman Liquidation

Remark's takeover of CBG constituted a "Liquidity Event" under the Note and therefore, according to Roseman and Bobulinski's agreement, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the sale to Remark for a total of $1,625,000.  Bobulinski Decl. ¶ 8, Ex. C (Note) ¶ 10. However, because of the Cayman Liquidation that was initiated under apparent false pretenses by CBG and Hickory Grove, Bobulinski was forced to submit his proof of debt claim in the Cayman court to preserve his rightful interests.  *Id*. ¶¶ 15-16.  But for this sham liquidation aimed at undermining the managing interest of CBG's veto-holding shareholder SIG, Bobulinski would have been able to litigate his claim per the forum selection clause negotiated by the parties and been allowed to take extensive discovery on the underlying transactions that led to the liquidation.  *Id*.; Huggins Decl. ¶ 4.

1    Based on his belief that he was a senior secured creditor of CBG, whose loan
2 was secured by the Collateral, and because he never signed the Distribution
3 Agreement, Bobulinski submitted a Proof of Debt to the JOLs during the Cayman
4 Liquidation for $1,625,000, plus legal fees, the total which included the principal Note
5 amount plus the 2.5 multiplier Roseman promised.  Bobulinski Decl. ¶ 15.
6 Ultimately, the JOLs rejected Bobulinski's Proof of Debt, claiming Bobulinski was
7 only owed a balance of the principal $650,000 and concluding that Bobulinski's Note
8 was not secured by the Collateral.  Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 36,
9 100.  This dispute was the basis for the legal proceeding in the "Cayman Litigation."
10    During the Cayman Litigation, the JOLs hired purported expert, Mark C.
11 Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues
12 including the APA.  Kendall Decl., Ex. B (Cayman Judgment) ¶ 113.  The APA was
13 the agreement by which all of CBG's assets and interest in its subsidiaries were sold
14 to Remark.  Dosker reported the following:

15    To the extent, if any, that CBG previously owned any assets in the United
   States consisting of 'content library', 'license agreements' or 'production
16   equipment', they were sold as part of all the assets sold pursuant to the
   APA as approved by the Grand Court of the Cayman Islands.  The APA
17   does not identify any such assets of CBG in the United States consisting
   of 'content library', 'license agreements' or 'production equipment'."; 
18   and

19    [T]he Pledge Agreement clearly states that what is pledged are assets of
   CBG – not assets of any subsidiary of CBG... CBG did not own any
20   license agreements or media content… Since CBG did not own those,
   they are not within the scope of the pledge in the Pledge Agreement.
21
   Kendall Decl., Ex. B (Cayman Judgment) ¶ 113.
22
23    Based on Dosker's report, the JOLs argued that CBG never owned the
   Collateral.  Rather, it was owned by RAAD, an entity that Roseman had never told
24 Bobulinski about in any of their discussions.  Bobulinski Decl. ¶¶ 3-6.  When
25 Bobulinski argued that his loan was secured by the Collateral, the JOLs argued:
26    [T]here is no evidence that [CBG] had any assets falling within the
   operative part of the definition of Collateral in the Pledge,.. the
27   Company carries on business as an investment company… As such,
   the Company had relatively few assets.
28 Kendall Decl., Ex. B (Cayman Judgment) ¶ 221.

1    In direct contravention of his representations to Bobulinski, Roseman made this

2    argument as well.  *See*, *e.g.*, Kendall Decl., Ex. B (Cayman Judgment) ¶ 222. This

3    argument also served as the basis for why the Cayman Court asserted that CBG did

4    not breach Section 7 of Bobulinski's Pledge Agreement requiring his consent before

5    CBG could transfer its assets to Remark.  The JOLs justified closing the Remark

6    transaction without Bobulinski's approval and signature by arguing that CBG had

7    simply transferred shares of RAAD and had not transferred the assets comprising the

8    Collateral.  Kendall Decl., Ex. B (Cayman Judgment) ¶ 222.  While Roseman

9    represented that CBG's content library and license agreements were in the United

10   States, he did not distinguish which "content library and license agreements" in the

11   U.S. belonged to RAAD as opposed to CBG.  *Id*. ¶ 148.

12   The Cayman Court rejected Bobulinski's appeal on January 23, 2019.

13   However, the court did not allow any meaningful development of the factual record

14   to challenge the underpinnings of the Cayman Liquidation or the actors involved.

