Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Teresa L. Huggins (Bar. No. 263257)
  thuggins@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California, 90017
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

*Attorneys for Defendant Tony Bobulinski*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited,<br><br>Plaintiff,<br><br>v.<br><br>TONY BOBULINSKI.<br><br>Defendant. | Case No. 2:20-CV-06759 RGK (JC)<br><br>**DECLARATION OF TONY BOBULINSKI IN SUPPORT OF OPPOSITION TO APPLICATION FOR PREJUDGMENT RIGHT TO ATTACH ORDER**<br><br>Judge:  Hon. R. Gary Klausner<br>Magistrate Judge: Jacqueline Chooljian<br><br>*[Filed Concurrently with Opposition to Prejudgment Right to Attach Order; Declaration of Teresa L. Huggins]*<br><br>Date:  October 13, 2020<br>Time:  9:30 a.m.<br>Courtroom:  750 |

I, Tony Bobulinski, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto.

2. On or about March 5, 2015, Adam Roseman ("Roseman"), the CEO of China Branding Group ("CBG"), reached out to me by email seeking a short-term bridge loan for CBG. In that email, Roseman claimed that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position." Attached as **Exhibit A** is the email I received from Adam Roseman.

3. At that point, I had been friends and business associates with Roseman for over 13 years. I therefore told my friend I wanted to help him, and subsequent communications took place. During these conversations, Roseman told me that CBG owned the rights and interests in a content library, license agreements, and physical assets (including production equipment) (the "Collateral").

4. At all relevant times, Roseman acted consistently with his statements that the Collateral was owned by CBG. For example, he offered to take me to "come see the Culver studio" in a March 20, 2015 email. Attached as **Exhibit B** is the March 20, 2015 email I received from Roseman.

5. On March 25, 2015, I met with Roseman in-person at the Peninsula Hotel in Beverly Hills. During that meeting, Roseman repeated these same statements, going into detail about CBG's purported assets. Roseman informed me that he would take a loan on whatever terms I asked for or needed to move quickly. Believing that CBG owned the Collateral, I required that my loan be senior secured by all of CBG's assets, including the Collateral. Roseman also promised me that I would receive a 2.5 multiplier of my principal loan amount, no matter what.

6. Roseman agreed to these terms, assuring me that any loan I provided would be senior secured by all of CBG's assets and, if CBG was sold, my loan would be senior in order of funding, and that I would be entitled to a 2.5 multiplier of my principal loan amount, no matter what.

7. Roseman said he wanted to move quickly and assured me that our understanding would be properly documented by the law firm Sheppard Mullin Richter Hampton, LLP, counsel for CBG at the time. Roseman also told me not to obtain separate counsel, as he said it would slow down the process of obtaining my loan and harm CBG. I trusted Roseman, on the basis of our long-standing friendship and business association, and did not retain separate counsel as a result.

8. On or about April 15, 2015, I entered into a Senior Secured Promissory Note (the "Note") and a Pledge Agreement (the "Pledge Agreement"), based on Roseman's assurances that the Note was senior secured by the Collateral, that I would receive a 2.5 multiplier of my principal no matter what, and that I would have the right to approve any sale of CBG. I entered into the Note and the Pledge Agreement because of these assurances and would not have entered into the Note or Pledge Agreement otherwise. It was very important to me that Paragraph 7 of the Pledge Agreement required CBG to obtain my written consent before it could transfer or sell any part of the Collateral. In addition, Paragraph 10.4 of the Note contained a forum selection clause stating that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding." Attached as **Exhibits C** and **D**, respectively, are the Note and Pledge Agreement that I signed with CBG.

9. In the fall of 2015, I introduced Roseman to my good friend, Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark"). Remark was

interested in purchasing CBG based on Roseman's continued representations about what assets CBG owned. I became aware that Remark made an offer of $23.5 million to purchase CBG and its assets.

10. On or about March 17, 2016, I called into a CBG Board Meeting where, among other things, the Board discussed the opposition of the sale to Remark by CBG's veto-holding shareholder, SIG. The meeting was attended by CBG's directors, including, among others, Roseman, Robert Roche ("Roche"), and Jacob Fisch ("Fisch"). I understand that Fisch, in addition to being a director of CBG, worked for Roche and was also a subordinated creditor under terms similar to my Note and Pledge Agreement. The solvency of CBG was also discussed at the Board meeting. I knew and understood from the terms of the Note that I signed and other similar Notes, that there were no immediate debts due to CBG Noteholders. In fact, when debts were to become due, the terms of the Note dictated that a negotiation would ensure for ownership and payment. **Exhibit C** of this Declaration contains the relevant Note terms.

