1  Ryan G. Baker (Bar No. 214036)
     rbaker@bakermarquart.com
2  Teresa L. Huggins (Bar. No. 263257)
3    thuggins@bakermarquart.com
   Sam Meehan (Bar No. 307934)
4    smeehan@bakermarquart.com
5  BAKER MARQUART LLP
   777 S. Figueroa St., Suite 2850
6  Los Angeles, California, 90017
7  Telephone:  (424) 652-7800
   Facsimile:   (424) 652-7850
8

9  *Attorneys for Defendant Tony Bobulinski*

10

11               UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13  CHINA BRANDING GROUP              Case No. 2:20-CV-06759 RGK (JC)
    LIMITED (IN OFFICIAL
14  LIQUIDATION), by and through its   **DEFENDANT TONY
    Joint Official Liquidators, Hugh   BOBULINSKI'S OPPOSITION TO
15  Dickson of Grant Thornton Specialist  PLAINTIFF CHINA BRANDING
    Services (Cayman), Limited and David  GROUP LIMITED'S MOTION
16  Bennett of Grant Thornton Recovery &  FOR SUMMARY JUDGMENT**
17  Reorganisation Limited,
                                       *[Filed concurrently with Statement of
18               Plaintiff,            Uncontroverted Facts and Conclusions
                                       of Law; Declaration of Tony
19  v.                                Bobulinski; Declaration of Teresa L.
                                       Huggins; Objections to Declaration of
20  TONY BOBULINSKI                   Peter Kendall]*

21               Defendant.           Judge:  Hon. R. Gary Klausner
22                                    Date: December 7, 2020
                                      Time: 9:00 a.m.
23                                    Courtroom: 850

24                                    Complaint Filed: July 28, 2020
25

26

27

28                                            Case No. 2:20-CV-06759 RGK (JC)
─────────────────────────────────────────────────────
      OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND .............................................................................3

       A.    CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business .........3

       B.    Bobulinski Enters into the Note and Pledge Agreement with
             CBG.............................................................................................................4

       C.    Bobulinski Finds a Buyer and CBG Manufactures an Event of
             Default and the Subsequent Liquidation in the Cayman Islands............5

             1.    Remark Purchases CBG's Assets, Violates Pledge
                   Agreement........................................................................................6

             2.    Bobulinski is Forced to File a Proof of Debt in the
                   Cayman Liquidation .......................................................................7

             3.    Bobulinski Files Suit Against Roseman for Fraud.......................9

             4.    The JOLs Seek to Enforce the Cayman Judgment .......................9

III.   LEGAL STANDARD ........................................................................................10

IV.    ARGUMENT .....................................................................................................11

       A.    The Motion Must Be Denied for Failure to File or Serve a
             Statement of Uncontroverted Facts and Conclusion of Law ...............11

       B.    Plaintiff's Debt to Bobulinski Precludes Summary Judgment ............12

       C.    The Motion Is Premature under Federal Rule of Civil Procedure
             56..............................................................................................................13

       D.    Summary Judgment is Inappropriate Because Genuine Issues of
             Material Fact Exist as the Enforceability of the Foreign
             Judgment .................................................................................................15

             1.    The Cayman Judgment Was Based on Fraud............................15

             2.    The Cayman Judgment Is Repugnant to Public Policy .............17

             3.    The Foreign Proceeding Was Contrary to the Parties'
                   Agreement......................................................................................19

             4.    The Cayman Proceeding Violated Due Process ........................20

V.     CONCLUSION ..................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aqui es Texcoco, Inc. v. Lopez*,
Case Nos. 12-CV-2113-BEN (WVG) & 12-CV-1215-BEN (WVG)
2014 WL 714862 (S.D. Cal., Feb. 21, 2014) ...................................................12

*Burlington Northern Santa Fe Railroad Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*,
323 F.3d 767 (9th Cir. 2003) ...........................................................................13

*de Fontbrune v. Wofsy*,
409 F. Supp. 3d 823 (N.D. Cal. 2019) ..........................................3, 15, 16, 20

*Enodis Corp. v. Employers Insurance Co. of Wausau*,
Case No. CV-03-0866 CAS (PJWx)
2004 WL 5642006 (C.D. Cal. May 18, 2004) ................................................12

*Falcon Enterprises Inc. v. Publishers Service, Inc.*,
438 Fed. App'x. 579 (9th Cir. 2011) ...............................................................11

*Howell v. Liddell*,
Case No. 2:19-cv-0578
2020 WL 949557 (E.D. Cal. Feb. 27, 2020) ............................................11, 13

*In re County of Orange*,
219 B.R. 543 (Bankr. C.D. Cal. 1997) ........................................................1, 12

*Java Oil Ltd. v. Sullivan*,
168 Cal. App. 4th 1178 (2008)..........................................................................18

*L.A. Printex Industries., Inc. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012)............................................................................10

*Metropolitan Creditors Service v. Sadri*,
15 Cal.App.4th 1821 (1993)..............................................................................17

*Motorola, Inc. v. Pick*,
Case No. CV 04-2655 ABC (SHx)
2004 WL 5472092 (C.D. Cal., June 22, 2004) ...........................................1, 11

*Ohno v. Yasuma*,
723 F.3d 984 (2013) .........................................................................................17

*Pentz v. Kuppinger*,
31 Cal. App. 3d 590 (1973)..............................................................................15

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) .........................................................................................10

*T.W. Electrical Services., Inc. v. Pacific Electrical Contractors Association*,
809 F.2d 626 (9th Cir. 1987)............................................................................10

*Texas Partners v. Conrock Co.*,
   685 F.2d 1116 (9th Cir. 1982).......................................................................13

*Vien Phuong Thi Ho v. Nationstar Mortgage, LLC*,
   Case No. 2:19-cv-10532-Odw (Jprx)
   2020 WL 6271208 (C.D. Cal. Oct. 23, 2020) ...............................................11

