Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Teresa L. Huggins (Bar. No. 263257)
  thuggins@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California, 90017
Telephone:  (424) 652-7800
Facsimile:   (424) 652-7850

*Attorneys for Defendant Tony Bobulinski*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited,<br><br>              Plaintiff,<br><br>v.<br><br>TONY BOBULINSKI<br><br>              Defendant. | Case No. 2:20-CV-06759 RGK (JC)<br><br>**DEFENDANT TONY BOBULINSKI'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW**<br><br>Judge:  Hon. R. Gary Klausner<br>Date:  December 7, 2020<br>Time:  9:00 a.m.<br>Courtroom:  850<br><br>Complaint Filed: July 28, 2020 |

Case No. 2:20-CV-06759 RGK (JC)

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

**Tony Bobulinski's Statement of Uncontroverted Facts and Conclusions of Law**

| Defendant's Uncontroverted Fact | Evidence |
|---|---|
| 1. The Central District requires a moving party on a motion for summary to file a Statement of Uncontroverted Facts and Conclusions of Law, in which the moving party identifies "the material facts as to which the moving party contends there is no genuine dispute." The Central District also requires the moving party to submit a proposed order in support of its motion for summary judgment. | L.R. 56-1. |
| 2. Courts routinely hold that a moving party's failure to file a Statement of Uncontroverted Facts and Conclusions of Law is fatal to its motion for summary judgment. | *See Vien Phuong Thi Ho v. Nationstar Mortgage, LLC*, Case No. 2:29-cv-10532-Odw (Jprx), 2020 WL 6271208, at *2-3 (C.D. Cal. Oct. 23, 2020) ("Without providing evidence of undisputed material facts, [plaintiff] cannot prevail on summary judgment. Parties bear their own obligation to lay out their evidentiary support clearly."); *Mortorola, Inc. v. Pick*, No. CV 04-2655ABCSHX, 2004 WL 5472092, at *3 (C.D. Cal. June 22, 2004) ("[F]ailure to provide the Court with a separate statement of uncontroverted facts is fatal to motions for summary judgment."); *Falcon Enters., Inc. v. Publishers Serv., Inc.*, 438 Fed. Appx. 579, 582 (9th Cir. 2011) (affirming trial court's denial of summary judgment for failure to file a separate statement of uncontroverted facts in violation of the Local Rules). |
| 3. On November 9, 2020, Plaintiff China Branding Group (in official liquidation) ("CBG" or "Plaintiff") filed and served its motion for summary | Declaration of Teresa L. Huggins ("Huggins Decl.") ¶ 11; Dkt. 47; L.R. 56-1. |

| | |
|---|---|
| judgment, but failed to file or serve a Statement of Undisputed Facts and Conclusions of Law or a proposed order, in violation of Local Rule 56-1. | |
| 4. China Branding Group was a Cayman Island corporation, whose primary business was to provide live event and media content into the Chinese marketplace. | Declaration of Peter Kendall ("Kendall Decl."), Ex. B (January 23, 2019 Cayman Judgment ("Cayman Judgment")) ¶ 3. |
| 5. In or around 2015, CBG needed to find working capital to fund its growth. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 10. |
| 6. As a result, Roseman, the founder and CEO of CBG, urgently sought ways to quickly infuse funding into the company. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 21. |
| 7. On or about March 5, 2015, Roseman emailed his long-time friend and business associate, Tony Bobulinski, seeking a short-term bridge loan for CBG. | Declaration of Tony Bobulinski ("Bobulinski Decl.") ¶ 2, Ex. A. |
| 8. In that email, Roseman claimed that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position." | Bobulinski Decl. ¶ 2, Ex A |
| 9. During these conversations between Roseman and Bobulinski, Roseman told Bobulinski that CBG owned the rights and interests in certain assets, including a content library, license agreements, and physical assets (including | Bobulinski Decl. ¶ 3. |

