1  Ryan G. Baker (Bar No. 214036)
     rbaker@bakermarquart.com
2  Teresa L. Huggins (Bar. No. 263257)
3    thuggins@bakermarquart.com
   Sam Meehan (Bar No. 307934)
4    smeehan@bakermarquart.com
5  BAKER MARQUART LLP
   777 S. Figueroa St., Suite 2850
6  Los Angeles, California, 90017
7  Telephone:  (424) 652-7800
   Facsimile:   (424) 652-7850
8

9  *Attorneys for Defendant Tony Bobulinski*

10

11                 UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13  CHINA BRANDING GROUP              Case No. 2:20-CV-06759 RGK (JC)
    LIMITED (IN OFFICIAL
14  LIQUIDATION), by and through its  **DEFENDANT TONY**
15  Joint Official Liquidators, Hugh  **BOBULINSKI'S OPPOSITION TO**
    Dickson of Grant Thornton Specialist **PLAINTIFF CHINA BRANDING**
16  Services (Cayman), Limited and David **GROUP LIMITED'S MOTION**
    Bennett of Grant Thornton Recovery & **FOR SUMMARY JUDGMENT**
17  Reorganisation Limited,
18                                    *[Filed concurrently with Statement of*
              Plaintiff,              *Uncontroverted Facts and Conclusions*
19                                    *of Law; Declaration of Tony*
    v.                                *Bobulinski; Declaration of Teresa L.*
20                                    *Huggins; Objections to Declaration of*
    TONY BOBULINSKI                   *Peter Kendall; (Proposed) Orders]*
21
              Defendant.             Judge:  Hon. R. Gary Klausner
22                                   Date: December 21, 2020
23                                   Time: 9:00 a.m.
                                     Courtroom: 850
24
25                                   Complaint Filed: July 28, 2020
26

27

28                                                 Case No. 2:20-CV-06759 RGK (JC)
    _____
         OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND ...................................................................3

    A.   CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business ........3

    B.   Bobulinski Enters into the Note and Pledge Agreement with CBG.........................................................................................................5

    C.   Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands ...........5

        1.   Remark Purchases CBG's Assets, Violates Pledge Agreement...................................................................................6

        2.   Bobulinski Is Forced To File a Proof of Debt in the Cayman Liquidation ..................................................................7

        3.   Bobulinski Files Suit Against Roseman for Fraud ......................9

        4.   The JOLs Seek to Enforce the Cayman Cost Certificates..........10

III.  LEGAL STANDARD ............................................................................11

IV.   ARGUMENT ........................................................................................11

    A.   Plaintiff's Debt to Bobulinski Precludes Summary Judgment .............11

    B.   The Motion Is Premature under Federal Rule of Civil Procedure 56.........................................................................................................12

    C.   Summary Judgment is Inappropriate Because Genuine Issues of Material Fact Exist as the Enforceability of the Foreign Judgment ............................................................................................15

        1.   The Cayman Judgment Was Based on Fraud............................15

        2.   The Cayman Judgment Is Repugnant to Public Policy ..............17

        3.   The Foreign Proceeding Was Contrary to the Parties' Agreement..................................................................................19

        4.   The Cayman Proceeding Violated Due Process ........................20

V.    CONCLUSION ....................................................................................20

1

# **TABLE OF AUTHORITIES**

2

Cases

3

*Aqui es Texcoco, Inc. v. Lopez,*
4     2014 WL 714862 (S.D. Cal., Feb. 21, 2014) .................................................. 12

5 *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation,*
6     323 F.3d 767 (9th Cir. 2003) ......................................................................... 13

7 *de Fontbrune v. Wofsy,*
    409 F. Supp. 3d 823 (N.D. Cal. 2019) ........................................... 3, 15, 16, 20
8

*Enodis Corp. v. Employers Insurance Co. of Wausau,*
9     2004 WL 5642006 (C.D. Cal. May 18, 2004) .............................................. 11

10 *Howell v. Liddell,*
    2020 WL 949557 (E.D. Cal. Feb. 27, 2020) ........................................... 11, 13
11

*In re County of Orange,*
12     219 B.R. 543 (Bankr. C.D. Cal. 1997) ........................................................ 1, 12

13 *Java Oil Ltd. v. Sullivan,*
    168 Cal. App. 4th 1178 (2008) ...................................................................... 18
14

*L.A. Printex Industries, Inc. v. Aeropostale, Inc.,*
15     676 F.3d 841 (9th Cir. 2012) ......................................................................... 11

16 *Metropolitan Creditors Service v. Sadri,*
    15 Cal.App.4th 1821 (1993) ........................................................................... 17
17

*Ohno v. Yasuma,*
18     723 F.3d 984 (2013) ....................................................................................... 17

19 *Pentz v. Kuppinger,*
    31 Cal. App. 3d 590 (1973) ............................................................... 3, 15, 16
20

*Reeves v. Sanderson Plumbing Products, Inc.,*
21     530 U.S. 133 (2000) ....................................................................................... 11

22 *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987) ......................................................................... 11
23

*Texas Partners v. Conrock Co.,*
24     685 F.2d 1116 (9th Cir. 1982) ....................................................................... 13

25 *World Granite and Marble Corp. v. Wil-Freds Const., Inc.,*
    1996 WL 763230 (N.D. Ill., Nov. 25, 1996) .......................................... 17, 18
26

*Zell v. InterCapital Income Sec., Inc.,*
27     675 F.2d 1041 (9th Cir. 1982) ....................................................................... 13

28

Statutes

C.C.P. § 1716 ..................................................................................2, 15, 17, 19, 20

Rules

Fed.R.Civ.P. 56(a) ............................................................................... 11, 13

Case No. 2:20-CV-06759 RGK (JC)
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# I.   INTRODUCTION

Plaintiff China Branding Group Limited's ("Plaintiff's" or "CBG's") haste to obtain judgment in this case resulted in the denial of its first motion for summary judgment for failure to meet and confer pursuant to the Local Rules. Plaintiff's rush to judgment was again on full display in its second bite at the summary judgment apple, which was also procedurally defective, for failure to file a statement of uncontroverted facts and conclusions of law.  *See* L.R. 56-1.[1]  Now, CBG files a *third* summary judgment motion, without seeking leave of Court, as this Court's standing order requires.  CBG's third attempt at summary judgment is defective, like its first two, and should be denied.

