1  Ryan G. Baker (Bar No. 214036)
2   rbaker@bakermarquart.com
   Teresa L. Huggins (Bar. No. 263257)
3   thuggins@bakermarquart.com
4  Sam Meehan (Bar No. 307934)
    smeehan@bakermarquart.com
5  BAKER MARQUART LLP
6  777 S. Figueroa St. Suite 2850
   Los Angeles, California, 90017
7  Telephone:  (424) 652-7800
8  Facsimile:   (424) 652-7850

9  *Attorneys for Defendant Tony Bobulinski*

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13  CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION), by and through its Joint Official Liquidators, Hugh Dickson of Grant Thornton Specialist Services (Cayman), Limited and David Bennett of Grant Thornton Recovery & Reorganisation Limited, <br><br> Plaintiff, <br><br> v. <br><br> TONY BOBULINSKI. <br><br> Defendant. | Case No. 2:20-CV-06759 RGK (JC) <br><br> **DECLARATION OF TONY BOBULINSKI IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** <br><br> Judge:  Hon. R. Gary Klausner <br><br> Date:  December 21, 2020 <br> Time:  9:00 a.m. <br> Courtroom:  850 <br><br> Complaint Filed: July 28, 2020 |

DECLARATION OF TONY BOBULINSKI IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1     I, Tony Bobulinski, declare as follows:

2     1.     I have personal knowledge of the facts set forth herein and, if called as

3   a witness, I could and would testify competently thereto.

4     2.     On or about March 5, 2015, Adam Roseman ("Roseman"), the CEO of

5   China Branding Group ("CBG"), reached out to me by email seeking a short-term

6   bridge loan for CBG. In that email, Roseman claimed that the loan was to be "a

7   senior secured loan to be paid off in first priority" and "secured by all our assets

8   (content licenses, our production library and our fixed production equipment in our

9   10k square foot studio in Culver City) and all bridge loan principal and interest

10  secured in first position." Attached as **Exhibit A** is the March 5, 2015 email I

11  received from Adam Roseman.

12    3.     As of 2015, I had been friends and business associates with Roseman

13  for over 13 years.  I told Roseman I wanted to help him, and subsequent

14  communications took place.  During these conversations, Roseman told me CBG

15  owned the rights and interests in a content library, license agreements, and physical

16  assets (including production equipment) (collectively, the "Collateral").

17    4.     At all relevant times, Roseman acted consistently with his statements

18  that the Collateral was owned by CBG.  For example, he offered to take me to

19  "come see the Culver studio" in a March 20, 2015 email.  Attached as **Exhibit B** is

20  the March 20, 2015 email I received from Roseman.

21    5.     On March 25, 2015, I met with Roseman in-person at the Peninsula

22  Hotel in Beverly Hills.  During that meeting, Roseman repeated these same

23  statements, going into detail about CBG's purported assets.  Roseman informed me

24  he would take a loan on whatever terms I asked for or needed to move quickly.

25  Believing CBG owned the Collateral, I required that my loan be senior secured by

26  all of CBG's assets, including the Collateral. Roseman also promised me I would

27  receive a 2.5 multiplier of my principal loan amount.  I never agreed to Cayman

28  Islands jurisdiction over the terms of my loan at any time.  To the contrary, I would

1  not have agreed to make any loan that was subject to jurisdiction outside of
2  California.

3      6.      Roseman agreed to these terms, assuring me that any loan I provided
4  would be senior secured by all of CBG's assets and, if CBG was sold, my loan
5  would be senior in order of funding, and that I would be entitled to a 2.5 multiplier
6  of my principal loan amount.

7      7.      Roseman said he wanted to move quickly.  He assured me our
8  understanding would be properly documented by the law firm Sheppard Mullin
9  Richter Hampton, LLP, counsel for CBG at the time.  Roseman also told me not to
10  obtain separate counsel, as he said it would slow down the process of obtaining my
11  loan, which would harm CBG.  I trusted Roseman, on the basis of our long-standing
12  friendship and business association.  Based on his word, I did not retain separate
13  counsel.

14      8.      On or about April 15, 2015, based on Roseman's assurances that the
15  Note was senior secured by the Collateral, that I would receive a 2.5 multiplier of
16  my principal no matter what, and that I would have the right to approve any sale of
17  CBG, I entered into a Senior Secured Promissory Note (the "Note") and a Pledge
18  Agreement (the "Pledge Agreement").  I would not have entered into the Note or
19  Pledge Agreement absent Roseman's assurances.  It was very important to me that
20  Paragraph 7 of the Pledge Agreement required CBG to obtain my written consent
21  before it could transfer or sell any part of the Collateral.  In addition, Paragraph 10.4
22  of the Note contained a forum selection clause stating that CBG "(i) agrees that any
23  legal action, suit or proceeding arising out of or relating to this Note or the Pledge
24  Agreement may be brought in the courts of the State of California or of the United
25  States of America for the Southern District of California, and (ii) submits to the
26  exclusive jurisdiction of any such court in any such action, suit or proceeding."  I
27  would not have signed the Note and the Pledge Agreement without these clauses.
28  Attached as **Exhibits C** and **D**, respectively, are the Note and Pledge Agreement.

9.     In the fall of 2015, I introduced Roseman to my good friend, Shing Tao, the CEO and Chairman of Remark Media Inc. ("Remark").  Remark was interested in purchasing CBG based on Roseman's continued representations about assets CBG owned.  I became aware that Remark made an offer of $23.5 million to purchase CBG and its assets in the Spring of 2016.