15   Bobulinski was not entitled to standard trial discovery in the Cayman Litigation,

16   making it essentially impossible for him to adequately present his case.  Bobulinski

17   Decl. ¶ 17.  Bobulinski was unable to develop a record as to the legitimacy of the

18   bases for the liquidation, the actors involved, the veracity of CBG's representations

19   upon which the Court relied, and CBG's ulterior motive to deprive shareholders of

20   their voting rights, subordinate debts, and acquire and transfer shares of RAAD.  *Id.*

21   Bobulinski has a litany of specific requests that he is ready to propound, and that are

22   vital to his affirmative defenses.  *See* Huggins Decl. ¶ 4.

23   After Bobulinski's Proof of Debt was rejected, the JOLs sought cost

24   certificates against Bobulinski.  Kendall Decl. ¶ 5.  Ultimately, the Cayman court

25   issued three Cost Certificates against Bobulinski: (1) a November 13, 2018, for

26   $56,431.82, (2) a $57,208.58 on January 8, 2019, and (3) a February 5, 2019, default

27   cost certificate in the amount of $562,170.94.  *Id.*

28

### 3.  Bobulinski Files Suit Against Roseman for Fraud

On July 10, 2019, Bobulinski filed a complaint against Roseman in California Superior Court.  After removal, on July 10, 2019, Bobulinski filed a first amended complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx (the "Roseman Matter").  Bobulinski Decl. ¶ 19. Bobulinski has two current causes of action against Roseman based on his first amended complaint in the Roseman Matter: (1) fraud in the inducement; and (2) negligent misrepresentation.  *Id.*

### 4.  The JOLs Seek to Enforce the Cost Certificates

On July 28, 2020, by and through the JOLs, CBG sued Bobulinski in the instant matter, alleging that the United States should recognize the Cost Certificates under the UFCMJRA or under the principles of comity.

On August 24, 2020, Plaintiff prematurely filed this Attachment seeking to enforce the three Cost Certificates – only one which was issued prior to the Cayman Judgment.

On September 18, 2020, nearly two weeks before Bobulinski's responsive pleading was due, before any discovery had been conducted in this matter and without meeting and conferring in violation of Local Rule 7-3, CBG filed a motion for summary judgment, arguing that the fact that the JOLs had obtained the Cost Certificates is enough to enforce those certificates in the U.S.  (Dkt. 23.) The matter has been fully briefed and is scheduled to be heard before Judge Klausner on October 19, 2020.

On September 30, 2020, Bobulinski filed his Answer to the Complaint, asserting that the Cost Certificates should not be recognized, *inter alia*, due to fraud, inadequate forum, public policy reasons, lack of due process, contrary to parties' written agreement, and offset.  (Dkt. 30.)

### III.   LEGAL STANDARD

Attachment is a prejudgment remedy that allows a creditor to have a lien on the debtor's assets until final adjudication of the claim sued upon.  C.C.P. § 481.010

1    *et seq*. (the "Attachment Law").  The Attachment Law is subject to strict

2    construction: unless specifically provided for by the Attachment Law, no attachment

3    may be ordered by the court.  *Pacific Decision Sciences,* 121 Cal. App. 4th at 1106.

4         California Code of Civil Procedure section 484.090 provides that the Court

5    shall issue a right to attach order, *only if* it finds all of the following: (1) The claim

6    upon which the attachment is based is one upon which an attachment may be issued;

7    (2) the plaintiff has the probable validity of the claim upon which the attachment is

8    based; (3) the attachment is not sought for a purpose other than the recovery of the

9    claim upon which the attachment is based; and (4) the amount to be secured by the

10   attachment is greater than zero.  C.C.P. § 484.090.

11        In addition, any amount the plaintiff seeks to attach must be reduced, *inter*

12   *alia*, by the amount of (1) "any money judgment in favor of the defendant and

13   against the plaintiff that remains unsatisfied and is enforceable," and (2) "any claim

14   of the defendant asserted as a defense in the answer . . . if the defendant's claim is

15   one upon which an attachment could be issued had an action been brought on the

16   claim when it was not barred by the statute of limitations."  C.C.P. § 483.015 (a), (b)

17   (1), (3).

18         "The court's determinations shall be made upon the basis of the pleadings

19   and other papers in the record; but, upon good cause shown, the court may receive

20   and consider at the hearing additional evidence, oral or documentary, and additional

21   points and authorities, or it may continue the hearing for the production of the

22   additional evidence or points and authorities."  C.C.P. § 484.090(d).  Under

23   California law, the party moving for an attachment has the burden of establishing

24   grounds for an attachment order.   *Hamilton Beach Brands, Inc. v. Metric and Inch*

25   *Tools, Inc*., 614 F. Supp. 2d 1056, 1062 (C.D. Cal. 2009).

26        Plaintiff has failed to meet that burden. Specifically, Plaintiff has failed to

27   establish the first and second elements of attachment: that it has a claim on which an

28   attachment can issue, or that it has the probability of succeeding on the merits of that

claim.  Plaintiff also seeks to attach an amount that far exceeds the amount it may legally seek to attach.  As a result, CBG's Attachment must be denied as a matter of law.

## IV.    ARGUMENT

### A.    Attachment Is An Extraordinary Remedy

"A pre-judgment writ of attachment is an extraordinary measure that may only issue if it complies with statutory requirements." *Thunderbird Resorts, Inc. v. Zimmer*, 15cv1304-JAH (BGS), 2018 WL 4700499, at *3 (S.D. Cal. Sept. 30, 2018).  Indeed, because courts recognize that attachment is a "harsh remedy," "the provisions relating thereto should be strictly construed."  *U.S. Liability Ins. Co. v. Superior Ct. for Los Angeles Cnty.*, 252 Cal. App. 2d 557, 560 (1967); *see also Barceloux v. Dow*, 174 Cal. App. 2d 170, 174 (1959) ("It has been said that attachment is a harsh remedy at best in that an alleged debtor loses control of his property before the claim against him has been adjudicated. This being so, the provisions relating thereto should be strictly construed.")

CBG's application for attachment is an extraordinary measure that should be denied because CBG has not shown it has a claim that is subject to an attachment, that it has a probability of prevailing on the merits, or that it has sought an amount that is properly secured by an attachment.

### B.    Plaintiff Has Not Established a Claim That Can Be Attached

In order to succeed on its Attachment, Plaintiff must show that "[t]he claim upon which the attachment is based is one upon which an attachment may be issued."  C.C.P. § 484.090.  CBG has introduced no competent or sufficient evidence regarding the basis for the purported "cost orders."  The Cayman Judgment attached to the Kendall Declaration as Exhibit B makes no mention of an order of costs or right to an order of costs.  Plaintiff has also not introduced the purported "order of costs" or provided evidence that the "order of costs" was issued by the "Cayman Islands Grand Court" or recognized as a "foreign country money

judgment."  Before any Attachment can issue, the Court must determine whether the Cost Certificates it seeks to enforce meet these requirements.  Plaintiff's failure to establish these facts means the Attachment must fail as a matter of law.  *See* C.C.P. § 484.090.

### C.    Plaintiff Cannot Establish a Probability of Prevailing on the Merits on its UFCMJRA Claim

A creditor seeking an attachment must also establish a *prima facie* claim before an attachment can be issued.  As a result, the court is required to make a preliminary determination of the merits of the dispute to determine the moving party's probability of prevailing on the claim.  *Lorber Indus. of Calif. v. Turbulence, Inc.*, 175 Cal. App. 3d 532, 535 (1985).  The Attachment Law "recognizes a claim to have 'probable validity' where 'it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim.'"  *Id*. (quoting C.C.P. § 481.190).

Plaintiff here seeks attachment of three Cayman Islands Cost Certificates that have not been recognized in the United States and are currently unenforceable.  In order to have the Cost Certificates enforced in California, Plaintiff must show that it can prevail on one of its two claims: (1) the UFCMJRA, or (2) comity.  Plaintiff can do neither.  As a result, its Attachment fails as a matter of law.

While the UFCMJRA provides a mechanism by which California courts may recognize and enforce judgments entered by courts in foreign countries, a party seeking recognition of a foreign judgment must file an action in the trial court, and has the burden of establishing the judgment is entitled to recognition.  *See* C.C.P. §§ 1715(c), 1718(a); *see also AO Alfa-Bank v. Yakovlev*, 21 Cal. App. 5th 189, 199 (2018); *Ohno v. Yasuma,* 723 F. 3d 984, 991 (9th Cir. 2013).

A foreign judgment is *not* entitled to recognition by a United States court if it was (1) obtained by fraud that deprived the losing party to an adequate opportunity to present his case, (2) the judgment or the cause of action or claim for relief on

which the judgment is based is repugnant to the public policy of California or of the United States, (3) the proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court, and (4) the specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law.  *See* C.C.P. §§ 1716(c)(1)(B), (C), (D), (G). The purported judgment here suffers from all four deficiencies; it therefore cannot be enforced under the UFCMJRA claim as a matter of law.

### 1. The Cayman Judgment Was Based on Fraud

The UFCMJRA provides for nonrecognition of a foreign-country judgment if fraud deprived the losing party of an adequate opportunity to present its case.  C.C.P. § 1716(c)(1)(B).  The Uniform Law Commission's commentary on this provision indicates that the type of fraud that can serve as grounds for nonrecognition is "extrinsic fraud," in which the "conduct of the prevailing party that deprived the losing party of an adequate opportunity to present its case."

*De Fontbrune v. Wofsy* is instructive.  There, plaintiff sued defendants for publishing volumes of a book that reproduced copyright-protected photographs of Picasso's works.  409 F. Supp. 3d at 828.  The plaintiff prevailed and the French court issued a French legal device, called an *astreinte*, that would subject defendants to damages for any further acts of infringement.  Ten years later, after plaintiff had transferred its copyrights, plaintiff discovered copies of the same book in a French bookstore and initiated legal proceedings to liquidate the *astreinte*.  *Id.*  Defendants did not appear and contended they were not properly served.  In early 2012, the enforcement division of the French trial court, the JEX, granted an award of $2 million to the plaintiff.  *Id.*

The next year, plaintiff brought a suit against defendants in California state court to enforce the judgment under the UFCMRJA.  *Id.*  Defendant argued that plaintiffs deceived the French court as to their ownership of the underlying intellectual

property and, as a result of that deception, wrongfully obtained a judgment liquidating the *astreinte*. *Id.* at 839. The U.S. district court held that such facts "could constitute extrinsic fraud," since the French court did not know "the true state of affairs," and refused to enforce the judgment at the summary judgment stage on that basis. *Id.* (citing *Pentz*, 31 Cal. App. 3d at 597 (refusing to enforce judgment where party did not have an opportunity to inform court of alimony payments critical to that case)).

Here, as in *de Fontbrune* and *Pentz*, Bobulinski contends that the Cayman Judgment is based on false information upon which the tribunal and parties relied in obtaining the foreign judgment. Roseman did not fully inform the Cayman court of the true nature and effect of CBG's agreements with Bobulinski, and instead presented false testimony. More importantly, the initiation of the Cayman Liquidation also appeared to involve fraudulent and nefarious circumstances and to be based upon a sham Event of Default. Based in part upon its reliance on CBG's (and potential others') extrinsic fraud as to the triggering events behind the liquidation, the Cayman court did not consider these issues or allow for meaningful discovery on them.

Bobulinski is currently suing Roseman for fraud in the inducement and negligent misrepresentation, and the case is ongoing. The outcome of the Roseman Matter could be determinative of this one, given the extent of Roseman's fraud. Because this case is in its infancy, Bobulinski is prepared to propound a series of discovery requests to support his affirmative defenses to this action. Huggins Decl. ¶ 4. Further, Bobulinski has even asked Plaintiff's counsel for a stay to allow him to obtain discovery in the that case that may be producible in this case. *Id.* ¶¶ 5-6. The JOLs have not responded to that request. *Id.*

### 2. The Cayman Judgment Is Repugnant to Public Policy

The UFCMJRA provides that a court is not required to recognize a foreign judgment when "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States." *See* C.C.P. § 1716(c)(1)(C) ("A court of this state shall not recognize a

Case No. 2:20-CV-06759 RGK (JC)

OPPOSITION IN RESPONSE TO APPLICATION FOR PREJUDGMENT RIGHT TO ATTACH ORDER

foreign-country judgment if… the… claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States.")  Repugnancy under California's UFCMJRA measures not simply whether the foreign judgment or cause of action is contrary to California public policy, but whether either is so offensive to public policy as to be prejudicial to recognized standards of morality and to the general interests of the citizens.  *Ohno*, 723 F.3d at 984; *see also Metropolitan Creditors Serv. v. Sadri*, 15 Cal. App. 4th 1821 (1993) (State's public policy exception to enforcement of sister state cause of action applies when sister state law violates recognized standards of morality and general interest of state citizens).

In *World Granite and Marble Corp. v. Wil-Freds Const., Inc.*, No. 96 C 6441, 1996 WL 763230 (N.D. Ill. Nov. 25, 1996), the court found that an Italian judgment procured through fraudulent representations and premised on incorrect information could not be enforced.  The court reasoned that "[p]ublic policy (and this Court) does not, and cannot, countenance attempts by litigants to circumvent judicial rulings by obtaining favorable foreign judgments through the use of false or incomplete information and registering those foreign judgments with United States courts." *Id.* at *4.

Here, Bobulinski intends to discover and prove that the Cost Certificates are based on CBG's false representations as to the nature of Bobulinski's creditor status and the false pretenses upon which the liquidation was based.  In addition, CBG was sold out from under Bobulinski, despite contractual agreement that he had the right to any sale.  Then, Hickory Grove, purportedly CBG's largest creditor, initiated the liquidation and transferred all of its interest in RAAD (the apparent owner of all collateral promised to Bobulinski) to CBG for pennies on the dollar.  Thereafter, the JOLs sold the transferred assets of RAAD to Remark, before determining that Bobulinski was not a secured creditor.  Such actions do indeed violate the standards of morality and general interest of the citizens of California, and preclude enforcement of the Cost Certificates in the U.S. *See World Granite and Marble*

*Corp.*, 1996 WL 763230.  Absent a defense to these issues, which it has failed to provide, CBG does not have a probability of prevailing on any of its claims.

Also, as a procedural matter, courts have long held a foreign money judgment should not be enforced where it is based on laws that are "'prejudicial to… the general interests of the citizens.'"  *See Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th 1178, 1189 (2008).  In the United States, "[t]he American Rule [that a party pays its own attorneys' fees] has been perpetuated because it represents a democratic ideal.  Unfettered access to the courts for all citizens with genuine legal disputes has become a cornerstone of the American concept of justice." *Id.* at 1190.  Allowing CBG to enforce a foreign judgment for prevailing on Bobulinski's righteous appeal contravenes U.S. public policy which "reflects an equitable principle that penalizing a party for merely defending or prosecuting a lawsuit is unfair." *Id.*; *see also* C.C.P. § 1715(b)(2) ("This chapter does not apply to a foreign-country judgment… to the extent that the judgment is…  a fine or other penalty.").  While *Java Oil* allowed the domestication of a fee award based upon a malicious and/or fraudulent filing, the awards here punish Bobulinski merely for objecting to a sham liquidation and asserting his rights as a creditor.  The costs at issue were already being paid out of CBG's liquidation estate (harming Bobulinski's potential return), Bobulinski was already forced to incur significant expense out of his own pocket to assert his rights and Bobulinski's debt was recognized as valid.  To shift fees to Bobulinski by essentially the same amount as the JOLs claimed Bobulinski was entitled to be paid back for his debt would unduly penalize him for asserting his rights as a creditor in a liquidation.  This is completely repugnant to the laws of the forum to which the parties agreed.  The Cost Certificates cannot be enforced for this additional reason.

### 3.  The Foreign Proceeding Was Contrary to the Parties' Agreement

A foreign judgment cannot be enforced if "[t]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court."  C.C.P. §

1716 (c)(1)(D); *see also* Commentary to 2005 UFCMJRA ¶ 9 ("Subparagraph (c)(1)(D) of Section 1716 allows the forum court to refuse recognition of a foreign-country judgment when the parties had a valid agreement, such as a valid forum selection clause . . . , providing that the relevant dispute would be resolved in a forum other than the forum issuing the foreign-country judgment.").

Here, the Note Bobulinski entered into with CBG clearly provides that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding."  Bobulinski Decl. ¶ 9, Ex. C (Note) ¶ 10.4(a).

Bobulinski never approved any sale of CBG, and never agreed to have any aspect of the Note or Pledge Agreement decided by a Cayman court.  Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-22; Bobulinski Decl. ¶ 9.  The Cayman court's involvement only occurred after CBG sent out false letters indicating it could not meet its debts to its Noteholders, thus manufacturing an "Event of Default."  Four days later, Hickory Grove initiated the wind-up process.  Thus, Bobulinski had no choice but to seek to enforce his rights and assert his creditor's claim under the Cayman courts, despite the forum selection clause in his Note mandating that any claims under the Note must be litigated in California.  Bobulinski Decl. ¶ 9, Ex. C (Note) ¶ 11.  Once that claim was denied, Bobulinski's only recourse was to appeal to the Cayman appellate courts, contrary to the forum selection clause negotiated between the parties.  *Id*.  Plaintiff cannot prevail in enforcing a foreign judgment obtained in violation of the statute. *See* C.C.P. § 1716 (c)(1)(D).

### 4.  The Cayman Proceeding Violated Due Process

A foreign judgment should also not be enforced if the "specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law."  C.C.P. § 1716(c)(1)(G).  "This grounds for nonrecognition is

1 'reserved for challenges as to the integrity or fundamental fairness with regard to the

2 particular proceeding leading to the foreign country judgment.'" *de Fontbrune*, 409 F.

3 Supp. 3d at 845.

4        In *de Fontbrune*, the defendants argued that the underlying French proceeding

5 violated due process, *inter alia*, because plaintiffs misrepresented that they still owned

6 the underlying intellectual property rights to copyright-protected photographs of

7 Picasso's works, and, as a result of that deception, wrongfully obtained a judgment to

8 liquidate an *astreinte* of 10,000 francs per violation. The U.S. district court held that

9 such facts "could constitute extrinsic fraud," since the French court did not know "the

10 true state of affairs," and refused to enforce the judgment at the summary judgment

11 stage on that basis. *Id.* at 839.

12        Here, these same principles should apply, and the Cayman Judgment should

13 not be enforced as it was acquired based on a proceeding that was incompatible with

14 due process of law, and without fundamental fairness to Bobulinski. He was unable

15 to develop a full factual record of the evidence the Court relied on in its decision and

16 was not able to impeach the underpinnings of the Cayman Liquidation. As in *de

17 Fontbrune,* such actions clearly could "constitute extrinsic fraud" and deprived the

18 Cayman Court from knowing the "true state of affairs."

19        **D.**    **Comity Does Not Apply**

20        Plaintiff's argument that the attachment should be issued under the principles

21 of comity fails for the same reasons that its request fails under the UFCMJRA.

22 Comity remains the basis for recognizing foreign judgments not covered by the act

23 UFCMJRA. C.C.P. §§ 1723, *et seq*. However, a plaintiff must still prove he is

24 entitled to comity. To that end, courts generally only respect "decisions of foreign

25 judgments and decrees under the principle of comity upon a showing of (1)

26 jurisdiction, and (2) no offense to the forum state public policy. *Chuidian v.

27 Philippine Nat. Bank*, 734 F. Supp. 415, 420 (C.D. Cal. 1990). When the

28 acceptance and recognition of the foreign judgment would be contrary or prejudicial

1   to the interest of the nation called upon to give it effect, comity should not be

2   afforded." *Id.*; *see also Waxman v. Kealoha*, 296 F. Supp. 1190, 1193 (D. Haw.

3   1969) (comity extends to a foreign court's judgment when it is "just" to do so.).

4       In *Asvesta v. Petroutsas*, 580 F.3d 1000 (9th Cir. 2009), the Ninth Circuit

5   held the district court abused its discretion by extending comity to the judgment of a

6   Greek court that had "egregiously" misinterpreted the Hague Convention. *Id.* at

7   1021.  While the *Asvestas* court acknowledged the general "admonition to avoid a

8   reexamination of the merits of a foreign court's judgment," it held that the Greek

9   court's ruling ran afoul of the "considerations of due process and fairness." *Id.* at

10   1013.  In *In re Stephanie M.* the court declined to extend comity to a Mexican child

11   custody decree, observing "courts of this state may, but are not required to, execute

12   the judgment of a foreign nation as a matter of comity." 7 Cal. 4th 295, 314 (1994).

13       Here, comity does not support issuing the Attachment because as described

14   above, the Cayman Judgment placed at issue by Plaintiff is based on fraud, is

15   repugnant to the public policy of this state, is contrary to the parties' written

16   agreements and violates due process.  Such actions do indeed violate the standards

17   of morality and general interest of the citizens of California.  *Metropolitan Creditors*

18   *Service,* 15 Cal. App. 4th at 1821.  Further, allowing CBG to enforce a foreign

19   judgment for prevailing on Bobulinski's righteous appeal contravenes U.S. public

20   policy which "reflects an equitable principle that penalizing a party for merely

21   defending or prosecuting a lawsuit is unfair." *Id.*; *see also* C.C.P. § 1715(b)(2)

22   ("This chapter does not apply to a foreign-country judgment… to the extent that the

23   judgment is…  a fine or other penalty.").  The fact that Bobulinski is being asked to

24   pay over $600,000 in attorneys' fees, solely for pursing his right to the return he was

25   promised by CBG's CEO, is repugnant to U.S. policy and means the Cayman

26   Judgment cannot be enforced for this additional reason.  Comity should not apply.

27   / / /

28   / / /

### E.     CBG's Claimed Attachment Amount Must Be Reduced by The Amounts CBG Owes Bobulinski

Any attachment may only secure the amount of defendant's indebtedness as claimed by plaintiff, plus estimated costs and allowable attorney fees, as reduced by the total amount of, *inter alia*, (1) the amount of any money judgment in favor of the defendant and against the plaintiff that remains unsatisfied and is enforceable, and (2) the amount of any claim of the defendant asserted as a defense in the answer. C.C.P. § 483.015(a), (b)(1), (3); *see also VFS Financing, Inc. v. CHF Express, LLC*, 620 F. Supp. 2d 1092, 1095-96 (C.D. Cal. 2009).  Any claim CBG has against Bobulinski must therefore be reduced by these amounts.  Currently, by Plaintiff's own admission, CBG owes Bobulinski $650,000 out of CBG's estate.  Kendall Decl. ¶ 3.  The amount the JOLs seek in the Attachment, i.e., $659,429.79, must be reduced by this amount, leaving the JOLs with a claim of, at most, $9,429.79 to be attached.  *See VFS Financing*, 620 F. Supp. 2d at 1095-96.  In addition, Bobulinski has asserted in his Answer that any judgment must be offset by the amounts Plaintiff owes Bobulinski as a result of its breach of its contractual obligations, which, given the 2.5x multiplier, will exceed the amount Plaintiff seeks to attach.  *See* Dkt. 30 (Answer) Seventh Affirmative Defense (Offset).  Plaintiff's Attachment fails for this additional reason.  *See* C.C.P. § 483.015.

### F.     The Court Should Continue the Hearing, If It Needs More Evidence

Attachment is an extraordinary remedy that "may only issue if it complies with statutory requirements." *Thunderbird Resorts,* 2018 WL 4700499 at *3. Because courts recognize that attachment is such a "harsh remedy," should the Court have any doubt as to the unenforceability of the Cost Certificates, the Court should continue the hearing and allow Bobulinski to produce additional evidence or points and authorities.  *See* C.C.P. § 484.090(d).

Case No. 2:20-CV-06759 RGK (JC)
OPPOSITION IN RESPONSE TO APPLICATION FOR PREJUDGMENT RIGHT TO ATTACH ORDER

## V.    CONCLUSION

Based on the foregoing, Defendant respectfully requests that this Court deny the Attachment in its entirety, or, in the alternative, continue the hearing to allow Bobulinski to produce additional evidence in support of his Opposition.


DATED: October 5, 2020                    BAKER MARQUART LLP


By:  s/ Ryan G. Baker
                                          Ryan G. Baker
                                          Teresa L. Huggins

                                          *Attorneys for Defendant Tony Bobulinski*

Case No. 2:20-CV-06759 RGK (JC)
OPPOSITION IN RESPONSE TO APPLICATION FOR PREJUDGMENT RIGHT TO ATTACH ORDER