11. Despite the fact that there were no debts due under my Note or any other Notes of which I was aware, and that CBG recently got a $23.5 million offer from Remark, on or about April 24, 2016, Fisch on behalf of CBG (and claiming to have done so at the direction of CBG's board of directors) sent out a written notice to CBG's Noteholders stating that CBG was unable to meet its debts to its Noteholders. From my understanding of the Note that I signed and other similar Notes, an "admission in writing" such as this email purported to be, to the effect that CBG could not meet its obligations under the notes, would create an "Event of Default" under the Note, opening the door for creditors to initiate wind-up proceedings. **Exhibit C** of this Declaration contains the relevant Note terms on Event of Defaults in Paragraph 8.

12. As noted above, this "admission in writing" that served as the "Event of Default" was sent out on behalf of CBG by Fisch, and I understand that Fisch

works for another CBG Co-Director, Roche.  I am further aware from my dealings with CBG, Roche, and Roseman, that Roche is an owner of CBG's largest creditor (and I understand, an authorized representative) of CBG's largest creditor, Hickory Grove, LLC.  Based on my knowledge of CBG's dealings, SIG's objections to the sale to Remark, and in part on the close relationship between Roche and Roseman, I suspected, and still suspect, that CBG and Roche conspired to manufacture the Event of Default so that Roche's Company, Hickory Grove, could initiate the Cayman Liquidation Proceedings (the "Cayman Liquidation"), and in the process, circumvent any opposition to a sale by SIG.

13. On or about April 28, 2016, four days after the Event of Default, Hickory Grove did initiate the Cayman Liquidation.

14. In or around April, 2016, after CBG entered into liquidation in the Caymans Islands, CBG asked each Noteholder, including me, to sign a distribution agreement that would negate their pledge agreements ("Distribution Agreement"), which all included the same Section 7 as my Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent.  I refused to sign the Distribution Agreement because I did not wish to give up my rights to control the timing of any sale of CBG.

15. Given that CBG went into the Cayman Liquidation without my approval, and despite my suspicion that the Cayman Liquidation was initiated by collusion between CBG and Hickory Grove's principals to manufacture a false Event of Default, I had no choice but to submit a Proof of Debt in the Cayman Islands, despite the forum selection clause in my Note.  I submitted a Proof of Debt to the Joint Official Liquidators of CBG (the "JOLs") during the Cayman Liquidation for a total of $1,625,000, which included the principal Note amount plus the 2.5 multiplier Roseman had promised me.  The JOLs rejected my Proof of Debt, claiming that I was only owed a balance of the principal $650,000 and concluding that my Note was not senior secured by the Collateral.

16. After the JOLs rejected my Proof of Debt, and CBG's assets were being distributed to meet its obligations, I had no choice but to appeal the JOLs denial (the "Cayman Litigation").

17. During the Cayman Litigation, I attempted to conduct discovery typical to that available to litigants in U.S. Courts, where my forum selection clause was supposed to govern. I was seeking discovery to, among other things, present to the Court a full picture of my negotiations with Roseman and CBG, to discover the nature of the initiation of the sham Cayman Liquidation that forced me into the Cayman courts and to learn more about the internal deliberative process of all relevant parties that led to the results in the Cayman Liquidation. I was denied this opportunity before and at the hearing.

18. CBG also never sought written consent from me to transfer its assets, as Section 7 of the Pledge Agreement required. To this day, I do not know how the sale of CBG to Remark closed without my required consent.

19. On February 21, 2019, I filed suit against Roseman in California. On July 10, 2019, I filed a first amended complaint in the Central District of California, <u>Tony Bobulinski v. Adam Roseman</u>, Case No. 2:19-cv-02963-MWF-SS. I currently have two causes of action pending against Roseman: fraud in the inducement, and negligent misrepresentation.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing information is true and correct. Executed on October 5th, 2020, at Los Angeles, California.

By: _____
Tony Bobulinski