*World Granite and Marble Corp. v. Wil-Freds Construction, Inc.*,
   Case No. 96 C 6441
   1996 WL 763230 (N.D. Ill., Nov. 25, 1996).............................................17, 18

*Zell v. InterCapital Income Securities, Inc.*,
   675 F.2d 1041 (9th Cir. 1982)......................................................................13

<u>Statutes</u>

C.C.P. § 1716.......................................................................2, 15, 17, 19, 20

<u>Rules</u>

Fed.R.Civ.P. 56 ......................................................................... 10, 11, 13

Local Rule 56-1 ……………………………………………..…….……1, 3, 10, 11

## I.   INTRODUCTION

Plaintiff China Branding Group Limited's ("Plaintiff's" or "CBG's") haste to obtain judgment in this case resulted in the denial of its first motion for summary judgment for failure to meet and confer pursuant to the Local Rules. Plaintiff's rush to judgment is again on full display in its second bite at the summary judgment apple, which is also procedurally defective. This time, CBG has failed to file a statement of uncontroverted facts and conclusions of law. *See* L.R. 56-1.[1] The failure is "fatal" to its motion. *Motorola, Inc. v. Pick*, No. CV 04-2655ABCSHX, 2004 WL 5472092, at *3 (C.D. Cal., June 22, 2004). Accordingly, this Court cannot determine whether there are *any* undisputed facts dispositive to Plaintiff's motion and the Motion should be denied on this basis alone. *See id.*

Summary judgment must be denied for an additional reason: CBG, by its own admission, *owes* Defendant Tony Bobulinski ("Defendant" or "Bobulinski") $650,000 – the amount of his principal loan to CBG. Bobulinski has claimed all amounts CBG owes him as offset in his Answer. This Court cannot grant summary judgment if and until it determines the validity of Defendant's affirmative defense of offset. *See In re County of Orange,* 219 B.R. 543, 566 (Bankr. C.D. Cal. 1997).

CBG's motion must be denied for yet another reason: it is woefully premature. CBG is simply wrong that the mere fact that it obtained a foreign judgment is *de facto* proof that a U.S. court must enforce it. Bobulinski is entitled to and intends to challenge the underlying judgment on several grounds and needs discovery to do so. As it did in the Cayman Islands, CBG hopes to short-circuit this process without affording Bobulinski an opportunity to be heard. This Court's rules, the Federal Rules of Civil Procedure and the Uniform Foreign Country Money Judgments Recognition Act ("UFCMJRA") guarantee Bobulinski an opportunity to challenge the underlying judgment and necessitate that summary judgment be denied.

---

[1] Plaintiff also failed to lodge or serve a proposed order, in violation of the Local Rules. L.R. 56-1.

1    Courts have long held that a motion for summary judgment must be denied

2    where the opposing party has not had adequate time to conduct discovery. Here,

3    Defendant served discovery at his first opportunity, but has not received any response

4    to that discovery, or had the opportunity to take either deposition he has noticed.

5    Discovery is critical because significant and material questions of triable fact

6    remain as to whether the foreign judgment at issue can be enforced. A U.S. court

7    cannot enforce a judgment based on fraud; repugnant to the public policy of

8    California or the U.S.; contrary to the agreement between the parties under which the

9    dispute was to be determined; or incompatible with the requirements of due process

10    of law. C.C.P. § 1716(c)(1)(B), (C), (D), (G). All four bases are at issue here.

11    In 2015, in order to induce Bobulinski to loan CBG $650,000, CBG's CEO,

12    Adam Roseman ("Roseman") told Bobulinski, *inter alia*, that: (1) CBG owned

13    certain assets in the United States that would secure Bobulinski's loan; (2) that

14    Bobulinski would be a senior secured creditor and would receive a 2.5 multiplier of

15    his principal "no matter what"; and (3) that Bobulinski would have the right to sign

16    off on any sale of CBG or its assets. Based on these promises, Bobulinski entered a

17    Senior Secured Convertible Promissory Note ("Note") and Pledge Agreement with

18    CBG and would not have entered those agreements absent those assurances.

19    Then, in February 2016, a third-party company, Remark, sent a letter of intent

20    to acquire CBG. CBG's largest shareholder, SIG, who had veto rights, opposed the

21    sale, and a special board meeting was held in March 2016 to discuss the opposition.

22    In April 2016, CBG sent false notices regarding its inability to pay outstanding debts

23    (which were not even due) and manufactured a sham liquidation. Four days later,

24    CBG's largest creditor, Hickory Grove, LLC ("Hickory Grove"), initiated the

25    Cayman Liquidation. Bobulinski suspected and suspects that CBG and Hickory

26    Grove conspired to create a sham Event of Default to avoid SIG's veto of any sale,

27    and initiate the underlying liquidation proceedings. CBG (and others) misrepresented

28    to the Cayman court facts underlying the liquidation, and Bobulinski was not allowed

2

to conduct any meaningful discovery into the sham proceeding or its origins. These transactions and other conduct in the Cayman Islands proceeding raise foundational questions about the bases for the underlying liquidation, the (bad) actors involved, and propriety of the judgment that necessitate discovery in this litigation.

Indeed, the underlying judgment was based largely on extrinsic fraud by CBG and potentially others that deprived that court of the true state of affairs. In addition to robbing SIG of its veto rights, this conduct robbed Bobulinski of his right to litigate his debt in California, as required by the forum selection clause the parties negotiated. Bobulinski did not have a chance to litigate these issues, and the evidentiary record behind these occurrences needs to be developed before any judgment can be enforced. *See de Fontbrune v. Wofsy*, 409 F. Supp. 3d 823, 839 (N.D. Cal. 2019).

Plaintiff's improper and premature Motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business

CBG was a Cayman Island corporation, whose primary business was to provide live event and media content into the Chinese marketplace. (Defendant's Statement of Uncontroverted Facts ("SSUF") ¶ 4.) [2] In or around 2015, CBG working capital to fund its growth. (*Id.* ¶ 5.) As a result, Roseman, founder and CEO of CBG, urgently sought ways to quickly infuse funding into the company. (*Id.* ¶ 6.)

On or about March 5, 2015, Roseman emailed his long-time friend and business associate, Bobulinski, seeking a short-term bridge loan for CBG. (SSUF ¶ 7.) Roseman wrote that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position." (*Id.* ¶ 8.) Bobulinski expressed interest in helping his friend, and communications took place. (*Id.* ¶ 9.)

---

[2] Plaintiff failed to file or serve a Statement of Uncontroverted Facts and Conclusions of Law. *See* L.R. 56-1. Defendant therefore sets forth his own undisputed facts; he cannot submit a response to Plaintiff's undisputed facts (none exist).

During these conversations, Roseman told Bobulinski that CBG owned the rights and interests in certain assets, including a content library, license agreements, and physical assets (including production equipment) (the "Collateral"). (*Id*.)

Roseman at all times acted consistently with his statements that the Collateral was owned by CBG. For example, Roseman offered to take Bobulinski to "come see the Culver studio" in a March 20, 2015 email. (SSUF ¶ 10.) Roseman repeated these same statements during a March 25, 2015 in-person meeting in Beverly Hills, when he went into further detail explaining CBG's purported assets to Bobulinski. (*Id*. ¶ 11.) Wanting to move quickly, Roseman informed Bobulinski that he would take a loan on whatever terms Bobulinski asked for or needed. (*Id*. ¶ 12.) Believing that CBG owned the Collateral, Bobulinski required that his loan be senior secured by all of CBG's assets. (*Id*. ¶ 13.) Roseman also promised Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal loan amount, no matter what. (*Id*. ¶ 14.)

Roseman agreed to these terms, assuring Bobulinski that: any loan he provided would be senior secured by all of CBG's assets; if CBG was sold, his loan would be senior in order of funding; and, Bobulinski would be entitled to a 2.5 multiplier of his principal loan amount, no matter what. (SSUF ¶ 15.) He also assured Bobulinski that their understanding would be properly documented by the law firm Sheppard Mullin Richter & Hampton, LLP, counsel for CBG. (*Id*. ¶ 16.) At Roseman's insistence and having no reason not to trust his friend Roseman's representations as to the assets in CBG's possession, Bobulinski did not retain separate counsel. (*Id*. ¶ 17.)

## B.   Bobulinski Enters into the Note and Pledge Agreement with CBG

On or about April 15, 2015, Bobulinski entered into the Secured Convertible Promissory Note and a Pledge Agreement (the "Pledge Agreement"), based on Roseman's assurances that the Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal no matter what, and that he would have the right to approve any sale of CBG. (SSUF ¶ 18.) Bobulinski entered into the Note and the Pledge Agreement because of these assurances and would not have entered into

them otherwise. (*Id*. ¶ 19.) Importantly, Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any Collateral. (*Id.* ¶ 18, Ex. D.)

### C.   Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands

In Fall 2015, Bobulinski introduced Roseman to Shing Tao, CEO and Chairman of Remark Media Inc. ("Remark"). (SSUF ¶ 22.) On February 18, 2016, Remark executed a Letter of Intent, stating its interest in buying CBG. (*Id*. ¶ 23.) The offer was for $23.5 million. (*Id.*) CBG shareholder SIG had veto rights and opposed the sale. (*Id*. ¶ 24.)

Thereafter, and of particular import for the need of discovery in this litigation, on March 17, 2016, CBG held a board meeting wherein its directors, including Roseman, Robert Roche ("Roche"), and Jacob Fisch ("Fisch"), discussed SIG's opposition to the sale. (SSUF ¶ 25.) Bobulinski suspected and suspects that CBG and Hickory Grove conspired to initiate sham liquidation proceedings to their benefit. (*Id.* ¶ 27.) Indeed, on April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent out false and/or fraudulent correspondence to its Noteholders regarding its inability to pay outstanding debts, despite the fact that the Promissory Notes signed by Bobulinski and all other Noteholders did not have any debts due. (*Id.* ¶ 26.) Fisch sent this writing at the direction of CBG, and in concert with CBG co-director Roche, for whom he worked. (*Id*. ¶ 27.) Roche was an owner and principal of CBG's largest creditor, Hickory Grove. (*Id.* ¶ 28.) This writing purportedly created an "Event of Default" under the Notes so Hickory Grove could initiate the wind-up process leading to the underlying Cayman Judgment. (*Id*. ¶ 29.) On April 28, 2016, just four days after CBG and Hickory Grove principals manufactured this false Event of Default, Hickory Grove initiated the wind-up proceeding. (*Id*. ¶ 30.)

The JOLs were appointed to begin the liquidation (the "Cayman Liquidation"),

pursuant to a winding up order dated August 18, 2016, issued in the Cayman Islands. (SSUF ¶ 31.) Bobulinski was deprived of a meaningful opportunity to obtain facts about the initiation of the liquidation. (*Id.* ¶¶ 50-52.)

### 1. Remark Purchases CBG's Assets, Violates Pledge Agreement

Discovery is necessary to understand the transgressions surrounding the Cayman Liquidation, the actors involved, and the motives, all which affect the validity of the underlying Judgment. (SSUF ¶ 63.) At all times relevant, Hickory Grove owned 33% of RAAD, the company which, purportedly owned the "Collateral" that was supposed to be security for Bobulinski's loan. (*Id.* ¶ 32.) CBG and Hickory Grove's creation of the Event of Default and the subsequent wind-up process deprived SIG of its controlling interest, laying the foundation for Hickory Grove to transfer its interests in RAAD to CBG, and for CBG to sell these assets to Remark pursuant to the APA Agreement. (*Id.* ¶¶ 33-42.)

Indeed, as a condition precedent to the APA, it was agreed that Hickory Grove and RAAD's two other shareholders, Roseman's wife and the Roseman Family Trust, would transfer their shares in RAAD to CBG for **consideration of $10**. (SSUF ¶ 34.) Thus, Hickory Grove, within a week of its "loan" to CBG of $670,000, initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD, the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10. (*Id.* ¶ 35.)

As a further condition precedent to that agreement, all CBG's Noteholders were required to enter into distribution agreements ("Distribution Agreements") that would subordinate their claims to CBG's general body of unsecured creditors. (SSUF ¶ 36.) The Distribution Agreements also had the result of negating the pledge agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent. (*Id.* ¶ 37.) All the Noteholders signed their Distribution Agreements, except one – Bobulinski. (*Id.* ¶ 38.) Bobulinski's Pledge Agreement

stayed in effect, and Bobulinski had the right to stop any deal by CBG to transfer its assets. (*Id*. ¶ 39.)

Despite this, CBG pushed for the deal with Remark to close. (SSUF ¶ 40.) On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG, and one day later, CBG entered into the APA Agreement to sell all its assets to Remark, including its shares of RAAD, which apparently continued to own the Collateral securing Bobulinski's loan. (*Id*. ¶¶ 41-42.)

### 2. Bobulinski is Forced to File a Proof of Debt in the Cayman Liquidation

Remark's takeover of CBG constituted a "Liquidity Event" under the Note and so, according to Roseman and Bobulinski's agreement, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the sale to Remark for a total of $1,625,000. (SSUF ¶ 43.) Because of the Cayman Liquidation initiated under apparent false pretenses, Bobulinski was forced to submit his proof of debt claim in the Cayman court to preserve his rightful interests. (*Id*. ¶ 44.) But for this sham liquidation aimed at undermining the managing interest of CBG veto-holding shareholder SIG, Bobulinski could have litigated his claim in California per the forum selection clause the parties negotiated, and been allowed to take extensive discovery on the transactions that led to the liquidation. (*Id*.) Bobulinski has since served discovery seeking information about the initiation of the Cayman Liquidation, and is awaiting Plaintiff's and Hickory Grove's responses. (*Id*. ¶¶ 61-63.)

Based on his belief that he was a senior secured creditor of CBG, whose loan was secured by the Collateral, and because he never signed the Distribution Agreement, Bobulinski submitted a Proof of Debt to the JOLs during the Cayman Liquidation for $1,625,000, plus legal fees, the total which included the principal Note amount plus the 2.5 multiplier Roseman promised. (SSUF ¶¶ 43-44.) Ultimately, the JOLs rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the principal $650,000 and that Bobulinski's Note was not secured by the

Collateral. (*Id*. ¶ 45.) This dispute was the basis for the legal proceeding in the "Cayman Litigation."

During the Cayman Litigation, the JOLs hired purported expert, Mark C. Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues including the APA. (SSUF ¶ 46.) The APA was the agreement by which all of CBG's assets and interest in its subsidiaries were sold to Remark. Dosker reported the following:

> To the extent, if any, that CBG previously owned any assets in the United States consisting of 'content library', 'license agreements' or 'production equipment', they were sold as part of all the assets sold pursuant to the APA as approved by the Grand Court of the Cayman Islands. The APA does not identify any such assets of CBG in the United States consisting of 'content library', 'license agreements' or 'production equipment'."; and

> [T]he Pledge Agreement clearly states that what is pledged are assets of CBG – not assets of any subsidiary of CBG... CBG did not own any license agreements or media content… Since CBG did not own those, they are not within the scope of the pledge in the Pledge Agreement.

(*Id*.)

Based on Dosker's report, the JOLs argued that CBG never owned the Collateral. Rather, it was owned by RAAD, an entity Roseman had never mentioned. (SSUF ¶ 47.) In direct contravention of his representations to Bobulinski, Roseman made this argument as well. (*Id*. ¶ 48.) This argument also served as the basis for why the Cayman Court asserted CBG did not breach Section 7 of Bobulinski's Pledge Agreement requiring his consent before CBG could transfer its assets to Remark. The JOLs justified closing the Remark transaction without Bobulinski's approval and signature by arguing CBG had simply transferred shares of RAAD and not the assets comprising the Collateral. (*Id*. ¶ 50.) While Roseman represented that CBG's content library and license agreements were in the United States, he did not distinguish which "content library and license agreements" in the U.S. belonged to RAAD as opposed to CBG. (*Id*. ¶ 49.)

The Cayman Court rejected Bobulinski's appeal on January 23, 2019.

However, the court did not allow any meaningful development of the factual record to challenge the underpinnings of the Cayman Liquidation. Bobulinski was not entitled to standard trial discovery, and was unable to develop a record as to the bases for the liquidation, actors involved, the veracity of CBG's representations upon which the Court relied, or CBG's motive to deprive shareholders of their voting rights, subordinate debts, and acquire and transfer shares of RAAD. (SSUF ¶¶ 50-52.) Bobulinski has served specific discovery addressing these issues that are vital to his affirmative defenses here. (*Id*. ¶¶ 61-63, Exs. F and G.)

After his Proof of Debt was rejected, the JOLs sought costs against Bobulinski. (SSUF ¶ 53.) Ultimately, the Cayman court issued three cost certificates: (1) a November 13, 2018, for $56,431.82, (2) a $57,208.58 on January 8, 2019, and (3) a February 5, 2019, default cost certificate in the amount of $562,170.94 (together, "Cost Certificates"). (*Id*.) Despite seeking costs, CBG has not paid Bobulinski the $650,000 it admits it owes him. (*Id*.)

### 3. Bobulinski Files Suit Against Roseman for Fraud

On July 10, 2019, Bobulinski filed a complaint against Roseman in California. After removal, on July 10, 2019, Bobulinski filed a first amended complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx (the "Roseman Matter"). (SSUF ¶ 54.) Bobulinski has two current causes of action against Roseman: (1) fraud in the inducement; and (2) negligent misrepresentation. (*Id*.)

### 4. The JOLs Seek to Enforce the Cayman Judgment

On July 28, 2020, CBG, by and through the JOLs, sued Bobulinski, alleging the United States should recognize the Cayman Judgment under the UFCMJRA or the principles of comity. On September 18, 2020, nearly two weeks before Bobulinski's responsive pleading was due, CBG filed a motion for summary judgment ("First Motion"). (SSUF ¶ 55.) Bobulinski timely responded to the Complaint by filing an Answer on September 30, 2020. In his Seventh Affirmative

Defense of Offset, he claimed the amounts CBG owes him. (*Id*. ¶ 57.) On October 22, 2020, the Court denied CBG's motion for failure to meet and confer. (*Id*. ¶ 58.)

After the Court denied its First Motion, Plaintiff asked to meet and confer on this motion. During meet and confer, Defendant reiterated his need for discovery, but Plaintiff refused to reconsider its motion. (SSUF ¶¶ 59-60.) On November 3, 2020, both parties served written discovery. (*Id*. ¶ 61.) Less than a week later, on November 9, 2020, Plaintiff filed the instant motion for summary judgment ("Motion"), on the same grounds as the First Motion. Plaintiff failed to file or serve a Statement of Uncontroverted Facts and Conclusions of Law or a proposed order with the Motion or otherwise identify any undisputed facts, in violation of the Local Rules. (*See* L.R. 56-1; SSUF ¶¶ 1-3.) On November 16, 2020, Defendant served deposition notices to CBG and Hickory Grove. (SSUF ¶ 62, Ex. G.)

As of the date of filing, CBG has not paid Bobulinski the full $650,000 it owes him, and which he claims as offset in his Answer. (SSUF ¶ 65.) Defendant has not yet received a single answer or document in response to his discovery and has not had the opportunity to conduct either deposition he has noticed. (*Id*. ¶ 64.) All of Defendant's outstanding discovery issues therefore remain.

## III.   LEGAL STANDARD

Summary judgment is only appropriate when there exists no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *L.A. Printex Indus., Inc. v. Aeropostale, Inc*., 676 F.3d 841, 846 (9th Cir. 2012). "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). The trial "court must draw all reasonable inferences in favor of the nonmoving party," and may not weigh evidence. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). Where a party fails to identify any undisputed facts and fails to file a statement of uncontroverted facts or conclusions of law, the motion should be denied. L.R. 56-1;

*see also Vien Phuong Thi Ho v. Nationstar Mortgage, LLC*, Case No. 2:19-cv-10532-Odw (Jprx), 2020 WL 6271208, at \*2-3 (C.D. Cal. Oct. 23, 2020).

In addition, where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may defer consideration or deny a motion altogether. *See* Fed.R.Civ.P. 56(d); *Howell v. Liddell*, No. 2:19-cv-0578 TLN KJN P, 2020 WL 949557, at \*2 (E.D. Cal. Feb. 27, 2020) (denying summary judgment as "premature" due to insufficient discovery).

## IV.   ARGUMENT

### A. The Motion Must Be Denied for Failure to File or Serve a Statement of Controverted Facts and Conclusion of Law

To obtain summary judgment, "[t]he moving party *must* identify the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *Falcon Enters., Inc. v. Publishers Serv., Inc.*, 438 Fed. App'x. 579, 581-82 (9th Cir. 2011) (emphasis added) (internal quotations and citations omitted). To this end, "[t]he Central District of California *requires* all summary judgment motions to include a statement of undisputed facts." *Id*. (citing L.R. 56–1).

Where a moving party fails to provide a statement of undisputed facts, as required, courts routinely deny the motion outright. *See Vien Phuong Thi Ho,* 2020 WL 6271208, at \*2-3 ("Without providing evidence of undisputed material facts, [plaintiff] cannot prevail on summary judgment. Parties bear their own obligation to lay out their evidentiary support clearly."); *Motorola, Inc. v. Pick*, 2004 WL 5472092, at \*3 ("[F]ailure to provide the Court with a separate statement of uncontroverted facts is fatal to ... motions for summary judgment."); *Falcon Enters.,* 438 Fed. App'x. at 582.

Plaintiff has failed to file or serve a Statement of Uncontroverted Facts and Conclusions of Law. As Plaintiff has failed to set forth *any* facts that are undisputed, Plaintiff cannot carry its burden of showing that there are no triable issues of fact. Plaintiff's Motion must be denied as a matter of law.

## B.   Plaintiff's Debt to Bobulinski Precludes Summary Judgment

"Two parties who are liable to each other in the same suit are generally entitled to a setoff of any recovery owed by the other party." *Enodis Corp. v. Employers Ins. Co. of Wausau*, No. 2:03-cv-00866-CAS-PJW, 2004 WL 5642006, at *2 (C.D. Cal. May 18, 2004). "Normally, a court should first determine whether a party will prevail on his claim and, if so, how much he will recover. Only after that liability is established is it appropriate to evaluate defensive setoffs." *Aqui es Texcoco, Inc. v. Lopez*, No. 12-cv-01215-BEN-WVG, 2014 WL 714862, at *4 (S.D. Cal., Feb. 21, 2014). Accordingly, "[c]ourts have denied summary judgment as premature where a party asked that the court determine the offset." *Id*.

Here, by Plaintiff's own admission, CBG *owes* Bobulinski $650,000, the amount of his principal loan to CBG, and the Cayman court acknowledged the same. (SSUF ¶ 45.) Bobulinski claims all amounts owed to him by CBG as an offset in his Answer. Notably, Plaintiff has moved for summary judgment on its own claims, but not on any of Defendant's affirmative defenses. The Court cannot grant summary judgment in favor of Plaintiff if and until it determines the validity and amount of Defendant's claimed offset. *See Aqui es Texcoco*, 2014 WL 714862, at *4; *In re County of Orange*, 219 B.R. at 566 (if setoff warranted required evaluation of equities which depended on a resolution of facts inappropriate at summary judgment).[3]

---

[3] To avoid liability for offset, in other aspects of this litigation Plaintiff has claimed variously that the JOLs, CBG, and/or the estate of CBG are different entities, and therefore no offset can be had. Not so. Bobulinski seeks an offset from Plaintiff, not the JOLs, and as set forth in the Complaint, "China Branding acts by and through its Joint Official Liquidators," who have "no personal liability." Compl. 3. Any distinction between CBG and the "estate of CBG" is artificial and manufactured to avoid an offset. Indeed, the argument belies the fact that the JOLs control the assets of the estate, and have "allowed" Bobulinski's entitlement to at least $650,000 based on his dealings with CBG. (SSUF ¶ 45.) All debts and offsets owed Bobulinski are properly brought against Plaintiff – at the very least, the appropriateness of the offset against Plaintiff (not to mention the amount) is a triable issue of fact that warrants discovery and precludes summary judgment at this stage of the litigation.

### C.    The Motion Is Premature under Federal Rule of Civil Procedure 56

A motion for summary judgment made before the nonmoving party has had adequate time for discovery is "premature" and must be denied. *See* Fed.R.Civ. 56(d); *Howell*, 2020 WL 949557, at *2 (E.D. Cal., Feb. 27, 2020); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982). Unless the nonmoving party has "not diligently pursued discovery of the evidence," courts "generously grant Rule 56(d) motions." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003).

Bobulinski would be prejudiced were the Court to address this Motion now. This matter is in its infancy; Bobulinski has only just had the chance to serve discovery. He has not yet received a single response to that discovery,[4] nor has he had the opportunity to conduct either deposition he has noticed. CBG's responses to his first set of written discovery are not due until December 3, 2020. Even then, Bobulinski cannot be sure that CBG will timely produce documents. After sitting on its cost awards for over a year, CBG is now forcing Bobulinski to litigate a dispositive motion at this implausibly early stage in proceedings. Summary judgment is inappropriate here because Bobulinski has not been "afforded reasonable discovery." *Zell v. InterCapital Income Sec., Inc.*, 675 F.2d 1041, 1049 (9th Cir. 1982).

And Bobulinski needs discovery here. There are valid foundational questions about the bases for the underlying liquidation, the (bad) actors involved, and the true state of affairs which necessitate discovery. The judgment upholding the denial of Bobulinski's proof of debt claim was based largely on intentional misrepresentations by CBG and Roseman that deprived the Court of the true state of affairs, compounded by the denial of critical discovery as to such issues as the propriety of the underlying liquidation. Bobulinski has sought information from CBG about its decision to enter

---

[4] Plaintiff served Defendant with the documents cited in its Initial Disclosures on November 12, 2020, but has not yet answered his written discovery.

the Cayman Liquidation, and desire in avoiding SIG's blocking rights to the sale of CBG, rather than its stated insolvency as its reasons for doing so. (SSUF ¶ 61, Ex. F (Requests for Production ¶¶ 2-4, 6, 9), (Special Interrogatories ¶¶ 8, 12, 14-15).)

Moreover, the underlying liquidation that forced Bobulinski to submit his proof of debt claim in the Cayman court to preserve his rightful interests was initiated by CBG, in concert with others (including Hickory Grove), under what Bobulinski intends to prove were nefarious and self-dealing circumstances. This wind-up process forced CBG's Promissory Note holders to subordinate their loans, undermined the management rights of its veto-holding shareholder, SIG, and laid the foundation for the transfer of RAAD assets from CBG to Remark. This despite the fact that CBG's largest creditor, Hickory Grove, was a one-third partner in RAAD and initiated the wind-up process. But for this farce liquidation, which Bobulinski intends to prove was manufactured by CBG and Hickory Grove (whose agent was a co-director of Roseman's), Bobulinski would have been able to litigate his claim per the forum selection clause negotiated by the parties. The simple fact is that CBG has rushed to file a premature motion for summary judgment before the parties engaged in any semblance of discovery. The factual record for these occurrences needs to be developed before any judgment can be enforced here. For example, Bobulinski alleges the Cayman liquidation was a sham liquidation, and that CBG and others conspired to create a false Event of Default under the Notes. Bobulinski has sought documents and information about the genesis of Hickory Grove's wind-up petition in the Cayman Islands. (SSUF ¶ 61, Ex. F (Requests for Production ¶¶ 2-4, 6, 9), (Special Interrogatories ¶¶ 8, 12, 14-15).) Bobulinski has also sought documents and information regarding the internal deliberations and communications between and among CBG, Hickory Grove, their counsel and the JOLs that probe the legitimacy of the process, and why Bobulinski's contractual right to veto any sale to Remark was ignored. (*Id.*, Ex. F (Requests for Production ¶¶ 4-8, 11-18), (Special Interrogatories ¶¶ 2-4, 8, 12, 14-15).) If evidence sufficient to raise a material issue of fact is

discovered concerning issues of a sham liquidation and extrinsic fraud, the judgment should not be enforced in the U.S. Thus, summary judgment is premature.

### D. Summary Judgment is Inappropriate Because Genuine Issues of Material Fact Exist as the Enforceability of the Foreign Judgment

#### 1. The Cayman Judgment Was Based on Fraud

A foreign money judgment cannot be enforced where it is based on fraud. C.C.P. § 1716(c)(1)(B). Specifically, the UFCMJRA provides for nonrecognition of a foreign-country judgment if fraud deprived the losing party of an adequate opportunity to present its case. *Id.* The Uniform Law Commission's commentary on this provision indicates that the type of fraud that can serve as grounds for nonrecognition is "extrinsic fraud," in which the "conduct of the prevailing party that deprived the losing party of an adequate opportunity to present its case."

In *De Fontbrune v. Wofsy*, plaintiff sued defendants for publishing volumes of a book that reproduced copyright-protected photographs of Picasso's works. 409 F. Supp. 3d at 828. Plaintiff prevailed and the French court issued an *astreinte*, a legal device that would subject defendants to damages for further acts of infringement. Ten years later, after plaintiff had transferred its copyrights, plaintiff discovered copies of the same book in a bookstore and initiated legal proceedings to liquidate the *astreinte*. Defendants did not appear and contended they were not served. In early 2012, the enforcement division of the trial court, the JEX, awarded $2 million to plaintiff. *Id.*

The next year, plaintiff brought a suit against defendants in California to enforce the judgment under the UFCMRJA. *Id.* Defendant argued plaintiffs deceived the French court as to their ownership of the underlying intellectual property and, as a result, wrongfully obtained a judgment liquidating the *astreinte*. *Id.* at 839. The district court held that such facts "could constitute extrinsic fraud," since the French court did not know "the true state of affairs," and refused to enforce the judgment at the summary judgment stage on that basis. *Id*. (citing *Pentz v. Kuppinger*, 31 Cal. App. 3d 590, 597 (1973) (refusing to enforce judgment where party did not have

1   opportunity to inform court of alimony payments critical to case)).[5]

2       Here, as in *de Fontbrune* and *Pentz*, Bobulinski is contending that the Cayman

3   Judgment is based on false information on which the tribunal and parties relied in

4   obtaining the foreign judgment. Roseman did not fully inform the Cayman court of

5   the true nature of CBG's agreements with Bobulinski, and presented false testimony.

6   More importantly, the initiation of the Cayman Liquidation appeared to involve

7   fraudulent circumstances and to be based upon a sham Event of Default. Bobulinski

8   suspects that CBG and its largest creditor, Hickory Grove, conspired to create a sham

9   Event of Default to initiate the liquidation proceedings to their benefit, laying the

10   foundation for CBG's sale of its assets to Remark, and in the process, sidestepping

11   any veto rights or objections by CBG's creditors. Based in part on its reliance on

12   CBG's extrinsic fraud as to the events behind the liquidation, the Cayman court did

13   not consider these issues or allow for meaningful discovery on them. Bobulinski has

14   sought discovery on these issues in this litigation. (SSUF ¶¶ 61-62, Exs. F, G.)

15       Bobulinski is *not* asking this Court to relitigate the issues decided in the

16   Cayman Judgment – i.e., to determine whether Bobulinski was a senior secured

17   creditor or to assess the amount of his proof of debt claim. Instead, Defendant is

18   asking this Court not to enforce a foreign judgment for fees he contends was based on

19   extrinsic fraud. This issue has not been decided in the Cayman court, nor could it

20   have been, as that court was narrowly focused on whether Bobulinski was a secured

21   creditor and entitled to a multiplier, not whether the underlying liquidation was a

22   sham. Such is the problem presented by Plaintiff's request to enforce a fee award

23   given based solely on a cost-shifting statute and for which there was no hearing.

---

25   [5] CBG has elsewhere tried to distinguish *de Fontbrune* on the grounds that defendant there was in
26   default and unaware of the proceedings – not the case here. But the *de Fontbrune* court held the
   argument "turns on Plaintiff's representation to the JEX that Plaintiff's owned the copyrights at
   the at-issue photographs," and as a result "wrongfully obtained a judgment." 409 F.Supp. 3d at
27   839. Thus, Plaintiff's misrepresentation, not the default, was at issue in the court's determination
   of extrinsic fraud. *Id.* ("If Plaintiffs did not own the right to liquidate the astreinte and if they
28   intentionally misled the JEX as to that fact, then those facts could constitute extrinsic fraud.")

Bobulinski is currently suing CBG CEO Roseman for fraud in the inducement and negligent misrepresentation, and the case is ongoing. The outcome of that matter could determine this one, given the extent of Roseman's fraud. Bobulinski has asserted affirmative defenses in this regard that are dispositive of the case, if decided in his favor. Bobulinski has also served a series of written discovery on CBG, all of which support his affirmative defenses to this action. (SSUF ¶¶ 54, 61-62, Exs. F, G.)

## 2. The Cayman Judgment Is Repugnant to Public Policy

The UFCMJRA provides that a court is not required to recognize a foreign judgment when "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States." *See* C.C.P. § 1716(c)(1)(C). Repugnancy under California's UFCMJRA measures not simply whether the foreign judgment or cause of action is contrary to California public policy, but whether either is so offensive to public policy as to be prejudicial to recognized standards of morality and to the general interests of the citizens. *Ohno v. Yasuma*, 723 F.3d 984 (2013); *see also Metropolitan Creditors Serv. v. Sadri*, 15 Cal.App.4th 1821 (1993).

In *World Granite and Marble Corp. v. Wil-Freds Const., Inc*., Case No. No. 96 C 6441, 1996 WL 763230 (N.D. Ill., Nov. 25, 1996), the court found an Italian judgment procured through fraudulent representations and premised on incorrect information could not be enforced. The court reasoned that "[p]ublic policy (and this Court) does not, and cannot, countenance attempts by litigants to circumvent judicial rulings by obtaining favorable foreign judgments through the use of false or incomplete information and registering those foreign judgments with United States courts." *Id.* at *4.

Here, Bobulinski intends to prove through his served discovery that the Cayman Judgment is based on CBG's false representations as to the nature of Bobulinski's creditor status and the false pretenses upon which the liquidation was based. (SSUF ¶¶ 54, 61-62, Exs. F, G.) In addition, CBG was sold out from under

1   Bobulinski, despite contractual agreement that he had the right to any sale. Then,

2   Hickory Grove, purportedly CBG's largest creditor, initiated the liquidation and

3   transferred all of its interest in RAAD (the apparent owner of all collateral promised

4   to Bobulinski) to CBG for pennies on the dollar. Thereafter, the JOLs sold the

5   transferred assets of RAAD to Remark, before determining that Bobulinski was not a

6   secured creditor. Such actions violate the standards of morality and general interest of

7   California citizens, and preclude enforcement of the Cayman Judgment. *See World*

8   *Granite and Marble Corp.*, 1996 WL 763230.

9       Courts have also long held a foreign money judgment should not be enforced

10  where it is based on laws that are "'prejudicial to… the general interests of the

11  citizens.'" *See Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th 1178, 1189 (2008). "The

12  American Rule [that a party pays its own attorneys' fees] has been perpetuated

13  because it represents a democratic ideal. Unfettered access to the courts for all

14  citizens with genuine legal disputes has become a cornerstone of the American

15  concept of justice." *Id.* at 1190 (quotations and citations omitted). Allowing CBG to

16  enforce a foreign judgment for prevailing on Bobulinski's righteous appeal

17  contravenes U.S. public policy which "reflects an equitable principle that penalizing

18  a party for merely defending or prosecuting a lawsuit is unfair." *Id.* While *Java Oil*

19  allowed the domestication of a fee award based upon a malicious and/or fraudulent

20  filings, the case did not establish a bright line rule that attorney fees are not repugnant

21  to public policy. In fact, the court in *Java Oil* made clear that its holding was a

22  narrow one: "this is not a case where [the attorney] is penalized merely for

23  prosecuting a lawsuit, but instead he was ordered to pay costs for his complicity in

24  filing fraudulent claims and the preparation of false evidence." *Id.* at 1192. In

25  contrast, the fee awards here punish Bobulinski merely for asserting his rights as a

26  creditor, or "prosecuting" his claim. To shift fees to Bobulinski by essentially the

27  same amount as the JOLs claimed Bobulinski was entitled to be paid back for his

28  debt would unduly penalize him for asserting his creditor rights in a liquidation. The

costs at issue were already being paid out of CBG's liquidation estate (harming Bobulinski's potential return), Bobulinski was already forced to incur significant expense out of pocket to assert his rights *and* his debt was recognized as valid. This is completely repugnant to the laws of the forum the parties agreed to.

### 3. The Foreign Proceeding Was Contrary to the Parties' Agreement

A foreign judgment cannot be enforced if "[t]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court." C.C.P. § 1716 (c)(1)(D); *see also* Commentary to 2005 UFCMJRA ¶ 9 ("Subparagraph (c)(1)(D) of Section 1716 allows the forum court to refuse recognition of a foreign-country judgment when the parties had a valid agreement, such as a valid forum selection clause . . . , providing that the relevant dispute would be resolved in a forum other than the forum issuing the foreign-country judgment.").

The Note Bobulinski entered into with CBG provides that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding." (SSUF ¶ 21.)

Bobulinski never approved any sale of CBG, and never agreed to have any aspect of the Note or Pledge Agreement decided by a Cayman court. (SSUF ¶¶ 21, 38-39.) The Cayman court's involvement only occurred after CBG sent out false letters indicating it could not meet its debts to its Noteholders, manufacturing an "Event of Default." Four days later, Hickory Grove initiated the wind-up process. Thus, Bobulinski had no choice but to seek to assert his creditor's claim under the Cayman courts, despite the forum selection clause in his Note mandating any claims under the Note be litigated in California. (*Id*. ¶ 44.) Once that claim was denied, Bobulinski's only recourse was to appeal to Cayman appellate courts, contrary to the forum

selection clause the parties negotiated. (*Id.* ¶ 21.) Plaintiff cannot prevail in enforcing a foreign judgment obtained in violation of the statute. *See* C.C.P. § 1716 (c)(1)(D).

### 4.  The Cayman Proceeding Violated Due Process

A foreign judgment should also not be enforced if the "specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." C.C.P. § 1716(c)(1)(G).

In *de Fontbrune*, defendants argued the underlying French proceeding violated due process, *inter alia*, because plaintiffs misrepresented that they still owned the rights to copyright-protected photographs, and, as a result of that deception, wrongfully obtained a judgment to liquidate an *astreinte* of 10,000 francs per violation. The district court held that such facts could violate due process, and refused to enforce the judgment at the summary judgment stage. 409 F. Supp. 3d at 839.

Here, these same principles should apply, and the Cost Certificates should not be enforced as they were acquired based on a proceeding incompatible with due process, and without fundamental fairness to Bobulinski. He was unable to develop a full factual record of the evidence the Court relied on in its decision and was not able to impeach the underpinnings of the Cayman Liquidation. As in *de Fontbrune,* such actions clearly could "constitute extrinsic fraud" and deprived the Cayman Court from knowing the "true state of affairs." The Motion should be denied.

## V.   CONCLUSION

For the foregoing reasons, CBG's Motion should be denied in its entirety.

DATED:  November 16, 2020

BAKER MARQUART LLP

By: */s/ Teresa Huggins*

Ryan G. Baker
Teresa Huggins
*Attorneys for Defendant Tony Bobulinski*