| | |
|---|---|
| production equipment) (the "Collateral"). | |
| 10. Roseman acted consistently with his statements that the Collateral was owned by CBG. For example, Roseman offered to take Bobulinski to "come see the Culver studio" in a March 20, 2015 email. | Bobulinski Decl. ¶ 4, Ex. B. |
| 11. Roseman also repeated these same statements during a March 25, 2015 in-person meeting at the Peninsula Hotel in Beverly Hills, when he went into further detail explaining CBG's purported assets to Bobulinski. | Bobulinski Decl. ¶ 5. |
| 12. Roseman informed Bobulinski that he would take a loan on whatever terms Bobulinski asked for or needed. | Bobulinski Decl. ¶ 5. |
| 13. Bobulinski required that his loan be senior secured by all of CBG's assets. | Bobulinski Decl. ¶ 5. |
| 14. Roseman also promised Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal loan amount, no matter what. | Bobulinski Decl. ¶ 5. |
| 15. Roseman agreed to these terms, assuring Bobulinski that any loan he provided would be senior secured by all of CBG's assets and, if CBG was sold, his loan would be senior in order of funding, and that he would be entitled to a 2.5 multiplier of his principal loan amount, no matter what. | Bobulinski Decl. ¶¶ 5-6. |
| 16. Roseman also assured Bobulinski that their understanding would be properly documented by the law firm | Bobulinski Decl. ¶ 7. |

Case No. 2:20-CV-06759 RGK (JC)
STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| Sheppard Mullin Richter & Hampton, LLP, counsel for CBG. | |
| 17. At Roseman's insistence Bobulinski did not retain separate counsel. | Bobulinski Decl. ¶ 7. |
| 18. On or about April 15, 2015, Bobulinski entered into a Senior Secured Promissory Note (the "Note") and a Pledge Agreement (the "Pledge Agreement"). | Bobulinski Decl. ¶ 8, Exs. C (Note) and D (Pledge Agreement). |
| 19. Bobulinski entered into the Note and the Pledge Agreement based on Roseman's assurances that the Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal no matter what, and that Bobulinski would have the right to approve any sale of CBG, and would not have entered into them otherwise. | Bobulinski Decl. ¶ 8. |
| 20. Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any part of the Collateral. | Bobulinski Decl. ¶ 8, Ex. D (Pledge Agreement). |
| 21. The Note had a forum selection clause, requiring any dispute related to the Note or the Pledge Agreement to be brought in California.  Specifically, Paragraph 10.4 of the Note stated that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit | Bobulinski Decl. ¶ 8, Ex. C (Note) ¶ 10.4. |

Case No. 2:20-CV-06759 RGK (JC)

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| or proceeding." Bobulinski would not have signed the Note or the Pledge Agreement, absent this clause. | |
| 22. In the fall of 2015, Bobulinski introduced Roseman to Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark"). | Bobulinski Decl. ¶ 9. |
| 23. On February 18, 2016, Remark executed a Letter of Intent stating its interest in buying CBG for $23.5 million. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 15. |
| 24. CBG's shareholder, SIG, who had veto rights, opposed the sale. | Bobulinski Decl. ¶ 10. |
| 25. On March 17, 2016, a special CBG board meeting (not a quarterly or regularly-scheduled meeting) was held wherein CBG's directors, including Roseman, Robert Roche, and Jacob Fisch discussed SIG's opposition to the sale. | Bobulinski Decl. ¶ 10. |
| 26. On April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent out correspondence to its Noteholders regarding its inability to pay its outstanding debts, despite the fact that the Promissory Notes signed by Bobulinski and all other Noteholders did not have any debts due. | Bobulinski Decl. ¶¶ 10-11, Ex. C (Note). |
| 27. This writing was sent Jacob Fisch at the direction of CBG, and in concert with one of CBG's co-directors, Robert Roche (for whom Fisch worked). Based on his knowledge of CBG's dealings, SIG's objections to the sale to Remark, and in part on the close relationship | Bobulinski Decl. ¶ 12. |

| | |
|---|---|
| between Roche and Roseman, Bobulinski suspected and suspects that CBG and Hickory Grove conspired to initiate sham liquidation proceedings to their benefit. | |
| 28. Roche was an owner and principal of CBG's largest creditor, Hickory Grove LLC. | Bobulinski Decl. ¶ 12; Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 16, 54. |
| 29. The April 24, 2016 email from Fisch to the effect that CBG could not meet its obligations under the notes, purported to be an "admission in writing" which, if it was such an admission, would create an "Event of Default" under the Bobulinski Promissory Note and other similar Notes, opening the door for creditors to initiate wind-up proceedings. | Bobulinski Decl. ¶¶ 11-12; Kendall Decl., Ex. B (Cayman Judgment) ¶ 17. |
| 30. On April 28, 2016, Hickory Grove presented a creditor's winding up petition against CBG to the Cayman Court. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 17. |
| 31. The Joint Official Liquidators ("JOLs") were appointed to begin the liquidation process of CBG (the "Cayman Liquidation"), pursuant to a winding up order dated August 18, 2016 issued in the Cayman Islands. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 17-18. |
| 32. At all times relevant, Hickory Grove owned 33% of RAAD, the company which purportedly owned the "Collateral" which was supposed to be security for Bobulinski's loan to CBG. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 33. On September 20, 2016 CBG entered into an agreement to sell all of its assets to Remark in an Asset and | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |

| | |
|---|---|
| Securities Purchase ("APA") Agreement. | |
| 34. As a condition precedent to the APA Agreement, it was agreed that Hickory Grove and RAAD's two other shareholders, a company owned by Roseman's wife and the Roseman Family Trust, would transfer their shares in RAAD to CBG for consideration of $10. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 35. Hickory Grove, within a week of its "loan" to CBG of $670,000, initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD, the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 36. It was a further condition precedent to the APA for all of CBG's Noteholders to enter into respective distribution agreements (the "Distribution Agreements"), which would subordinate their claims to CBG's general body of unsecured creditors. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 37. The Distribution Agreements also had the result of negating the pledge agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent. | Bobulinski Decl. ¶ 8, Ex. D (Pledge Agreement). |
| 38. All the Noteholders signed their Distribution Agreements except Bobulinski. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶ 14. |

| | |
|---|---|
| 39. Therefore, Bobulinski's Pledge Agreement remained effective, and Bobulinski had the contractual right to stop any deal by CBG to transfer its assets. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 20-21; Bobulinski Decl. ¶¶ 8, 14 Ex. D (Pledge Agreement). |
| 40. Despite this, CBG pushed for the deal with Remark to close. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 21. |
| 41. On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80. |
| 42. One day later, CBG entered the APA to sell all of its assets to Remark, including its shares of RAAD, which continued to own the Collateral securing Bobulinski's Note.  To this date, Bobulinski does not know how the sale of CBG to Remark closed without his required consent, pursuant to the Pledge Agreement. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 80; Bobulinski Decl. ¶¶ 8, 18, Ex. D (Pledge Agreement). |
| 43. Remark's takeover of CBG constituted a "Liquidity Event" under the Note and therefore, according to Roseman and Bobulinski's agreements, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the sale to Remark for a total of $1,625,000. | Bobulinski Decl. ¶ 8, Ex. C (Note) ¶ 10. |
| 44. Because the Cayman Liquidation that was initiated under apparent false pretenses by CBG and Hickory Grove, Bobulinski was forced to submit his proof of debt claim in the Cayman court to preserve his rightful interests.  But for this sham liquidation, he could have litigated his claim in California per the forum selection clause the parties had | Bobulinski Decl. ¶¶ 8, 15-17, Ex. C (Note) ¶ 10. |

| | |
|---|---|
| negotiated for the Note and Pledge Agreement. | |
| 45. The JOLs rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the principal $650,000 and concluding that Bobulinski's Note was not secured by the Collateral. This dispute was one of the bases for the legal proceeding in the Cayman Litigation. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶ 36, 100. |
| 46. During the Cayman Litigation, the JOLs hired purported expert, Mark C. Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues including the APA. | Kendall Decl., Ex. B (Cayman Judgment) ¶¶108, 113. |
| 47. In the Cayman Litigation, the JOLs argued that CBG never owned the Collateral. Rather, it was owned by RAAD, an entity that Roseman had never told Bobulinski about in any of their discussions. The JOLs argued:<br><br>"[T]here is no evidence that [CBG] had any assets falling within the operative part of the definition of Collateral in the Pledge,.. the Company carries on business as an investment company… As such, the Company had relatively few assets." | Bobulinski Decl. ¶¶ 3-6; Kendall Decl., Ex. B (Cayman Judgment) ¶ 221. |
| 48. In direct contravention of his representations to Bobulinski, Roseman made this argument as well. | Kendall Decl., Ex. B (Cayman Judgment) ¶ 222. |
| 49. While Roseman represented that CBG's content library and license agreements were in the United States, he did not distinguish which "content | Kendall Decl., Ex. B (Cayman Judgment) ¶ 148. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| library and license agreements" in the U.S. belonged to RAAD as opposed to CBG. | |
| 50. The Cayman Court issued a judgment, rejecting Bobulinski's appeal on January 23, 2019. | Kendall Decl., Ex. B (Cayman Judgment). |
| 51. During the Cayman Litigation, Bobulinski was denied the opportunity to conduct meaningful discovery or develop the factual record to challenge the underpinnings of the Cayman Liquidation or the actors involved. Bobulinski was not entitled to standard trial discovery in the Cayman Litigation, making it essentially impossible for him to adequately present his case. | Bobulinski Decl. ¶ 17. |
| 52. Bobulinski was not able to develop a record as to the legitimacy of the bases for the liquidation, the actors involved, the veracity of CBG's representations upon which the Court based its decision, and CBG's true motives for the liquidation. | Bobulinski Decl. ¶ 17. |
| 53. After his Proof of Debt was rejected, the JOLs sought costs against Bobulinski. Ultimately, the Cayman court issued three cost certificates: (1) a November 13, 2018, for $56,431.82, (2) a $57,208.58 on January 8, 2019, and (3) a February 5, 2019, default cost certificate in the amount of $562,170.94. | Kendall Decl. ¶ 5. |
| 54. On July 10, 2019, Bobulinski filed a complaint against Roseman in California Superior Court.  After | Bobulinski Decl. ¶ 19. |

Case No. 2:20-CV-06759 RGK (JC)

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | |
|---|---|
| removal, on July 10, 2019, Bobulinski filed a first amended complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx (the "Roseman Matter").  Bobulinski has two current causes of action against Roseman based on his first amended complaint in the Roseman Matter: (1) fraud in the inducement; and (2) negligent misrepresentation. | |
| 55. On September 18, 2020, nearly two weeks before Bobulinski was required to file a responsive pleading, CBG filed a motion for summary judgment ("First Motion").  Counsel for CBG did not attempt to meet and confer on the Motion before it was filed. | Huggins Decl. ¶ 2; Dkt. 23. |
| 56. On September 18, 2020, Bobulinski's counsel sent an email to CBG's counsel, advising that the First Motion was premature and subject to dismissal under Federal Rule of Civil Procedure 56(d), as Bobulinski had not yet had the opportunity to conduct any discovery in this matter.  On September 21, 2020, CBG's counsel responded by email that he did not know what discovery Bobulinski needed.  That same day, Bobulinski's counsel responded to CBG's counsel, summarizing the discovery needed.  Bobulinski's counsel advised CBG's counsel that that the First Motion was filed in violation of Local Rule 7-3, which requires that parties meet and confer at least seven days before filing a motion for summary judgment. | Huggins Decl. ¶¶ 3-5, Exs. A-C. |

| | |
|---|---|
| 57. Bobulinski filed an Answer in the instant matter on September 30, 2020. Bobulinski, asserting fifteen affirmative defenses, including the affirmative defense of offset for the outstanding amounts CBG owes him, including the $650,000 that CBG admits it owes him. | Dkt. 30; Kendall Decl. ¶ 3. |
| 58. On October 22, 2020, the Court denied the First Motion for failure to meet and confer. | Huggins Decl. ¶ 6; Dkt. 42. |
| 59. Two days later, on Saturday, October 24, 2020, CBG's counsel left a voicemail for Bobulinski's counsel, saying Defendant had been right about the need to meet and confer and asking to meet and confer. On Monday, October 26, 2020, Bobulinski's counsel emailed CBG's counsel, agreeing to meet and confer but asking what the subject of the meet and confer was and if it was another summary judgment motion. Bobulinski's counsel reiterated Bobulinski's need for discovery at that time and suggested a Rule 26 conference at that time. | Huggins Decl. ¶ 7, Ex. D. |
| 60. After further email exchange, counsel for both parties met and conferred on October 29, 2020, at which time CBG's counsel told Bobulinski's counsel that CBG planned to file another motion for summary judgment on the same grounds as the First Motion. Defense counsel reiterated Bobulinski's acute need for discovery in this case, but Plaintiff's counsel indicated Plaintiff would immediately file a second summary judgment motion. | Huggins Decl. ¶ 8. |

| | |
|---|---|
| 61. On November 3, 2020, CBG served Bobulinski with its first set of special interrogatories. The same day, Bobulinski served CBG with his first set of special interrogatories and first set of requests for production. Both parties' responses are due December 3, 2020. | Huggins Decl. ¶ 9, Exs. E (Plaintiff's First Set of Special Interrogatories to Defendant), F (Defendant's First Set of Special Interrogatories and First Set of Requests for Production to Plaintiff). |
| 62. On November 16, 2020, Defendant served Plaintiff with a deposition notice. That deposition is currently scheduled for December 15, 2020. That same day, Defendant served Hickory Grove with a deposition notice. That deposition is currently scheduled for December 18, 2020. | Huggins Decl. ¶ 12, Ex. G. |
| 63. Bobulinski's discovery sought the following information which is required at a minimum to develop an adequate record in this matter: (1) non-privileged communications between the JOLs and all parties relevant to the Cayman Liquidation proceedings, including, among others, communications between the JOLs and: Hickory Grove, LLC, Robert Roche, Jacob Fisch, RAAD, Remark, and Adam Roseman; (2) documentation of the purported April 2016 Hickory Grove loan to CBG for $670,000 purportedly provided just prior to the initiation of liquidation proceedings by Hickory Grove, including proof that the loan was perfected, internal deliberations by CBG regarding the loan, communications and other paper trails between CBG and Hickory Grove, Roseman and Roche, Roseman and Fisch, and other agents for CBG and Hickory Grove, respectively regarding the loan; (3) the | Huggins Decl. ¶¶ 9-10, 12, Exs. F, G. |

| | |
|---|---|
| internal deliberations and communications of CBG and related third parties that led to the Hickory Grove "loan" and subsequent wind-up proceeding; (4) the JOL deliberations and communications with witnesses and others demonstrating their deliberations and communications regarding the JOLs' bases for assessing the propriety of the liquidation; (5) communications, board minutes, internal and external emails, and other documents evidencing CBG's and the JOL's internal deliberations about Bobulinski's senior secured status, the approval of his loan terms, and other issues related to his status in considering Bobulinski's proof of debt claim; (6) the non-privileged communications including, but not limited to, emails, memoranda, notes, and other communications between the JOLs and all CBG related parties, including Roseman, Fisch, Roche, and CBG's largest creditors and shareholders; and (7) other internal documentation of the JOLs indicating the extent to which the JOLs relied upon misrepresentations as to the propriety of the bases for the liquidation and other facts related to Bobulinski's status as a senior secured creditor, the amount Bobulinski was owed, and Bobulinski's right to approve of any sale of CBG's or its related entities' assets. | |
| 64.  Because this case is in its infancy, Bobulinski has not received CBG's responses to any written discovery, nor has he had the opportunity to conduct any of the depositions he has noticed. | Huggins Decl. ¶ 13. |

| | |
|---|---|
| 65. To date, CBG has not paid Bobulinski any of the principal amount of $650,000, which CBG admits it owes Bobulinski. | Bobulinski Decl. ¶ 15; Kendall Decl. ¶ 3. |

DATED:  November 16, 2020          BAKER MARQUART LLP


                                   By:   */s/ Teresa L. Huggins*
                                         Ryan G. Baker
                                         Teresa L. Huggins

                                         *Attorneys for Defendant Tony Bobulinski*