The Joint Official Liquidators ("JOLs") who bring this suit on behalf of CBG have a fiduciary duty to CBG's creditors, including Defendant Tony Bobulinski ("Defendant" or "Bobulinski").  Instead of protecting Bobulinski's rights, Plaintiff continues to burn through the assets of CBG's estate by suing him here. This is in spite of the fact that CBG, by its own admission, *owes* Defendant $874,775 – the amount of his principal loan to CBG and the finder's fee his company obtained for finding a buyer for CBG – from the assets of that same estate. Bobulinski has claimed all amounts CBG owes him, including these amounts, as offsets in his Answer. This Court cannot grant summary judgment if and until it determines the validity of Defendant's affirmative defense of offset. *See In re County of Orange,* 219 B.R. 543, 566 (Bankr. C.D. Cal. 1997).

CBG's motion must be denied for yet another reason: it is woefully premature. CBG is simply wrong that the mere fact that it obtained a foreign judgment is *de facto* proof that a U.S. court must enforce it. Bobulinski is entitled to and intends to challenge the underlying judgment on several grounds and needs discovery to do so. As it did in the Cayman Islands, CBG hopes to short-circuit this process without

---

[1] Plaintiff also failed to lodge or serve a proposed order, in further violation of the Local Rules. L.R. 56-1.

Case No. 2:20-CV-06759 RGK (JC)

affording Bobulinski an opportunity to be heard. This Court's rules, the Federal Rules of Civil Procedure and California's Uniform Foreign Country Money Judgments Recognition Act ("UFCMJRA") guarantee Bobulinski an opportunity to challenge the underlying judgment and necessitate that summary judgment be denied.

Courts have long held that a motion for summary judgment must be denied where the opposing party has not had adequate time to conduct discovery. Here, Defendant served discovery at his first opportunity, but, as of the date of filing, has not received *any* response to that discovery, or had the opportunity to take either deposition he has noticed.

And discovery is critical here because significant, material questions of triable fact remain as to whether the foreign judgment at issue can be enforced. A U.S. court cannot enforce a judgment that is based on fraud; repugnant to the public policy of California or the U.S.; contrary to the agreement between the parties under which the dispute was to be determined; or incompatible with the requirements of due process of law. C.C.P. § 1716(c)(1)(B), (C), (D), (G). All four bases are at issue here.

In 2015, in order to induce Bobulinski to loan CBG $650,000, CBG's CEO, Adam Roseman ("Roseman") told Bobulinski, *inter alia*, that: (1) CBG owned certain assets in the United States that would secure Bobulinski's loan; (2) that Bobulinski would be a senior secured creditor and would receive a 2.5 multiplier of his principal "no matter what"; and (3) that Bobulinski would have the right to sign off on any sale of CBG or its assets. Based on these promises, Bobulinski entered a Senior Secured Convertible Promissory Note ("Note") and Pledge Agreement with CBG and would not have entered those agreements absent those assurances.

Bobulinski also agreed to find, and did find, a buyer for CBG. In February 2016, third-party company, Remark, therefore sent a letter of intent to acquire CBG. CBG's largest shareholder, SIG, who had veto rights, opposed the sale, and a special board meeting was held in March 2016, to discuss the opposition. In April 2016, CBG sent false notices regarding its inability to pay outstanding payment obligations

(which were not even due) and manufactured a sham liquidation. Four days later, CBG's largest creditor, Hickory Grove, LLC ("Hickory Grove"), initiated the Cayman Liquidation.  Bobulinski believes that CBG and Hickory Grove conspired to create a sham Event of Default to avoid SIG's veto of any sale, and initiate the underlying liquidation proceedings.  Joint provisional liquidators were appointed in the Cayman Islands, and SIG objected in court in the Cayman Islands that the appointment violated Cayman law.  The Cayman court agreed, and the liquidation was moved into official liquidation.  CBG (and others) misrepresented to the Cayman court facts underlying the liquidation, and Bobulinski was not allowed to conduct any meaningful discovery into the sham proceeding or its origins. These transactions and other conduct in the Cayman Islands proceeding raise foundational questions about the bases for the underlying liquidation, the (bad) actors involved, and propriety of the judgment that necessitate discovery in this litigation.

Indeed, the underlying judgment was based largely on extrinsic fraud by CBG and potentially others that deprived that court of the true state of affairs. In addition to robbing SIG of its veto rights, this conduct robbed Bobulinski of his right to litigate his debt in California, as required by the forum selection clause the parties negotiated. Bobulinski did not have a chance to litigate these issues, and the evidentiary record behind these occurrences needs to be developed before any judgment can be enforced. *See de Fontbrune v. Wofsy*, 409 F. Supp. 3d 823, 839 (N.D. Cal. 2019); *Pentz v. Kuppinger*, 31 Cal. App. 3d 590, 597 (1973).

Plaintiff's improper and premature *third* Motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    CBG's CEO Defrauds Bobulinski to Prop Up a Failing Business

CBG was a Cayman Island corporation, whose primary business was to provide live event and media content into the Chinese marketplace. (Defendant's Statement of Uncontroverted Facts ("SSUF") 1.) In or around 2015, CBG working capital to fund its growth. (*Id*. 2.) As a result, Roseman, founder and CEO of CBG,

1  urgently sought ways to quickly infuse funding into the company. (*Id*. 3.)

2  On or about March 5, 2015, Roseman emailed his long-time friend and

3  business associate, Bobulinski, seeking a short-term bridge loan for CBG.  (SSUF 4.)

4  Roseman wrote that the loan was to be "a senior secured loan to be paid off in first

5  priority" and "secured by all our assets (content licenses, our production library and

6  our fixed production equipment in our 10k square foot studio in Culver City) and all

7  bridge loan principal and interest secured in first position." (*Id*. 5.)  Bobulinski

8  expressed interest in helping Roseman, and communications took place.  During

9  these conversations, Roseman told Bobulinski that CBG owned the rights and

10  interests in certain assets, including a content library, license agreements, and

11  physical assets (including production equipment) (the "Collateral").  (*Id*. 6.)

12  Roseman at all times acted consistently with his statements that the Collateral

13  was owned by CBG. For example, Roseman offered to take Bobulinski to "come see

14  the Culver studio" in a March 20, 2015 email.  (SSUF 7.)  Roseman repeated these

15  same statements during a March 25, 2015 in-person meeting in Beverly Hills, when he

16  went into further detail explaining CBG's purported assets to Bobulinski.  (*Id*. 8.)

17  Wanting to move quickly, Roseman informed Bobulinski that he would take a loan on

18  whatever terms Bobulinski asked for or needed.  (*Id*. 9.)  Believing that CBG owned

19  the Collateral, Bobulinski required that his loan be senior secured by all of CBG's

20  assets.  (*Id*. 10.)  Roseman also promised Bobulinski that, if CBG were sold, he would

21  receive a 2.5 multiplier of his principal loan amount. (*Id*. 11.)

22  Roseman agreed to these terms, assuring Bobulinski that: any loan he provided

23  would be senior secured by all of CBG's assets; if CBG was sold, his loan would be

24  senior in order of funding; and, Bobulinski would be entitled to a 2.5 multiplier of his

25  principal loan amount.  (SSUF 12.)  He also assured Bobulinski that their

26  understanding would be properly documented by the law firm Sheppard Mullin

27  Richter & Hampton, LLP, counsel for CBG.  (*Id*. 13.)  Bobulinski trusted Roseman,

28  on the basis of their long-standing friendship and business association.  Based on his

word, Bobulinski did not retain separate counsel. (*Id*. 14.)

## B. Bobulinski Enters into the Note and Pledge Agreement with CBG

On or about April 15, 2015, Bobulinski entered into the Secured Convertible Promissory Note and a Pledge Agreement (the "Pledge Agreement"), based on Roseman's assurances that the Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal, and that he would have the right to approve any sale of CBG. (SSUF 15.)  Bobulinski would not have entered into the Note or Pledge Agreement absent these assurances. (*Id*. 16.) Importantly, Section 7 of the Pledge Agreement required CBG to obtain Bobulinski's written consent before it could transfer or sell any Collateral.  (*Id.* 17, Ex. D.)

## C. Bobulinski Finds a Buyer and CBG Manufactures an Event of Default and the Subsequent Liquidation in the Cayman Islands

In Fall 2015, Bobulinski introduced Roseman to Shing Tao, CEO and Chairman of Remark Media Inc. ("Remark").  (SSUF 19.) On February 18, 2016, Remark executed a Letter of Intent, stating its interest in buying CBG.  (*Id*. 20.)  The offer was for $23.5 million.  (*Id.*)  CBG shareholder SIG had veto rights and opposed the sale. (*Id*. 21.)

Thereafter, and of particular import for the need of discovery in this litigation, on March 17, 2016, CBG held a board meeting wherein its directors, including Roseman, Robert Roche ("Roche"), and Jacob Fisch ("Fisch"), discussed SIG's opposition to the sale.  (SSUF 22.)  Bobulinski believes that CBG and Hickory Grove conspired to initiate sham liquidation proceedings to their benefit.  (*Id.* 24.) Indeed, on April 24, 2016, after receiving a valuation of $23.5 million from Remark, CBG sent false and/or fraudulent correspondence to its Noteholders regarding its inability to pay outstanding payment obligations, despite the fact that the Promissory Notes signed by Bobulinski and all other CBG Noteholders ("Noteholders") did not have any payment obligations due. (*Id*. 23.) Fisch sent this writing at the direction of CBG, and in concert with CBG co-director Roche, for whom he worked.  (*Id*. 24.)

1  Roche was an owner and principal of CBG's largest creditor, Hickory Grove.  (*Id.*

2  25.)  This writing purportedly created an "Event of Default" under the Notes so

3  Hickory Grove could initiate the wind-up process leading to the underlying Cayman

4  Judgment.  (*Id.* 26.)  On April 28, 2016, just four days after CBG and Hickory

5  Grove principals manufactured this false Event of Default, Hickory Grove initiated

6  the wind-up proceeding. (*Id.* 27.)

7       SIG filed suit in the Cayman Islands, objecting to the appointment of the joint

8  provisional liquidators CBG wanted, as violative of Cayman law.  (SSUF 28.) The

9  Cayman court agreed with SIG, and ordered CBG into official liquidation instead.

10  The Court appointed the JOLs to begin the liquidation (the "Cayman Liquidation"),

11  pursuant to a winding up order dated August 18, 2016, issued in the Cayman Islands.

12  (*Id.*)  Bobulinski was deprived of a meaningful opportunity to obtain facts about the

13  initiation of the liquidation.  (*Id.* 47-49.)

14              **1.  Remark Purchases CBG's Assets, Violates Pledge Agreement**

15       Discovery is necessary to understand the transgressions surrounding the

16  Cayman Liquidation, the actors involved, and the motives, all which affect the validity

17  of the underlying Judgment. (SSUF 58, 60, 63.) At all times relevant, Hickory Grove

18  owned 33% of RAAD, the company which, purportedly owned the "Collateral" that

19  was supposed to be security for Bobulinski's loan. (*Id.* 29.)  CBG and Hickory

20  Grove's creation of the Event of Default and the subsequent wind-up process deprived

21  SIG of its controlling interest, laying the foundation for Hickory Grove to transfer its

22  interests in RAAD to CBG, and for CBG to sell these assets to Remark pursuant to the

23  APA Agreement.  (*Id.* 30-39.)

24       Indeed, as a condition precedent to the APA, it was agreed that Hickory Grove

25  and RAAD's two other shareholders, Roseman's wife and the Roseman Family

26  Trust, would transfer their shares in RAAD to CBG for **consideration of $10**.

27  (SSUF 31.)  Thus, Hickory Grove, within a week of its "loan" to CBG of $670,000,

28  initiated wind-up proceedings, and thereafter, agreed to transfer its shares of RAAD,

the company which, according to the JOLs, owned the collateral securing Bobulinski's Note, to CBG for $10.  (*Id.* 32.)

As a further condition precedent to that agreement, all CBG's Noteholders were required to enter into distribution agreements ("Distribution Agreements") that would subordinate their claims to CBG's general body of unsecured creditors.  (SSUF 33.) The Distribution Agreements also had the result of negating the pledge agreements of all Noteholders, which all included the same Section 7 as Bobulinski's Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent.  (*Id.* 34.)  All the Noteholders signed their Distribution Agreements, except one – Bobulinski.  (*Id.* 35.)  Bobulinski's Pledge Agreement stayed in effect, and Bobulinski had the right to stop any deal by CBG to transfer its assets. (*Id.* 36.)

Despite this, CBG pushed for the deal with Remark to close. (SSUF 37.) On or about September 19, 2016, the three RAAD shareholders transferred their shares to CBG, and one day later, CBG entered into the APA Agreement to sell all its assets to Remark, including its shares of RAAD, which apparently continued to own the Collateral securing Bobulinski's loan.  (*Id.* 38-39.)

## 2. Bobulinski Is Forced To File a Proof of Debt in the Cayman Liquidation

Remark's takeover of CBG constituted a "Liquidity Event" under the Note and so, according to Roseman and Bobulinski's agreement, CBG was required to pay him the principal of the Note with the promised 2.5x return upon the close of the sale to Remark for a total of $1,625,000. (SSUF 40.) Because of the Cayman Liquidation initiated under apparent false pretenses, Bobulinski was forced to submit his proof of debt claim in the Cayman court to preserve his rightful interests.  (*Id.* 41.)  But for this sham liquidation aimed at undermining the managing interest of CBG veto-holding shareholder SIG, Bobulinski could have litigated his claim in California per the forum selection clause the parties negotiated, and been allowed to take extensive

1   discovery on the transactions that led to the liquidation. (*Id*.) Bobulinski has since

2   served discovery seeking information about the initiation of the Cayman Liquidation,

3   and is awaiting Plaintiff's and Hickory Grove's responses. (*Id*. 58, 60, 63.)

4         Based on his belief that he was a senior secured creditor of CBG, whose loan

5   was secured by the Collateral, and because he never signed the Distribution

6   Agreement, Bobulinski submitted a Proof of Debt to the JOLs during the Cayman

7   Liquidation for $1,625,000, plus legal fees, the total which included the principal Note

8   amount plus the 2.5 multiplier Roseman promised.  (SSUF 40-41.)  Ultimately, the

9   JOLs rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a

10   balance of the principal $650,000 and $224,775 his finder's fee, and that Bobulinski's

11   Note was not secured by the Collateral.  (*Id*. 42.)  This dispute was the basis for the

12   legal proceeding in the "Cayman Litigation."

13         During the Cayman Litigation, the JOLs hired purported expert, Mark C.

14   Dosker of Squire Patton Boggs to provide a report analyzing issues certain issues

15   including the APA.  (SSUF 43.)  The APA was the agreement by which all of CBG's

16   assets and interest in its subsidiaries were sold to Remark. Dosker reported the

17   following:

18         To the extent, if any, that CBG previously owned any assets in the United
           States consisting of 'content library', 'license agreements' or 'production
19         equipment', they were sold as part of all the assets sold pursuant to the
           APA as approved by the Grand Court of the Cayman Islands. The APA
20         does not identify any such assets of CBG in the United States consisting
           of 'content library', 'license agreements' or 'production equipment'.";
21         and

22         [T]he Pledge Agreement clearly states that what is pledged are assets of
           CBG – not assets of any subsidiary of CBG... CBG did not own any
23         license agreements or media content… Since CBG did not own those,
           they are not within the scope of the pledge in the Pledge Agreement.

24   (*Id*.)

25

26         Based on Dosker's report, the JOLs argued that CBG never owned the

27   Collateral. Rather, it was owned by RAAD, an entity Roseman had never mentioned.

28   (SSUF 44.) In direct contravention of his representations to Bobulinski, Roseman

made this argument as well. (*Id*. 45.) This argument also served as the basis for why the Cayman Court asserted CBG did not breach Section 7 of Bobulinski's Pledge Agreement requiring his consent before CBG could transfer its assets to Remark. The JOLs justified closing the Remark transaction without Bobulinski's approval and signature by arguing CBG had simply transferred shares of RAAD and not the assets comprising the Collateral. (*Id*. 47.) While Roseman represented that CBG's content library and license agreements were in the United States, he did not distinguish which "content library and license agreements" in the U.S. belonged to RAAD as opposed to CBG. (*Id*. 46.)

The Cayman court rejected Bobulinski's appeal on January 23, 2019. However, the court did not allow any meaningful development of the factual record to challenge the underpinnings of the Cayman Liquidation. Bobulinski was not entitled to standard trial discovery, and was unable to develop a record as to the bases for the liquidation, actors involved, the veracity of CBG's representations upon which the Court relied, or CBG's motive to deprive shareholders of their voting rights, subordinate debts, and acquire and transfer shares of RAAD. (SSUF 47-49.) Bobulinski has served specific discovery addressing these issues that are vital to his affirmative defenses here. (*Id*. 58, 60, 63, Exs. F and G.)

After his Proof of Debt was rejected, the JOLs sought costs against Bobulinski. (SSUF 50.) Ultimately, the Cayman court issued three cost certificates: (1) a November 13, 2018, for $56,431.82, (2) a $57,208.58 on January 8, 2019, and (3) a February 5, 2019, default cost certificate in the amount of $562,170.94 (together, "Cost Certificates"). (*Id*.) Despite seeking costs, CBG has not paid Bobulinski the $874,775 it admits it owes him. (*Id*. 65.)

### 3. Bobulinski Files Suit Against Roseman for Fraud

On July 10, 2019, Bobulinski filed a complaint against Roseman in California. After removal, on July 10, 2019, Bobulinski filed a first amended complaint in the Central District of California, Case No. 2:19-cv-02963-MWF-SSx (the "Roseman

Matter"). (SSUF 51.) Bobulinski has two current causes of action against Roseman: (1) fraud in the inducement; and (2) negligent misrepresentation. (*Id*.)  The case is in discovery and both parties have served and responded to written discovery and have discussed depositions.  (*Id*.)  Bobulinski has also served third-party subpoenas on Hickory Grove and Remark, among others. (*Id*.)

### 4.  The JOLs Seek to Enforce the Cayman Cost Certificates

On July 28, 2020, CBG, by and through the JOLs, sued Bobulinski, alleging that, pursuant to the UFCMJRA or the principles of comity, the United States should enforce the cost certificates they obtained in the Cayman Islands against Bobulinski for litigating his Proof of Debt claim.  On September 18, 2020, nearly two weeks before Bobulinski's responsive pleading was due, CBG filed a motion for summary judgment ("First Motion").  (SSUF 52.)  Bobulinski timely responded to the Complaint by filing an Answer on September 30, 2020.  In his Seventh Affirmative Defense of Offset, he claimed the amounts CBG owes him, including the $874,775 that Plaintiff admits it owes him.  (*Id*. 54.)  On October 22, 2020, the Court denied CBG's motion for failure to meet and confer.  (*Id*. 55.)

After the Court denied its First Motion, Plaintiff asked to meet and confer on another second judgment motion.  During meet and confer, Defendant reiterated his need for discovery, but Plaintiff refused to reconsider its second motion.  (SSUF 56-57.)  On November 3, 2020, both parties served written discovery.  (*Id*. 58.)  Less than a week later, on November 9, 2020, Plaintiff filed its second motion for summary judgment ("Second Motion"), on the same grounds as the First Motion. Plaintiff failed to file or serve a Statement of Uncontroverted Facts and Conclusions of Law or a proposed order in support of the Second Motion or otherwise identify any undisputed facts, in violation of the Local Rules.  (SSUF 59.)  On November 16, 2020, Defendant served deposition notices to CBG and Hickory Grove. (*Id*. 60, Ex. G.) That same day, Defendant opposed the Second Motion, pointing out its deficiencies.  (*Id*. 61.)

On November 17, 2020, apparently in response to Defendant's opposition to its Second Motion, Plaintiff withdrew the Second Motion. (SSUF 62.) That same day, Plaintiff filed the instant third motion for summary judgment ("Third Motion"), on the same grounds as the First Motion and the Second Motion.  (*Id*.)  Plaintiff did not seek leave of the Court to file its Third Motion, as the Court's standing order requires. (*Id*.)

As of the date of filing, CBG has not paid Bobulinski any amount it owes him which he claims as offset in his Answer, including the $874,775 it admits. (SSUF 65.) Defendant has not yet received a single answer or document in response to his discovery and has not had the opportunity to conduct either deposition he has noticed. (*Id*. 64.)  All of Defendant's outstanding discovery issues therefore remain.

## III.   LEGAL STANDARD

Summary judgment is only appropriate when there exists no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *L.A. Printex Indus., Inc. v. Aeropostale, Inc*., 676 F.3d 841, 846 (9th Cir. 2012).  "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  The trial "court must draw all reasonable inferences in favor of the nonmoving party," and may not weigh evidence.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

In addition, where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may defer consideration or deny a motion altogether.  *See* Fed.R.Civ.P. 56(d); *Howell v. Liddell*, No. 2:19-cv-0578 TLN KJN P, 2020 WL 949557, at *2 (E.D. Cal. Feb. 27, 2020) (denying summary judgment as "premature" due to insufficient discovery).

## IV.   ARGUMENT

### A. Plaintiff's Debt to Bobulinski Precludes Summary Judgment

"Two parties who are liable to each other in the same suit are generally entitled to a setoff of any recovery owed by the other party." *Enodis Corp. v. Employers Ins.*

*Co. of Wausau*, No. 2:03-cv-00866-CAS-PJW, 2004 WL 5642006, at *2 (C.D. Cal. May 18, 2004). "Normally, a court should first determine whether a party will prevail on his claim and, if so, how much he will recover. Only after that liability is established is it appropriate to evaluate defensive setoffs." *Aqui es Texcoco, Inc. v. Lopez*, No. 12-cv-01215-BEN-WVG, 2014 WL 714862, at *4 (S.D. Cal., Feb. 21, 2014). Accordingly, "[c]ourts have denied summary judgment as premature where a party asked that the court determine the offset." *Id.*

The instant litigation was brought on behalf of CBG by the JOLs, who have a fiduciary duty to CBG's creditors, including Defendant. But, by Plaintiff's own admission, CBG *owes* Bobulinski $874,775, the amount of his principal loan to CBG, plus the finder's fee, and the Cayman court acknowledged the same. (SSUF 42.) Bobulinski claims all amounts owed to him by CBG as an offset in his Answer. (*Id.* 54.) Notably, Plaintiff has moved for summary judgment on its own claims, but not on any of Defendant's affirmative defenses. The Court cannot grant summary judgment in favor of Plaintiff if and until it determines the validity and amount of Defendant's claimed offset. *See Aqui es Texcoco*, 2014 WL 714862, at *4; *In re County of Orange*, 219 B.R. at 566 (if setoff warranted required evaluation of equities which depended on a resolution of facts inappropriate at summary judgment).[2]

**B.   The Motion Is Premature under Federal Rule of Civil Procedure 56**

A motion for summary judgment made before the nonmoving party has had

---

[2] To avoid liability for offset, in other aspects of this litigation Plaintiff has claimed variously that the JOLs, CBG, and/or the estate of CBG are different entities, and therefore no offset can be had. Not so. Bobulinski seeks an offset from Plaintiff, not the JOLs, and as set forth in the Complaint, "China Branding acts by and through its Joint Official Liquidators," who have "no personal liability." Compl. ¶ 3. Any distinction between CBG and the "estate of CBG" is artificial and manufactured to avoid an offset. Indeed, the argument belies the fact that the JOLs control the assets of the estate, and have "allowed" Bobulinski's entitlement to $874,775 based on his dealings with CBG. (SSUF 42.) All debts and offsets owed Bobulinski are properly brought against Plaintiff – at the very least, the appropriateness of the offset against Plaintiff (not to mention the amount) is a triable issue of fact that warrants discovery and precludes summary judgment at this stage of the litigation.

adequate time for discovery is "premature" and must be denied. *See* Fed.R.Civ. 56(d); *Howell*, 2020 WL 949557, at *2 (E.D. Cal., Feb. 27, 2020); *Texas Partners v. Conrock Co*., 685 F.2d 1116, 1119 (9th Cir. 1982). Unless the nonmoving party has "not diligently pursued discovery of the evidence," courts "generously grant Rule 56(d) motions." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003).

Bobulinski would be prejudiced were the Court to address this Motion now. This matter is in its infancy; Bobulinski has only just had the chance to serve discovery. He has not yet received a single response to that discovery,[3] nor has he had the opportunity to conduct either deposition he has noticed. CBG's responses to his first set of written discovery are not due until December 3, 2020.  Even then, Bobulinski cannot be sure that CBG will timely produce documents.  After sitting on its cost awards for over a year, CBG is now forcing Bobulinski to litigate a dispositive motion at this implausibly early stage in proceedings. Summary judgment is inappropriate here because Bobulinski has not been "afforded reasonable discovery." *Zell v. InterCapital Income Sec., Inc*., 675 F.2d 1041, 1049 (9th Cir. 1982).

And Bobulinski needs discovery here. There are valid foundational questions about the bases for the underlying liquidation, the (bad) actors involved, and the true state of affairs which necessitate discovery.  The judgment upholding the denial of Bobulinski's proof of debt claim was based largely on intentional misrepresentations by CBG and Roseman that deprived the Court of the true state of affairs, compounded by the denial of critical discovery as to such issues as the propriety of the underlying liquidation. Bobulinski has sought information from CBG about its decision to enter the Cayman Liquidation, and desire in avoiding SIG's blocking rights to the sale of CBG, rather than its stated insolvency as its reasons for doing so. (SSUF 58, Ex. F (Requests for Production ¶¶ 2-4, 6, 9), (Special Interrogatories ¶¶ 8, 12, 14-15).)

---

[3] Plaintiff served Defendant with the documents cited in its Initial Disclosures on November 12, 2020, but has not yet answered his written discovery.

1    Moreover, the underlying liquidation that forced Bobulinski to submit his proof

2 of debt claim in the Cayman court to preserve his rightful interests was initiated by

3 CBG, in concert with others (including Hickory Grove), under what Bobulinski

4 intends to prove were nefarious and self-dealing circumstances. This wind-up process

5 forced CBG's Promissory Note holders to subordinate their loans, undermined the

6 management rights of its veto-holding shareholder, SIG, and laid the foundation for

7 the transfer of RAAD assets from CBG to Remark.  This despite the fact that CBG's

8 largest creditor, Hickory Grove, was a one-third partner in RAAD and initiated the

9 wind-up process. But for this farce liquidation, which Bobulinski intends to prove was

10 manufactured by CBG and Hickory Grove (whose agent was a co-director of

11 Roseman's), Bobulinski would have been able to litigate his claim per the forum

12 selection clause negotiated by the parties. The simple fact is that CBG has rushed to

13 file a premature motion for summary judgment before the parties engaged in any

14 semblance of discovery.  The factual record for these occurrences needs to be

15 developed before any judgment can be enforced here. For example, Bobulinski alleges

16 the Cayman liquidation was a sham liquidation, and that CBG and others conspired to

17 create a false Event of Default under the Notes. Bobulinski has sought documents and

18 information about the genesis of Hickory Grove's wind-up petition in the Cayman

19 Islands. (SSUF 58, Ex. F (Requests for Production ¶¶ 2-4, 6, 9), (Special

20 Interrogatories ¶¶ 8, 12, 14-15).)  SIG objected to the appointment of the Joint

21 Provisional Liquidators CBG wanted, as violative of Cayman law and the Cayman

22 court agreed. (SSUF 28.) Bobulinski has also sought documents and information

23 regarding the internal deliberations and communications between and among CBG,

24 Hickory Grove, their counsel and the JOLs that probe the legitimacy of the process,

25 and why Bobulinski's contractual right to veto any sale to Remark was ignored. (*Id*.,

26 Ex. F (Requests for Production ¶¶ 4-8, 11-18), (Special Interrogatories ¶¶ 2-4, 8, 12,

27 14-15).) If evidence sufficient to raise a material issue of fact is discovered concerning

28

issues of a sham liquidation and extrinsic fraud, the judgment should not be enforced in the U.S. Thus, summary judgment is premature.

**C.   Summary Judgment is Inappropriate Because Genuine Issues of Material Fact Exist as the Enforceability of the Foreign Judgment**

**1.  The Cayman Judgment Was Based on Fraud**

A foreign money judgment cannot be enforced where it is based on fraud. C.C.P. § 1716(c)(1)(B). Specifically, the UFCMJRA provides for nonrecognition of a foreign-country judgment if fraud deprived the losing party of an adequate opportunity to present its case. *Id.* The Uniform Law Commission's commentary on this provision indicates that the type of fraud that can serve as grounds for nonrecognition is "extrinsic fraud," in which the "conduct of the prevailing party that deprived the losing party of an adequate opportunity to present its case."

In *De Fontbrune v. Wofsy*, plaintiff sued defendants for publishing volumes of a book that reproduced copyright-protected photographs of Picasso's works. 409 F. Supp. 3d at 828.  Plaintiff prevailed and the French court issued an *astreinte*, a legal device that would subject defendants to damages for further acts of infringement. Ten years later, after plaintiff had transferred its copyrights, plaintiff discovered copies of the same book in a bookstore and initiated legal proceedings to liquidate the *astreinte*. Defendants did not appear and contended they were not served.  In early 2012, the enforcement division of the French trial court, the JEX, awarded $2 million to plaintiff.  *Id.*

The next year, plaintiff brought a suit against defendants in California to enforce the judgment under the UFCMRJA.  *Id.* Defendant argued plaintiffs deceived the French court as to their ownership of the underlying intellectual property and, as a result, wrongfully obtained a judgment liquidating the *astreinte*.  *Id.* at 839. The district court held that such facts "could constitute extrinsic fraud," since the French court did not know "the true state of affairs," and refused to enforce the judgment at the summary judgment stage on that basis.  *Id.* (citing *Pentz*, 31 Cal. App. 3d at 597

(refusing to enforce judgment where party did not have opportunity to inform court of alimony payments critical to case)).[4]

Here, as in *de Fontbrune* and *Pentz*, Bobulinski is contending that the Cayman Judgment is based on false information on which the tribunal and parties relied in obtaining the foreign judgment.  Roseman did not fully inform the Cayman court of the true nature of CBG's agreements with Bobulinski, and presented false testimony. More importantly, the initiation of the Cayman Liquidation appeared to involve fraudulent circumstances and to be based upon a sham Event of Default.  Bobulinski suspects that CBG and its largest creditor, Hickory Grove, conspired to create a sham Event of Default to initiate the liquidation proceedings to their benefit, laying the foundation for CBG's sale of its assets to Remark, and in the process, sidestepping any veto rights or objections by CBG's creditors.  Based in part on its reliance on CBG's extrinsic fraud as to the events behind the liquidation, the Cayman court did not consider these issues or allow for meaningful discovery on them. Bobulinski has sought discovery on these issues in this litigation.  (SSUF 58, 60, 63, Exs. F, G.)

Bobulinski is *not* asking this Court to relitigate the issues decided in the Cayman Judgment – i.e., to determine whether Bobulinski was a senior secured creditor or to assess the amount of his proof of debt claim. Instead, Defendant is asking this Court not to enforce a foreign judgment for fees he contends was based on extrinsic fraud. This issue has not been decided in the Cayman court, nor could it have been, as that court was narrowly focused on whether Bobulinski was a secured creditor and entitled to a multiplier, not whether the underlying liquidation was a

---

[4] CBG has elsewhere tried to distinguish *de Fontbrune* on the grounds that defendant there was in default and unaware of the proceedings – not the case here. But the *de Fontbrune* court held the argument "turns on Plaintiff's representation to the JEX that Plaintiff's owned the copyrights at the at-issue photographs," and as a result "wrongfully obtained a judgment." 409 F.Supp. 3d at 839.  Thus, Plaintiff's misrepresentation, not the default, was at issue in the court's determination of extrinsic fraud. *Id.* ("If Plaintiffs did not own the right to liquidate the astreinte and if they intentionally misled the JEX as to that fact, then those facts could constitute extrinsic fraud.")

Case No. 2:20-CV-06759 RGK (JC)

sham. Such is the problem presented by Plaintiff's request to enforce a fee award given based solely on a cost-shifting statute and for which there was no hearing.

Bobulinski is currently suing CBG CEO Roseman for fraud in the inducement and negligent misrepresentation, and the case is ongoing. The outcome of that matter could determine this one, given the extent of Roseman's fraud. Bobulinski has asserted affirmative defenses in this regard that are dispositive of the case, if decided in his favor. Bobulinski has also served discovery on CBG, all of which support his affirmative defenses to this action.  (SSUF 54, 58, 60, 63, Exs. F, G.)

### 2.  The Cayman Judgment Is Repugnant to Public Policy

The UFCMJRA provides that a court is not required to recognize a foreign judgment when "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States."  *See* C.C.P. § 1716(c)(1)(C).  Repugnancy under California's UFCMJRA measures not simply whether the foreign judgment or cause of action is contrary to California public policy, but whether either is so offensive to public policy as to be prejudicial to recognized standards of morality and to the general interests of the citizens.  *Ohno v. Yasuma*, 723 F.3d 984 (2013); *see also Metropolitan Creditors Serv. v. Sadri*, 15 Cal.App.4th 1821 (1993).

In *World Granite and Marble Corp. v. Wil-Freds Const., Inc*., Case No. No. 96 C 6441, 1996 WL 763230 (N.D. Ill., Nov. 25, 1996), the court found an Italian judgment procured through fraudulent representations and premised on incorrect information could not be enforced.  The court reasoned that "[p]ublic policy (and this Court) does not, and cannot, countenance attempts by litigants to circumvent judicial rulings by obtaining favorable foreign judgments through the use of false or incomplete information and registering those foreign judgments with United States courts."  *Id.* at *4.

Here, Bobulinski intends to prove through his served discovery that the Cayman Judgment is based on CBG's false representations as to the nature of

1  Bobulinski's creditor status and the false pretenses upon which the liquidation was

2  based. (SSUF 54, 58, 60, 63, Exs. F, G.)  In addition, CBG was sold out from under

3  Bobulinski, despite contractual agreement that he had the right to any sale.  Then,

4  Hickory Grove, purportedly CBG's largest creditor, initiated the liquidation and

5  transferred all of its interest in RAAD (the apparent owner of all collateral promised

6  to Bobulinski) to CBG for pennies on the dollar.  Thereafter, the JOLs sold the

7  transferred assets of RAAD to Remark, before determining that Bobulinski was not a

8  secured creditor.  Such actions violate the standards of morality and general interest

9  of California citizens, and preclude enforcement of the Cayman Judgment.  *See*

10  *World Granite and Marble Corp*., 1996 WL 763230.

11      Courts have also long held a foreign money judgment should not be enforced

12  where it is based on laws that are "'prejudicial to… the general interests of the

13  citizens.'"  *See Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th 1178, 1189 (2008).  "The

14  American Rule [that a party pays its own attorneys' fees] has been perpetuated

15  because it represents a democratic ideal.  Unfettered access to the courts for all

16  citizens with genuine legal disputes has become a cornerstone of the American

17  concept of justice."  *Id.* at 1190 (quotations and citations omitted). Allowing CBG to

18  enforce a foreign judgment for prevailing on Bobulinski's righteous appeal

19  contravenes U.S. public policy which "reflects an equitable principle that penalizing

20  a party for merely defending or prosecuting a lawsuit is unfair." *Id.* While *Java Oil*

21  allowed the domestication of a fee award based upon a malicious and/or fraudulent

22  filings, the case did not establish a bright line rule that attorney fees are not repugnant

23  to public policy.  In fact, the court in *Java Oil* made clear that its holding was a

24  narrow one: "this is not a case where [the attorney] is penalized merely for

25  prosecuting a lawsuit, but instead he was ordered to pay costs for his complicity in

26  filing fraudulent claims and the preparation of false evidence." *Id*. at 1192.  In

27  contrast, the fee awards here punish Bobulinski merely for asserting his rights as a

28  creditor, or "prosecuting" his claim. To shift fees to Bobulinski by essentially the

same amount as the JOLs claimed Bobulinski was entitled to be paid back for his debt would unduly penalize him for asserting his creditor rights in a liquidation. The costs at issue were already being paid out of CBG's liquidation estate (harming Bobulinski's potential return), Bobulinski was already forced to incur significant expense out of pocket to assert his rights *and* his debt was recognized as valid. This is completely repugnant to the laws of the forum the parties agreed to.

### 3. The Foreign Proceeding Was Contrary to the Parties' Agreement

A foreign judgment cannot be enforced if "[t]he proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be determined otherwise than by proceedings in that foreign court."  C.C.P. § 1716 (c)(1)(D); *see also* Commentary to 2005 UFCMJRA ¶ 9 ("Subparagraph (c)(1)(D) of Section 1716 allows the forum court to refuse recognition of a foreign-country judgment when the parties had a valid agreement, such as a valid forum selection clause . . . , providing that the relevant dispute would be resolved in a forum other than the forum issuing the foreign-country judgment.").

The Note Bobulinski entered into with CBG provides that CBG "(i) agrees that any legal action, suit or proceeding arising out of or relating to this Note or the Pledge Agreement may be brought in the courts of the State of California or of the United States of America for the Southern District of California, and (ii) submits to the exclusive jurisdiction of any such court in any such action, suit or proceeding." (SSUF 18.)

Bobulinski never approved any sale of CBG, and never agreed to have any aspect of the Note or Pledge Agreement decided by a Cayman court.  (SSUF 18, 35-36.)  The Cayman court's involvement only occurred after CBG sent out false letters indicating it could not meet its payment obligations to its Noteholders, manufacturing an "Event of Default." Four days later, Hickory Grove initiated the wind-up process. Thus, Bobulinski had no choice but to seek to assert his creditor's claim under the Cayman courts, despite the forum selection clause in his Note mandating any claims

under the Note be litigated in California. (*Id*. ¶ 41.) Once that claim was denied, Bobulinski's only recourse was to appeal to Cayman appellate courts, contrary to the forum selection clause the parties negotiated. (*Id*. ¶ 18.) Plaintiff cannot prevail in enforcing a foreign judgment obtained in violation of the statute. *See* C.C.P. § 1716 (c)(1)(D).

### 4.  The Cayman Proceeding Violated Due Process

A foreign judgment should also not be enforced if the "specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." C.C.P. § 1716(c)(1)(G).

In *de Fontbrune*, defendants argued the underlying French proceeding violated due process, *inter alia*, because plaintiffs misrepresented that they still owned the rights to copyright-protected photographs, and, as a result of that deception, wrongfully obtained a judgment to liquidate an *astreinte* of 10,000 francs per violation. The district court held that such facts could violate due process, and refused to enforce the judgment at the summary judgment stage. 409 F. Supp. 3d at 839.

Here, these same principles should apply, and the Cost Certificates should not be enforced as they were acquired based on a proceeding incompatible with due process, and without fundamental fairness to Bobulinski.  He was unable to develop a full factual record of the evidence the Court relied on in its decision and was not able to impeach the underpinnings of the Cayman Liquidation.  As in *de Fontbrune,* such actions clearly could "constitute extrinsic fraud" and deprived the Cayman Court from knowing the "true state of affairs." The Motion should be denied.

### V.   CONCLUSION

For the foregoing reasons, CBG's Motion should be denied in its entirety.

DATED:  November 30, 2020            BAKER MARQUART LLP

By: */s/ Teresa Huggins*

Ryan G. Baker
Teresa Huggins
*Attorneys for Defendant Tony Bobulinski*