10.     On or about March 17, 2016, I called into a special Board Meeting of CBG (as opposed to a quarterly or regularly-scheduled board meeting), where, among other things, the Board discussed the opposition of the sale to Remark by CBG's veto-holding shareholder, SIG. This special meeting was attended by CBG's directors, including Roseman, Robert Roche, Jacob Fisch and David Lande. The entire call focused on SIG and its blocking rights, not on outstanding debts.  I knew and understood from the terms of the Note I signed and the similar notes that other CBG creditors had signed, that there were no immediate payment obligations due to CBG Noteholders ("Noteholders").  In fact, when payment obligations were to become due, the terms of the Note dictated that a negotiation would ensure for ownership and payment. (*See* Exhibit C ¶ 3.)

11.     Despite the fact that there were no payment obligations due under my Note or any of the other notes of which I was aware, and that CBG recently got a $23.5 million offer from Remark, on or about April 24, 2016, Jacob Fisch, on behalf of CBG (claiming to have done so at the direction of CBG's board of directors) sent written notice to CBG's Noteholders stating CBG was unable to meet its Noteholder payment obligations. Prior to sending out the written notice, neither Roseman nor anyone else from CBG had asked me for funds that would enable CBG to meet its payment obligations.  Pursuant to the terms of the Note, an "admission in writing" that CBG could not meet its obligations under outstanding notes (including the Note), was an event of default (the "Event of Default"), opening the door for creditors to initiate wind-up proceedings.  (*See* Exhibit C ¶ 8.)

DECLARATION OF TONY BOBULINSKI IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

12.     The email constituting the "Event of Default" was sent on behalf of CBG by Fisch. Fisch works for another CBG Co-Director, Roche. I am aware from my dealings with CBG, Roche, and Roseman, that Roche is an owner of CBG's largest creditor, Hickory Grove, LLC. Based on my knowledge of CBG's dealings, SIG's objections to the sale to Remark, and in part on the close relationship between Roche and Roseman, I believe that CBG and Roche conspired to notice the Event of Default so that Roche's Company, Hickory Grove, could initiate the Cayman Liquidation Proceedings (the "Cayman Liquidation"), and in the process, circumvent any opposition to a sale by SIG.

13.     On or about April 28, 2016, four days after the Event of Default, Hickory Grove, initiated the Cayman Liquidation.

14.     In or around April, 2016, after CBG entered into liquidation in the Cayman Islands, CBG asked each Noteholder, including me, to sign a distribution agreement that would negate their pledge agreements (the "Distribution Agreement").  Each Distribution Agreement included the same Section 7 as my Pledge Agreement and which prevented CBG from transferring assets without the Noteholders' consent.  I refused to sign the Distribution Agreement because I did not wish to give up my rights to control the timing of any sale of CBG.  SIG filed suit in the Cayman Islands to object to the appointment of Joint Provisional Liquidators, claiming the provisional liquidation was in violation of Cayman law. The Cayman court agreed with SIG, and moved the liquidation of CBG into official liquidation.  Attached as **Exhibit E** is the order in which the Cayman court agreed with SIG and rejected the Joint Provisional Liquidators that CBG wanted.

15.     Given that CBG went into the Cayman Liquidation without my approval, and despite my suspicion that the Cayman Liquidation was initiated by collusion between CBG and Hickory Grove's principals to manufacture a false default, I had no choice but to submit a Proof of Debt in the Cayman Islands, despite the forum selection clause in my Note.  I submitted a proof of debt to the

-4-

JOLs during the Cayman Liquidation for a total of $1,625,000 ("Proof of Debt"), which included the principal Note amount plus the 2.5 multiplier Roseman had promised me. The JOLs rejected my Proof of Debt, claiming that I was only owed a balance of the principal $650,000 and concluding that my Note was not senior secured by the Collateral. I never would have invested in CBG if I knew I was only going to get my principal back; I know of no investor who would. The JOLs also admitted that I was owed a $224,775 finder's fee because I found a buyer for CBG. To date, I have not been paid any of the money I am owed, except for $100,000 I was paid at closing out of the management pool.

16.     After the JOLs rejected my Proof of Debt, and CBG's assets were being distributed to meet its obligations, I had no choice but to appeal the JOLs denial (the "Cayman Litigation").

17.     During the Cayman Litigation, I attempted to conduct discovery that was, in fact, more limited than what is generally available to litigants in U.S. Courts, where the forum selection clause I had negotiated required the litigation of claims related to my Note and/or Pledge Agreement. I sought discovery to, among other things, present to the Cayman court a full picture of my negotiations with Roseman and CBG, and discover the nature of the initiation of the sham Cayman Liquidation that forced me to litigate in the Cayman courts. I was denied this opportunity before and at the hearing.

18.     CBG also never sought written consent from me to transfer its assets, as Section 7 of the Pledge Agreement required. To this day, I do not know how the sale of CBG to Remark closed without my required consent.

19.     On February 21, 2019, I filed suit against Roseman. On July 10, 2019, I filed a first amended complaint in the Central District of California, <u>Tony Bobulinski v. Adam Roseman</u>, Case No. 2:19-cv-02963-MWF-SS. I currently have two causes of action pending against Roseman: fraud in the inducement, and negligent misrepresentation. The case is in discovery and both parties have served

and responded to written discovery and have discussed depositions.  I have also sent third-party subpoenas to Hickory Grove and Remark, among others.  Hickory Grove's deadline to respond to my subpoena is December 18, 2020.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing information is true and correct.

Executed on November 30th, 2020, at Los Angeles, California.

By: _____
        Tony Bobulinski

DECLARATION OF TONY BOBULINSKI IN SUPPORT OF
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT