# EXHIBIT C

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 52 OF 2016 (RMJ)

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)

### COSTS CERTIFICATE

HAVING TAXED on the standard basis the Bill of Costs lodged by Hugh Dickson and David Bennett, the Joint Official Liquidators of China Branding Group (in Official Liquidation) on 5th July 2018 2018.

IT IS HEREBY CERTIFIED that the net amount payable by Tony Bobulinski pursuant to the Order for Costs made on 5th April 2018 is US$56,431.82 including the costs of taxation.

Dated the 13th day of November 2018

_____

Robert Jones
Taxing Officer



IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 52 OF 2016 (RMJ)

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)

## COSTS CERTIFICATE

HAVING TAXED on the indemnity basis the Bill of Costs lodged by Hugh Dickson and David Bennett, the Joint Official Liquidators of China Branding Group (in Official Liquidation) on 6th December 2018.

IT IS HEREBY CERTIFIED that the net amount payable by Tony Bobulinski pursuant to the Order for Costs made on 28th September 2018 is US$57,208.58 including the costs of taxation.

Dated the 8th day of January 2018

_____

Robert Jones
Taxing Officer





No. 309

**Default Costs Certificate (0.62, r.22(3))**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 52 OF 2016 (RMJ)**

**IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)**

**AND**

**IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)**

## <u>DEFAULT COSTS CERTIFICATE</u>

**UPON** reading the application made by Hugh Dickson and David Bennett of Grant Thornton, the joint official liquidators (the "**JOLs**") of China Branding Group Limited (in Official Liquidation), dated 7 March 2019.

**AND BEING SATISFIED** that Mr Tony Bobulinski (the "**Paying Party**") has failed to complete and return the Bills of Costs served on him in respect of the Order for Costs made against him on 5 February 2019. (the **"Order for costs"**)

**IT IS HEREBY CERTIFIED** that the amount payable to the JOLs by the Paying Party pursuant to the Order for Costs made is the sum of $562,170.94.

DATED the 6 day of May 2019.

FILED the 6ᵗʰ day of *May* 2019.

**REGISTRAR OF THE GRAND COURT**
**FINANCIAL SERVICES DIVISION**

1    **IN THE GRAND COURT OF THE CAYMAN ISLANDS**
2    **FINANCIAL SERVICES DIVISION**
3                                                  Cause No.: FSD 52 of 2016 (RMJ)
4
5
6    **IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)**

7    **AND IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL**
8    **LIQUIDATION)**

9    **IN OPEN COURT**

10   Appearances:          Mr. Barry Isaacs Q.C. instructed by Mr. Jan Golaszewski and Mr.
11                         Ardil Salem of Carey Olsen for Mr. Tony Bobulinski
12                         Mr. Tom Smith Q.C. instructed by Mr. Matthew Goucke and Mr. Peter
13                         Kendall of Walkers for the Joint Official Liquidators of China
14                         Branding Group Limited (In Official Liquidation)
15
16
17   **Before:**              The Hon. Mr. Justice Robin McMillan
18
19   **Heard in**
20   **Chambers:**            2, 3 and 4 October 2018
21
22
23   **Draft Judgment**
24   **Circulated:**          18 January 2019
25
26
27   **Judgment**
28   **Delivered:**           23 January 2019
29
30
31
32                                        **HEADNOTE**
33
34
35          *The function of the Court in relation to Appeals against rejection of a proof of debt – The*
36   *undesirability of an expert witness being subject to possibly conflicting duties – A debt and a*
37                            *liquidation preference distinguished.*
38
39
40

Exhibit 1                                                                          Page 4

# JUDGMENT

## Introduction

1.    This Judgment is in respect of an Appeal by Mr. Tony Bobulinski ("the Appellant") ("Mr. Bobulinski") against the partial rejection of the Appellant's proof of debt by Notice dated 14th June 2017. The rejection was made by the Joint Official Liquidators ("the JOLs") of China Branding Group Limited (In Official Liquidation) ("the Company").

2.    By Summons dated 5 July 2017 the Appellant applied for the following Orders:

"*1.    The partial rejection of the Appellant's proof of debt by notice dated 14 June 2017 be set aside.*

*2.    The Appellant's claim be admitted to proof in the sum of US$1,765,000.*

*3.    A declaration that the Appellant is a secured creditor of the Company in the amount of US$1,765,000.*

*4.    An order that the Appellant's costs of this appeal be paid out of the assets of the Company as an expense of the liquidation, such costs to be taxed if not agreed with the Joint Official Liquidators."*

## The Background

3.    The Company was the parent company of a group of companies ("the Group") operating in China and the USA. The primary business of the Group was the provision of localized international live events content, social media content and non-studio Hollywood and related video content into the China marketplace.

4.    The immediate subsidiaries of the Company included China SNS Group Limited ("China SNS"). Fans Tang (Shanghai) Entertainment Information Consulting Co Ltd ("FansTang") was in turn a subsidiary of China SNS.

5.    In addition, a third entity RAAD Productions LLC ("RAAD") sat outside the Group and it seems upon the evidence was not a subsidiary of the Company. This was a separate

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1

1       entity, which had three shareholders (Hickory Grove LLC ("Hickory Grove"), the

2       Hudson Holdings Trust and Tapirdo Enterprises LLC). RAAD owned relevant licence

3       agreements and media content. The shares in RAAD were transferred to the Company

4       immediately prior to the completion of the sale to Remark, so that they could be included

5       within that sale.

6   6.    In closing submissions, Mr Bobulinski appears to claim that RAAD was in fact a

7       subsidiary of the Company. However, based on their inquiries and investigations, the

8       JOLs stated that they are entirely satisfied that the position is correctly stated in Mr Hugh

9       Dickson's Ninth Affidavit, on which Mr Dickson was not in any event challenged in

10      cross-examination. In particular, the shares in RAAD were only transferred to the

11      Company immediately prior to completion under a sale agreement with Remark Media

12      Inc ("Remark") and were not, prior to that time, held by the Company. It follows in that

13      case that RAAD was not a subsidiary of the Company. This is a matter which in due

14      course may have implications in relation to asset allocations in the content of pledges and

15      securities at the material time.

16

17   7.    The Appellant was one of eight noteholders ("the Noteholders") who entered into

18      promissory notes with the Company in the period from April 2015 onwards for the

19      purpose of advancing funds to the Company in order to meet its working capital

20      requirements ("the Promissory Notes").

21

22   8.    In connection with the Promissory Notes, the Company entered into various pledge

23      agreements ("the Pledges") with the Noteholders (including the Appellant), pursuant to

24      which the Company sought to grant security interests over the "Collateral", defined as

25      being "*all assets (including intangible assets) of the [Company] in the United States,*

26      *including without limitation its content library, licence agreements and physical assets,*

27      *such as production equipment*".

28

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 03/08/21 Page 9 of 104 Page ID
Case 2:13-cv-02963-MWF-SS Document 148-8 Filed 04/24/19 Pages of 99 Page ID #:113
#:1560

9.  For present purposes, it is noted that the terms of the Promissory Notes entered into by the Noteholders of the senior secured convertible Promissory Notes were all materially identical. Likewise, the terms of the Pledges supporting those Promissory Notes were all materially identical. Thus the Appellant was one of a number of investors who invested money in the Company on the same terms.

10. The Company suffered significant cashflow difficulties from inception as a result of the need to find working capital to fund its growth. At the time when he initially advanced funds to the Company in 2015, the Appellant was aware that the Company had no other source of capital. The Company engaged financial advisers in 2014 in order to assist in seeking a solution to its financial problems, whether by way of additional financing or a sale of the business. From January 2015 onwards, attention had focused on seeking to effect a sale of the business.

11. Although there was initially interest in the business, it was not possible to raise further capital from any investors beyond that provided by the Noteholders. Moreover, the sales process which was carried out resulted in only one potential bidder, Remark, being interested in purchasing the business. The Chief Executive of Remark is Mr Shing Tao, who is a close friend of Mr Bobulinski.

12. There was some delay in progressing the proposed sale to Remark and by early 2016 the Company's financial position had become precarious. In his evidence, Mr Roseman described the commercial environment as *"incredibly challenging"*. It is apparent from the WhatsApp messages between Mr Bobulinski and Mr Roseman that Mr. Roseman was urgently seeking further funding:

*"28 January 2016 [B/1/36]*
*28/1/16 10:49am: TB – Let's discuss the money this afternoon*
*28/1/16 10:49am: AR- Okay thx*



*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                                    Page 7

1     *28/1/16 10:49am TB – What's your dropdead date need for cash*

2     *28/1/16 10:49am: AR – Memorial at 2pm*

3     *28/1/16 10:50am: TB – OK try me later, focus on that*

4     *28/1/16 1050am: AR – Really yesterday but I could do with 50k tomorrow, 50k on*

5     *Monday, 100k by the 4ᵗʰ and the last 100k by the 14ᵗʰ of Feb*

6

7     *1 February 2016 [B/1/38]*

8

9     *1/2/16 10:08am: TB – Did Robert fund the cash u need?*

10    *1/2/16 10:08am: TB – I am OK doing 50-100k of it, maybe 150*

11    *1/2/16 10:08am: AR – I haven't yet. Robert is waiting to hear who else is taking a piece*

12    *to send all at once.*

13    *1/2/16 10:08am: TB – I would do it in pieces as u need it.*

14    *1/2/16 10:09am: AR – Thank you. Please let me know what's comfortable as I don't want*

15    *to put you out!*

16    *1/2/16 10:09am: AR – I would be good on 50k now and any more by the 14ᵗʰ*

17    *1/2/16 10:09am: AR – Assuming Robert does 150k now, 100k not needed until 14ᵗʰ.*

18    *1/2/16 10:52am: TB – Remind me of the dates u need the cash again*

19    *1/2/16 10:52 am: AR – Given we've passed one, it's now 200k now and 100k by 14ᵗʰ thx!*

20    *1/2/16 10:54am: TB – Hmmm, what return did he balk at, what if it was just 10%*

21    *1/2/16 10:54am: AR - Roberts doing it because of the 2.5x*

22    *1/2/16 10:55am: TB – Yah but not sure how I feel about it, if I am not taking it*

23    *1/2/16 10:55am: TB – But u need it asap*

24    *1/2/16 10:57am: AR – Yes I'm in a dangerous territory right now with our top referral*

25    *source, agency on 50k and on the other 150k if I pass Friday .*

26

27    13.    Against this background, the Appellant advanced a further US$150,000 to the Company,

28           in addition to the US$500,000 which he had already advanced (US$50,000 was advanced

29           on 2 February 2016, US$50,000 on 9 March 2016 and US$50,000 on 10 March 2016).

1          Furthermore, at the end of April 2016, another Noteholder, Hickory Grove, agreed to

2          advance a further US$670,000 by way of short term emergency funding.

3

4    14.    By the end of May 2016, the Company had missed its payroll obligations on a number of

5          occasions over the previous five months and owed US$295,000 to employees in respect

6          of unpaid wages. It had also missed payment obligations in excess of US$300,000 under

7          various licence contracts. The evidence was that the Company was suffering "*severe*

8          *liquidity issues*" and "*unable to pay its debts*". The position is summarized in paragraph

9          26 of Mr Roseman's First Affirmation. It is clear that the Company's position was dire.

10         In his evidence, Mr Roseman described the "*tremendous hardship*" that was being faced

11         at that time, the "*incredibly challenging circumstances*" being faced and that the Board of

12         the Company had determined it to be insolvent. By this stage the management team of the

13         Company was working with no salary.

14

15   15.    Remark was the sole potential bidder interested in acquiring the business. On 28 February

16         2016 Remark sent a letter of intent for the proposed acquisition of the shares in the

17         Company for US$8.5 million in cash and approximately US$15 million in securities. The

18         offer was subject to various conditions, including the ability of Remark to raise the

19         necessary finance on terms to its satisfaction.

20

21   16.    One of the shareholders in the Company who held veto rights, SIG, however sought to

22         block the transaction. In light of the poor financial position of the Company, on 24 April

23         2016 the Company sent an email letter to the Noteholders stating that [B/2/64]:

24

25         *"As at the date hereof, the Company is unable to meet its obligations under the Notes*

26         *that have already matured, and anticipates not being able to meet its obligations under*

27         *the Notes that are shortly maturing. The Company is unable to pay its debts as they fall*

28         *due."*

29

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Page 6 of 98

17.  On 28 April 2016 the Company's largest creditor, Hickory Grove, then presented a creditor's winding up petition against the Company (the "Petition"). Following this, the Company issued an application for the appointment of Joint Provisional Liquidators and on 2 June 2016 Messrs. Dickson and Bennett were appointed as Joint Provisional Liquidators ("the JPLs") of the Company.

18.  Despite the JPLs determining that proceeding with the sale of the Company's business and assets to Remark represented the only prospect of achieving any realisations for the benefit of the Company's stakeholders, SIG continued to oppose the completion of the transaction. As a result, the Petition was reinstated and the JOLs were appointed pursuant to a winding up order dated 18 August 2016 with the Court readily accepting that the Company was unable to pay its debts and was therefore insolvent. Neither the Appellant nor any other creditor opposed the making of the Winding Up Order. During this period, the Company was reliant on yet further funding received from Hickory Grove of US $255,000.

19.  On 20 September 2016 the Company entered into an agreement to sell its assets to Remark pursuant to an asset and securities purchase agreement dated 20 September 2016 ("the APA"). Under the APA it was a condition precedent to completion that the Noteholders enter into joinder and distribution agreements under which they would agree to subordinate their claims to the Company's general body of unsecured creditors. Remark had sought this condition because it wanted to try and preserve the value of Group's trading relationships by ensuring the continued payment of trade creditors prior to any payment being made to the Noteholders.

20.  Apart from the Appellant, all the other Noteholders agreed to sign the distribution agreement ("the Distribution Agreement"). Under Clause 3.1 (a) of the Distribution Agreement, the Noteholders, other than the Appellant, agreed to subordinate their own claims under their Promissory Notes to the claims of the Company's unsecured creditors.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06750-RGK-JC Document 68-4 Filed 03/08/21 Page 13 of 104 Page ID
Case 2:19-cv-02965-MWF-SSC Document 141-1 Filed 04/24/13 Page 9 of 95 Page ID #:217
#:1564

21. The Appellant however refused to sign the Distribution Agreement. It is alleged by the JOLs that he sought to rely on this in order to create leverage in his ongoing discussions with Mr Roseman. However, as a result of the lengthy delay in proceeding to completion of the transaction and the Appellant's continued refusal to sign up to the Distribution Agreement, Remark unilaterally waived the requirement for Mr Bobulinski to sign the Distribution Agreement, and proceeded to complete the sale anyway.

22. Under the terms of the APA, the Company's assets, which principally consisted of its shares in China SNS (which in turn held FansTang) and any receivables owed by those companies, were sold to the Buyer, which was an outside entity owned and controlled by Remark. In addition, the shares in RAAD, which was outside of the Group, were transferred to the Company on 19 September 2016 for US$10, and then immediately sold by the Company to the Buyer.

23. Unlike those of other Noteholders who agreed to subordinate their claims in order to facilitate the sale to Remark, the Appellant's claim for the US$650,000 advanced pursuant to his Promissory Note is not subordinated and ranks *pari passu* with other unsecured creditors.

24. The Appellant's company, Global Investment Ventures LLC, also asserted a proof of debt claim for a "*finders' fee*" of US$250,000 under a fee agreement of 22 May 2016, such claim being admitted to prove in the Company's liquidation in the amount of US$224,775.

25. It follows, therefore, according to the JOLs that the Appellant is already in a better position than other Noteholders by reason of his refusal to sign the Distribution Agreement, even though the relevant Noteholders all held the same class of Promissory Notes and Pledges. In these circumstances, one point which troubles the JOLs about the claims now asserted by the Appellant is whether it can really be right that he should in

<div style="margin-left:4em">

1   effect be able to take advantage of the decision made by other Noteholders voluntarily to

2   subordinate their claims for the greater good in order to enable the transaction with

3   Remark to proceed, so as to scoop the pool of remaining assets ahead of ordinary

4   unsecured creditors and the other Noteholders, as they put it.

5

6   26.   Notwithstanding the JOLs' reservations as to this specific point, the Court must

7   essentially approach the Appeal in the context of both applicable law and relevant facts

8   only.

9

10  27.   The Court is informed that the JOLs hold the balance of the proceeds of sale under the

11  APA which, following the payment of professional fees and other liquidation expenses,

12  amount to approximately US$1.91 million, with in excess of US$1.4 million of

13  professional fees and priority liquidation expenses remaining unpaid. This is substantially

14  exceeded by the value of creditor claims submitted by creditors in the liquidation which

15  exceeded US$24 million, with claims totaling US$8,594,742 subsequently having been

16  admitted by the JOLs. The Company is therefore substantially insolvent.

17

18  28.   Closing Written Submissions dated 14 November 2018 have been made on behalf of the

19  Appellants.

20

21  29.   These have been followed by Closing Written Submissions dated 6 December 2018 made

22  on behalf of the JOLs.

23

24  30.   Closing Submissions in Reply were filed and served on behalf of the Appellant on 20

25  December 2018.

26

27  31.   At paragraphs 1-3 of the Appellant's Submissions the Appellant's case is summarized

28  thus:

</div>

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                    Page 12

1       "1.     It is clear from the contemporaneous documents and the Appellant's oral

2              testimony that the Appellant is entitled to claim $1,625,000 against the Company.

3              The Appellant is entitled to claim this sum under cl 3.1. Further or alternatively,

4              Mr Roseman promised the Appellant that he would be paid this sum, and the

5              Appellant reasonably and foreseeably relied on Mr Roseman's promise. A

6              promissory estoppel therefore arises in the Appellant's favour.

7       2.     The Appellant's claim against the Company is secured. The Pledge, the Notes,

8              and the oral testimony of the Appellant and Mr Roseman make it clear that the

9              Company's obligations to the Appellant were intended to be secured. The JOLs

10             have not contended to the contrary. The Appellant is able to trace the proceeds of

11             the Collateral into the JOLs' bank account.

12       3.     The Appellant is also entitled to be paid the legal fees he has incurred in

13             enforcing the Pledge, which sums are secured by the Pledge."

14

15 **Agreed List of Issues**

16 32.    The parties have agreed a List of Issues as follows:

17

18       "*Waiver*

19

20       1.     Whether the Maturity under Clause 3.1 (Clause 3.1) of the Promissory Notes

21              (Notes) was waived by the Company and Mr Bobulinski.

22       2.     Whether the conduct of the Company and Mr Bobulinski gives rise to a waiver as

23              a matter of Californian law.

24       3.     Insofar as the Appellant relies on conduct of Mr Roseman, whether he had

25              authority to act on behalf of the Company at the relevant time.

26       4.     Whether under the terms of the Notes the waiver needed to be in writing and, if

27              so, whether any such requirement was waived.

28       5.     Whether this is a case of doubt, such that there is no waiver.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

6.    *Whether, if the Maturity Date under Clause 3.1 was waived, the effect of Clause 3.1 would have been to convert the Notes to shares (as the JOLs contend) or whether Mr Bobulinski acquired some additional/freestanding claim to a liquidation preference (as Mr Bobulinski contends).*

7.    *Assuming the Court determines that Mr Bobulinski did acquire some additional/freestanding claim to a liquidation preference, where such claim ranks for payment in the Company's liquidation as a matter of Cayman Islands insolvency law i.e.*

     7.1.    *Whether, pursuant to section 140 and section 49(g) of the Companies Law, any such claim ranks behind ordinary unsecured creditors but ahead of any amounts due to members/ shareholders/ "any holder of equity securities" etc.*

     7.2    *Whether, any such claim has a higher ranking than the ordinary position set out at 5.1 above, whether:*

         7.2.1.    *Secured;*

         7.2.2.    *Ranking pari passu with unsubordinated unsecured debt;*

         7.2.3.    *Ranking ahead of unsubordinated unsecured debt; or*

         7.2.4.    *Some other ranking,*

### *Promissory Estoppel*

1.    *Whether a promise satisfying the requirements of Californian law was made by the Company that Mr Bobulinski would receive a cash amount of 2.5x the Principal Loan Amount of the Notes or the full amount due under the Notes.*

2.    *Insofar as the Appellant relies on statements of Mr Roseman, whether he had authority to act on behalf of the Company at the relevant time.*

3.    *Whether and how the Appellant relied on any such promise.*

4.    *Whether any reliance was foreseeable.*

5.    *Whether the Appellant suffered injury as a result of any reliance on any such promise.*

1        *6.     Whether the Company is estopped from denying the Claimant's claim.*

4       **_Security_**

5        *1.     Whether as a matter of Californian law the Pledge reasonably identifies the*
6                *Collateral and if so to what extent.*

7        *2.     Whether there is evidence of assets falling within the Collateral reasonably*
8                *identified by the Pledge.*

9        *3.     Whether any security created by the Pledge attaches to any part of the*
10                *consideration under the Remark APA, whether the cash proceeds, or the*
11                *warrants, or a combination thereof (and, if so, to which part of such*
12                *consideration).*

13        *4.     Whether, to the extent that liability arises as matter of promissory estoppel, such*
14                *liability falls with the definition of "Secured Obligations" secured by the Pledge.*

15        *5.     Whether the Company is estopped from denying it owned the Collateral.*

16        *6.     Whether the Appellant is a secured creditor of the Company and, if so, in respect*
17                *of what sum; and whether in respect of his legal fees."*

19    **Preliminary Observations**

20    33.   In approaching this matter the JOLs *inter alia* make two comments at paragraphs 50-51
21        of their Submissions:

23        *"50.   The <u>first</u> point is the burden which rests on a putative creditor who seeks to*
24                *overturn the rejection of a proof of debt. As the Court has previously observed, "a*
25                *potential creditor must provide satisfactory proof that the creditor's claim is*
26                *founded on a real debt" and that the burden rests on the creditor in respect (Re*
27                *Ardon Maroon Asia Master Fund, Grand Court, 17 July 2018) at [48] (citing*
28                *Home and Colonial Insurance Company, Limited [1930] 1 Ch 102 at p. 102 and*

1           *Re Van Laun [1907] 2 KB 23). A claim which is based upon tenuous and/or*

2           *inadequate proof will not succeed (Ibid at [49]). Generally, the Court requires the*

3           *creditor to adduce "satisfactory evidence that the debt on which the proof is*

4           *founded is a real debt" (Ibid at [50]).*

5     51.    *The <u>second</u> point is that the starting point for any analysis must be the written*

6           *legal agreements entered into by the parties. It is obvious, and barely needs*

7           *saying, that the whole purpose of written legal agreements is to record the*

8           *bargain made between the parties. Amongst other things, this is precisely so that,*

9           *in the event of future dispute, it is clear what the respective rights and obligations*

10          *of the parties are".*

11

12 34.    The Court accepts the apposite relevance of these comments.

13

14 35.    The Court also reminds itself that winding up on the basis of insolvency is a procedure

15       whereby both the assets and the liabilities of a company can be ascertained and fairly

16       addressed. It is a practical process which does justice to the interests of individual

17       creditors' claims.

18

19 **The Proof of Debt**

20

21 36.    The JOLs describe the position as to proof of debt at paragraphs 34-39 of their

22       Submissions in this manner:

23      *"34.   Mr Bobulinski's proof of debt is at [B/2/22-36] (the "Revised Proof"). As the*

24           *Court is aware, this was the third proof of debt submitted by Mr Bobulinski*

25           *following the submission of the earlier proofs of debt dated 6 October 2016 and 3*

26           *November 2016 [B/2/39, B/2/49].*

27       *35.   Mr Bobulinski's claim as set out in the Revised Proof comprises the following:*

---

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 19 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-3 Filed 04/24/19 Pages 5 of 99 104 Page ID #:123
#:1570

1          35.1.   *US$650,000 (the "Principal Loan Amount") being the sum advanced by*
2               *Mr Bobulinski under the promissory note entered into between the*
3               *Company and the Appellant on 14 April 2015 (as amended on 11 April*
4               *2016) (the "TB Promissory Note") [B/1/1];*

5          35.2.   *US$975,000, being the balance of the 2.5x multiplier which Mr Bobulinski*
6               *claims to be entered to receive from the Company; and*

7          35.3.   *US$140,000 in respect of legal fees claimed by Mr Bobulinski in proving*
8               *his claim.*

9     36.   *In addition, Mr Bobulinski claims to be a secured creditor of the Company in*
10       *respect of the above sums under the terms of a pledge agreement dated 15 April*
11       *2015 which accompanied the Promissory Note (the "TB Pledge") [B/1/2].*

12    37.   *Both the Promissory Note and the Pledge are governed by Californian law.*

13    38.   *It is to be noted that in the first two proofs of Debt submitted by Mr Bobulinski he*
14       *did not make any claim to be a secured creditor of the Company. This claim was*
15       *only made for the first time in the third Revised Proof submitted in April 2017.*
16       *This belated change of position has caused the JOLs to approach the secured*
17       *creditor claim with some skepticism, as it is clear that despite having the benefit*
18       *of legal advice at all material times, it is only relatively recently that Mr*
19       *Bobulinski has himself sought to argue that he is a secured, as opposed to*
20       *unsecured, creditor of the Company.*

21    39.   *As the Court is aware, the JOLs have partially admitted Mr Bobulinski's claim as*
22       *an unsecured creditor (for US$650,000) and partially rejected it (for the*
23       *balance). They also disagree that Mr Bobulinski is a secured creditor. The*
24       *rejection is at [B/1/226]."*

25    **Senior Secured Convertible Promissory Note**

26    37.   It is accepted that the Maturity Date referred to in Clause 3.1 below is intended as being
27       14 April 2016.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

38.     Clauses 3 and 4 of the Promissory Note are as follows:

"3.     *Conversion; Fractional Shares.*

3.1     *Conversion Upon Liquidity Event.* Upon the consummation of a Liquidity Event on or before the Maturity Date, the Principal Loan Amount shall automatically convert into a new class of preferred equity securities (the" New Equity Securities") of the Borrower at a pre-money as-converted, fully-diluted valuation of the Borrower of US$39 million based on using the treasury method to account for all authorized and issued securities, as of the date of the closing. Such New Equity Securities shall be entitled to an initial liquidation preference, prior and in preference to any distributions to any holder of equity securities, in the amount of two and one half (2.5) times the aggregate Principal Loan Amount. Thereafter, such New Equity Securities shall be entitled to participate with the other equity securities of the Borrower in any remaining distributions in accordance with the charter documents of the Borrower then in effect based on the as-converted ownership of the Borrower.

3.2     *Payment Upon Financing.* If a bona fide equity financing of the Borrower is consummated on or before the Maturity Date, then the Borrower shall pay the Noteholder in cash two and one half (2.5) times the amount of the Principal Loan Amount on or prior to the Maturity Date. For the avoidance of doubt, the conversion of a loan (whether originally in the form of a convertible loan or otherwise) into equity shall not constitute a "bona fide equity financing" for the purposes of this Note.

3.3     *Conversion after Maturity.* If neither (a) a Liquidity Event nor (b) a bona fide equity financing of the Borrower has been consummated on or before the Maturity Date, then the Principal Loan Amount shall convert into

equity securities of the Borrower on terms and conditions to be negotiated in good faith by the Borrower and the Noteholder. In addition, upon the Maturity Date, each holder of a promissory note payable by the Company and issued on or automatically and without further action by any Creditor be deemed to constitute a committee (the "Creditors' Committee"), to which certain rights relating to key corporate and operational actions by the Company and other rights to be negotiated between the Company and the Creditors shall be granted by the Company.

3.4   *Mechanics and Effect of Conversion.*  No fractional shares of the Borrower's capital stock will be issued upon conversion of this Note. In lieu of any fractional share to which the Noteholder would otherwise be entitled, the Borrower will pay to the Noteholder in cash the amount of the unconverted principal balance of this Note that would otherwise be converted into such fractional share. Upon conversion of this Note pursuant to this Section 3, the Noteholder shall surrender this Note, duly endorsed, the principal offices of the Borrower. The Borrower will, as soon as practicable thereafter, issue the deliver to the Noteholder, at such principal office, a certificate or certificates for the number of shares to which the Noteholder is entitled upon such conversion, together with any other securities and property to which the Noteholder is entitled   upon such conversion under the terms of this Note, including a check payable to the Noteholder for any cash amounts payable as described herein. Upon conversion of this Note, the Borrower will be forever released from all of its obligations and liabilities under this Note.

4.   **Pledge Agreement.**

The Borrower's performance of its obligations hereunder is secured by a first priority security in the collateral specified in the Pledge Agreement,

39.     It is accepted that in the context of the present facts Clause 3.2 has no applicability and that it never came into effect.

40.     A Liquidity Event is defined in Clause 1:

*"Liquidity Event" means (a) any consolidation, amalgamation, scheme of arrangement or merger of the Borrower with or into any other Person or other reorganization in which the shareholders of the Borrower immediately prior to such consolidation, amalgamation, merger scheme of arrangement or reorganization own less than fifty percent (50%) of the Borrower's voting power in the aggregate immediately after such consolidation, merger, amalgamation, scheme of arrangement or reorganization, or any transaction or series of related transactions to which the Borrower is a party in which in excess of fifty percent (50%) of Borrower's voting power is transferred provided that the foregoing shall not include a bona fide equity financing of the Borrower; or (b) a sale, transfer, lease or other disposition of all or substantially all of the assets of the Borrower (or any series of related transactions resulting in such sale, transfer, lease, or other disposition of all or substantially all of the assets of the Borrower)."*

41.     However, it is to be noted that the JOLs contend that there was in fact no Liquidity Event as described in Clause 3.1 prior to reaching the Maturity Date.

42.     Clause 10.3 prescribes that the governing law of the Note, the Pledge Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note, the Pledge Agreement and the transactions contemplated hereby and thereby shall be governed by the Laws of the State of California.

43.     Finally for present purposes Clause 10.11 states:

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                    Page 20

1

2           "10.11.     *Amendments and Waivers*. *No terms of this Note may be waived, modified or*

3                  *amended except by an instrument in writing signed by both of the parties*

4                  *hereto. Any waiver of the terms hereof shall be effective only in the specific*

5                  *instance and for the specific purpose given."*

6

7   44.     The JOLs contend in light of the foregoing provisions that under Clause 3.3 there is

8         requirement for an agreement to be reached between the Company and the Noteholder as

9         to the terms and conditions of the newly converted shares, and crucially that if there is no

10        such agreement reached and the Maturity Date has passed, the Noteholder will simply

11        have a claim for the repayment of the Principal Loan Amount under the Note.

12

13   45.     The JOLs set out this proposition at paragraph 46 of their Submissions, and it is an issue

14        which is central to the resolution of this Appeal.

15

16   46.     The JOLs further state that the terms of the Promissory Notes provide for certain events

17        of default (Clause 8.3). The effect of an Event of Default is that the Principal Loan

18        Amount became due and payable pursuant to the terms of Clause 9 of the Note.

19

20   47.     Events of Default are set out at Clause 8:

21

22         "8.     *Events of Default*. *The occurrence and continuance of any of the following shall*

23                *constitute an Event of Default hereunder:*

24

25             8.1     *Failure to Pay*. *The Borrower fails to pay (a) any principal amount of the*

26                   *Loan when due or (b) any other amount when due and such failure*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 24 of 104 Page ID
Case 2:18-cv-02663-MWF-SS Document 146-8 Filed 04/24/19 Page 20 of 99 Page ID #:128
#:1575

continues for thirty (30) Business Days after written notice has been sent
to the Borrower.

8.2    <u>Breach of Covenants</u>. The Borrower fails to observe or perform any
material covenant, obligation, condition or agreement contained in this
Note or the Pledge Agreement other than those specified Section 8.1 and
such failure continues for 30 days after written notice to the Borrower;
provided that an Event of Default shall not be triggered if the Borrower
disputes the alleged failures in the Noteholder's written notice to the
Borrower, and such alleged failures shall not constitute an Event of
Default unless and until the dispute has been resolved in the Noteholder's
favor in accordance with the procedures set forth in this Note.

8.3    <u>Bankruptcy.</u>

(a)    The Borrower commences any case, proceeding or other action (i)
under any existing or future Law relating to bankruptcy,
insolvency, reorganization, or other relief of debtors, seeking to
have an order for relief entered with respect to it, or seeking to
adjudicate it as bankrupt or insolvent, or seeking reorganization,
arrangement, adjustment, winding-up liquidation, dissolution,
composition or other relief with respect to it or its debts or (ii)
seeking appointment of a receiver, trustee, custodian, conservator
or other similar official for it or for all or any substantial part of
its assets, or the Borrower makes a general assignment for the
benefit of its creditors;

(b)    there is commenced against the Borrower any case, proceeding or
other action of a nature referred to in Section 8.3 (a) above which
(i) results in the entry of an order for relief or any such
adjudication or appointment or (ii) remains undismissed,
undischarged or unbounded for a period of 60 days;

(c)    there is commenced against the Borrower any case, proceeding or
other action seeking issuance of a warrant of attachment,

1      *execution or similar process against all or any substantial part of*
2      *its assets which results in the entry of an order for any such relief*
3      *which has not been vacated, discharged, or stayed or bonded*
4      *pending appeal within 60 days from the entry*

5      *(d)*      *the Borrower takes any action in furtherance of, or indicating its*
6      *consent to, approval of, or acquiescence in, any of the acts set*
7      *forth in Section 8.3 (a), Section 8.3 (b) or Section 8.3 (c)above; or*

8      *(e)*      *the Borrower is generally not, or shall be unable to, or admits in*
9      *writing its inability to, pay its debts as they become due."*

12    48.    Remedies are dealt with at Clause 9:

14      "9.    *Remedies. Upon the occurrence of any Event of Default and at any time thereafter*
15      *during the continuance of such Event of Default, the Noteholder may at its option,*
16      *by written notice to the Borrower (a) declare the entire principal amount of this*
17      *Note immediately due and payable; and (b) exercise any or all of its rights,*
18      *powers or remedies under the Pledge Agreement or applicable Law; provided,*
19      *however that, if an Event of Default, described in Section 8.3 shall occur, the*
20      *Principal Loan Amount shall become immediately due and payable without any*
21      *notice, declaration or other act on the part of the Noteholder. In addition to any*
22      *amount due hereunder, upon the occurrence of an Event of Default, the Borrower*
23      *shall reimburse the Noteholder for its reasonable out-of-pocket costs of*
24      *collections (including reasonable fees of its counsel)."*

25 **Pledge Agreement**

26    48.    Correspondingly there is a Pledge Agreement to secure the payment and performance of
27      all of the Secured Obligations, as referred to above.

28    49.    The Pledge is set out in these terms at Clause 2:

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1       "2.     *Pledge. The Pledgor hereby pledges, assigns and grants to the Secured Party as*

2                *primary obligor and not merely as surety, and hereby creates a continuing first*

3                *priority lien and security interest in favor of the Secured Party in and to all of its*

4                *right, title, benefit and interest in and to the following, wherever located, whether*

5                *now existing or hereafter from time to time arising or acquired (collectively, the*

6                *"Collateral").*

7          (a)     *all assets (including intangible assets) of the Pledgor in the United States,*

8                       *including without limitation its content library, license agreements, and*

9                       *physical assets, such as production equipment."*

10 50.   As the Court understands it, two specific points are made by the JOLs in relation to this

11       provision. First, the Clause deals with the assets of the Pledgor, which is a Company

12       incorporated in the Cayman Islands. Secondly, the Pledge is specifically restricted to all

13       assets of the Pledgor *"in the United States"*, and not otherwise.

14

15 **The Function of the Court**

16 51.   At this point the Court reminds itself as it did in the *Ardon* case that an Appeal against the

17       rejection of a proof of debt is to be treated as a *de novo* adjudication of the creditor's

18       proof, and that the alleging creditor is entitled to rely upon additional evidence in support

19       of its claim.

20 52.   The task for the Court on such an Appeal is to examine the evidence placed before it and

21       to come to a view whether, on balance, and taking into account the merits of the claim of

22       the creditor whose proof is being considered, the claim has been established and, if so, in

23       what amount: see McPherson's Law of Company Liquidation, 3rd ed., paragraph 12-064.

24 53.   A potential creditor must provide satisfactory proof that the creditor's claim is founded

25       on a real debt. Therefore in the absence of a potential creditor having discharged that

26       burden and duly satisfied the Court upon a balance of probabilities, no legal obligation

27       would then arise to admit the proof of debt.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Page 21 of 98

**The Fisch Letter**

54.     It was subsequent to the original Maturity Date as identified as above that the following email letter dated 24 April 2016 was sent to creditors:

*"Dear Creditor*

*China Branding Group Ltd ("Company")*

*As you may be aware, the Company has issued convertible promissory notes to a number of third party creditors. As at the date hereof, the Company is unable to meet its obligations under the Notes that have already matured, and anticipates not being able to meet its obligations under the Notes that are shortly maturing. The Company is unable to pay its debts as they fall due.*

*As a consequence, the Company's Board of Directors ("Board") has been seeking to effect a sale of the Company's business ("Business") in order to allow the Business to continue funding its operation, and maximize returns for the Company's creditors. The Company's efforts to effect a sale of its Business, and/or find alternative solutions to the Company's liquidity issues, are ongoing. The Board intends to revert back to the Company's creditors to update them on material developments in due course. In the meantime creditors are invited to direct any questions or concerns as to the Company's position to the Board.*

*Yours faithfully,*

*Jacob A. Fisch*

*For and on behalf of*

*China Branding Group Ltd"*

**The Evidence of Mr Tony Bobulinski**

55.     In his First Affidavit dated 4 August 2017 Mr Tony Bobulinski states that he is "*a secured creditor*" of the Company.

56.     At paragraph 2 he states:



Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 28 of 104 Page ID #:1579
Case 2:19-cv-02963-MWF-SSJC Document 68 Filed 04/24/19 Page 24 of 99 Page ID #:1579
#:1579

1    "2.     I make this Affidavit in support of a summons dated 5 July 2017 for an appeal of a
2            partial rejection of a proof of debt. On 19 April 2017 I lodged an amended proof
3            of debt in the winding up of the Company (the Proof of Debt) claiming the sum of
4            US$1,625,000 plus US$140,000 in legal fees (total US$1,765,000). On 14 June
5            2017 the Joint Official Liquidators (JOLs) issued a Notice of Rejection which
6            stated that the Proof of Debt had been rejected for the amount of
7            US$1,115,000.00 (and continued to be admitted for the balance of US$650,000)."

8    57.   Then he continues at paragraphs 5-10:

9    "5.     I have been a business associate of Mr Adam Roseman (Adam), who is the
10           founder and Chief Executive Officer of China Branding Group Limited ("CBG"),
11           for more than 16 years. Over the years, I invested in a number of Adam's business
12           ventures and I was a shareholder in CBG from the beginning of the company.
13           Adam and I have also been close personal friends for many years.

14   6.      In the spring of 2015, Adam asked me to provide a bridge loan for CBG for
15           working capital to supporting its ongoing business operations while CBG
16           searched for a buyer of the company.

17   7.      In April 2015, in response to Adam's request I agreed to lend CBG $500,000 in
18           exchange for a Senior Secured Convertible Promissory Note (Note) [pages 1 to
19           11] and corresponding Pledge Agreement [pages 12 to 18]. From the very
20           beginning of my negotiations with Adam regarding my providing a loan to CBG,
21           Adam proposed and agreed on behalf of CBG that I would receive a return of two
22           and a half times (2.5x) the amount of my loan in the event of the anticipated sale
23           of CBG or other liquidity event, with a liquidation preference based on the timing
24           of funding by each party (with priority given to those who funded first, which was
25           me and Michael Loeb who lent $100,000) if such a sale did not bring in enough
26           money to repay all the loans. This proposal was set out in an email from Adam to
27           me on 3 August 2015 [page 19 to 20].

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

<table>
<tbody>
<tr><td>1</td><td>8.</td><td>In an effort to incentivize CBG to move quickly toward consummating a liquidity</td></tr>
</tbody>
</table>

8.      *In an effort to incentivize CBG to move quickly toward consummating a liquidity event (i.e. the sale of CBG), and to provide a remedy for me in the event there was no liquidity event, I insisted on a maturity date deadline in the Note of one year from the loan, at which point I could exercise an alternative remedy. The purpose of the deadline was to allow my Note to be converted into a large equity interest in CBG in the event a liquidity event did not occur or was not on the horizon within one year. In accordance with clause 3.3 of the Note, if the sale (or other liquidity event) did not happen on or before the maturity date, the principal loan amount under the Note would convert into equity securities of CBG on terms and conditions to be negotiated by CBG and me.*

9.      *Before I executed the Note, Adam assured me in an email dated 8 April 2015 [pages 23] that the notes drafted for me and other investors "include the attorneys' final suggestions on creating protections for the note holders and a managed process controlled by the note holders after a year (disempowering SIG) if a sale is not complete." I understand that the maturity date was also added to other noteholders' documents after negotiations between CBG and those parties. I am informed and believe that SIG, a CBG shareholder, had convertible preferred stock that was subordinated to my Note.*

10.      *On or around 14 April 2015, I executed the Note and Pledge Agreement to lend CBG $500,000 and I wired CBG the first $100,000. Over the course of the following 12 months, I made further wire transfers totaling $650,000. The transfers and amounts were confirmed on 19 December 2016 [page 24]."*

58.    Mr Bobulinski continues at paragraph 12:

*"12.      Throughout the beginning of 2016, I was in constant communication with Adam about his negotiations with Remark. At the end of January 2016, Adam informed me, in a WhatsApp exchange on 26 and 28 January 2016, that he anticipated closing the deal to sell CBG to Remark in 45 days (i.e. mid-March 2016) [page*

1    *36]. In February 2016, Adam asked me for additional cash to keep CBG's*
2    *business operating until the sale and I agreed to lend an additional $150,000 to*
3    *CBG on the basis of Adam's representation that the sale of CBG was imminent. I*
4    *wired $50,000 towards that additional loan on February 2. A new Senior Secured*
5    *Convertible Promissory Note reflecting the additional loan amount was drafted*
6    *on 1 February 2016 [pages 79 to 88]."*

8    59.    Then he states at paragraph 17:

9    *"17.    On 11 April 2016, on Adam's request I signed an amendment to my Note*
10   *reflecting the increase in my loan amount from the original loan of $500,000 to*
11   *the $650,000 that I had actually loaned to CBG [pages 100 to 101]. Adam told*
12   *me, in an email on the same date, that the amended documents were to be*
13   *submitted to the Cayman court as proof of our agreement [pages 97 to 99]."*

15   60.    He continues at paragraph 20:

17   *"20.    On or around 22 April 2016, I had a telephone conversation with Adam about the*
18   *fact that the one-year maturity deadline had passed (pursuant to which, under*
19   *clause 3 of the Note, my Note would have been converted to equity on terms to be*
20   *negotiated) but there was no mention from me or from Adam about negotiating*
21   *the terms of such a conversion or of my surrendering the Note in accordance with*
22   *clause 3.4. I discussed getting new a new note in place, but Adam told me that*
23   *would be difficult and unnecessary, and repeatedly assured me (and I believe)*
24   *that I would be paid my 2.5x return in cash upon the close of the sale of CBG to*
25   *Remark which he continuously represented as being imminent."*

27   61.    Mr Bobulinski adds at paragraphs 24 and 25:



*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1      "24.    *Whenever I expressed any concern, Adam told me no deal could go forward*
2                *without my consent [page 64]. Based on his representations that the sale to*
3                *Remark would close soon and that he had control to make sure I would receive*
4                *the agreed upon 2.5x my loan, I did not initiate any process for or negotiation of*
5                *the conversion my Note to equity securities under the terms of the Note. Adam (on*
6                *behalf of CBG) also took no such action in relation to the Note conversion). This*
7                *conduct and the conversations between me and Adam were all inconsistent with*
8                *any enforcement of the maturity deadline and the actions that would follow under*
9                *the terms of the Note. My understanding was therefore that the one-year deadline*
10               *in the Note had been voluntarily waived, as we never engaged in any negotiation*
11               *of the terms of the conversion of my Note to equities (which is what would be*
12               *required if the deadline had not been waived) and I never took any steps to take*
13               *control over CBG's assets as provided in the Pledge Agreement or to block the*
14               *sale, based on Adam's representations that I would be paid in full what I was*
15               *owed under the Note.*
16

17      25.    *Given the waiver of the maturity date, under clause 3.1 of the Note the Principal*
18               *amount of $650,000 would therefore have been automatically converted into*
19               *preferred equity securities with an initial liquidation preference in the amount of*
20               *2.5x the principal (the premium) totaling $1,625,000. My understanding was that*
21               *I was therefore entitled to 2.5x the aggregate principal amount on the occurrence*
22               *of a liquidity event (the imminent sale of CBG). Given my close relationship with*
23               *Shing Tao of Remark, if I had thought I would not receive my 2.5x return on my*
24               *loan I could have prevented the deal. But I did not do so."*
25
26
27   62.   In addition, he states at paragraph 30:
28
29      "30.    *In reliance on the clear, unambiguous and continuous representations from*
30               *Adam, the CEO of CBG, I lost the valuable opportunity of exercising control over*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 32 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-6 Filed 04/24/19 Page 28 of 99 Page ID #:136
#:1583

1          *CBG through the conversion of my Note into equity, to block the sale to Remark*
2          *absent more favorable terms."*

63.   In cross-examination Mr Bobulinski agrees that he did not take legal advice and that Mr Roseman had told him that they were negotiating in good faith.

64.   He says that the sale to Remark was a Liquidity Event and he understood that he would be paid as a creditor.

65.   Nobody had explained to him what convertibility had meant. He had brought *"the Buyer"* to the table and because of achieving that he was to be paid his 2 ½ times.

**The Evidence of Mr Shing Tao**

66.   Mr Shing Tao is Chief Executive Officer and Chairman of the Board of Remark Holdings Inc formerly known as Remark Media Inc.

67.   He made his Affidavit, dated 23 September 2018, at the request of Mr Bobulinski.

68.   At paragraph 5 he states:

    *"5.*     *As reflected in Remark's 2016 10-K, (a copy of which is exhibited at ST-1) CBG allocated $9,206,000 of the purchase price for CBG to "media content and broadcast rights" ($2.1 million), "customer relationships" ($3.2million), "acquired technology" ($2million) and "trade names" ($3.7million). Media content and broadcast rights include the content library and license agreements for distribution of live events. The reference to "media content and broadcast rights" appears to be synonymous with the terms "content library" and "license agreements."*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

69. In cross-examination he contends however that Remark had purchased a business that had nothing in terms of assets.

### The Evidence of Mr Adam Roseman

70. Mr Adam Roseman's Third Affirmation is dated 8 September 2017, and is made at the request of the JOLs of the Company.

71. He is a Director and was previously Chief Executive Officer of the Company.

72. He states at paragraphs 10-14:

> "*Funding Issues and the Loan*
>
> 10. *Mr Bobulinski and I have been business associates for approximately 13 years. We were friends for many years and he invested in a number of my business ventures.*
>
> 11. *As mentioned at paragraph 6 of Bobulinski 1, in around Spring 2015 I asked Mr Bobulinski if he would be willing to provide a bridge loan to the Company to assist with funding requirements that had arisen. I refer to Roseman 1 which sets out the details of the liquidity difficulties the Company was facing between 2015 and 2016.*
>
> 12. *In summary, as explained at paragraph 16 of Roseman 1, due to the growth of the Company from 2013 to 2016, it was necessary for the Company to obtain working capital from multiple sources, as is often the case with start-up media businesses. As a result, the Company entered into a number of financing arrangements with third parties pursuant to the terms of certain promissory notes, which, as referred to at paragraph 18*

1  *(b) and Tab 5 of Exhibit "AR-1", included a Senior Secured Convertible*
2  *Promissory Note that the Company entered into with Mr Bobulinski, dated*
3  *14 April 2015 (the "Note"). The Note was based on a loan that Mr*
4  *Bobulinski has agreed to provide to the Company in the amount of*
5  *USD$500,000, subsequently increased by USD$150,000 to USD650,000*
6  *(the "Principal Loan Amount"), and the maturity date for which was 12*
7  *months following the date of the Note. The terms of the original form of*
8  *note were provided by Mr Bobulinski and subsequently further negotiated*
9  *with other investor participants, led by Mr Roche.*

## Communications with Mr Bobulinski

13.  *I should mention at the outset that it is unclear to me if the WhatsApp evidence adduced by Mr Bobulinski is complete. My understanding is that WhatsApp is unable to save and hold all messages so that after a period of time messages will be lost. I am therefore unable to confirm what messages were exchanged between us prior to those provided from page 34 of Exhibit "TB-1" onwards. Mr Bobulinski, unlike any other business associates of mine, preferred to communicate almost exclusively over the phone and via WhatsApp, with limited email communication.*

14.  *However, before addressing each of Mr Bobulinski's assertions directly, I believe the following points should be kept in mind when considering his evidence:*

   *(a) The assurances that Mr Bobulinski says that I made were assurances of intention and/or my attempts to obtain the financial and/or commercial outcome for him that he wanted. They were not assurances of my having achieved or obtained those outcomes. During this period, I was working under extreme pressure in seeking to procure and, latterly, assisting the Company's joint official liquidators*

to achieve a sale of the Company's business and assets, failing which, there would be no prospect of any returns to the Company's stakeholders. Ultimately, this process was far more prolonged and expensive than I had, or could have, anticipated based on the extensive professional advice I sought and received. In addition, the Company was reliant on third party loans in order to continue trading during this period;

(b) The prevailing theme of Mr Bobulinski's communications, implied and/or expressed, was to tell me what was imperative that I secure for him, and if I failed he would ensure the sale of the Company would collapse;

(c) As the matter progressed, it became necessary for me to respond to Mr Bobulinski in a certain manner in order to defend myself and my family from his bullying and threatening behavior;

(d) Remark and their Chief Executive Officer, Mr Shing Tao (who Mr Bobulinski describes as his close friend) were used by Mr Bobulinski as points of leverage in his threats to destroy the sale process if he did not receive what he wanted. However, it is highly significant that it was Remark who, at the last minute, and to the surprise of myself and Mr Bobulinski, elected to waive the requirement for Mr Bobulinski to sign the Distribution Agreement and Joinder Agreement in order that the transaction could complete without his consent to subordinate his outstanding loans to the Company's unsecured creditors; and

(e) In my opinion, Mr Bobulinski refused to take any pro-active steps to protect himself and refused to speak directly to the Company's other Noteholders, namely Mr Robert Roche and/or Mr Jacob Fisch, in order to keep me as a scapegoat if he did not obtain all that he wanted out of the transaction.

1
2       *Whilst Mr Bobulinski did assist with the sale on introducing Remark to the Company, he*
3       *was compensated with market sell-side M&A advisor compensation under the Finder's*
4       *Fee Agreement that he negotiated separately with the Company and pursuant to which*
5       *he was entitled to a "finder's fee" equal to three and one third per cent of the cash*
6       *consideration received by the Company for the sale of its business and assets, in*
7       *addition to the amount that Mr Bobulinski received from management's agreement to*
8       *assign part of its transaction bonus to him Mr Bobulinski's rights under this agreement*
9       *were separate and distinct from his rights arising under the Note."*
10
11
12   73.    He describes various assertions by Mr Bobulinski that he gave Mr Bobulinski assurances,
13         or promised him, that he would receive a two and a half times return on the Principal
14         Loan Amount in cash. He denies that promises were made: reassurances extended only as
15         far as stating that the Remark deal was "*on track*".
16
17   74.    He emphasises at paragraph 17 that the Maturity Date in the Note had not been waived,
18         but that he could help Mr Bobulinski by transferring to him "*a component of my*
19         *position*".
20
21   75.    He amplifies the point at paragraph 20:
22
23      "*20.    I was also, at this time, working on the basis that I would, in my appointed*
24            *position to allocate the management bonus pool, allocate US$100,000 to Mr*
25            *Bobulinski out of the management bonuses payable by Remark on completion of*
26            *the transaction. This was not money that he was entitled to or that I thought he*
27            *was entitled to (whether legally or commercially) but I was responding to his*
28            *relentless pressure and threats in trying to secure these monies for him as I was*
29            *concerned that if I did not, he would destroy the deal and nobody would receive*
30            *anything. I would add that Mr Bobulinski was of course aware that I could not*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1    *control all the parties and each of the moving parts throughout the process.*
2    *However, throughout this period, he always appeared more concerned with what*
3    *he wanted, regardless of whether this was what had been agreed between the*
4    *parties and/or whether the terms and mechanics of the documents recorded any*
5    *such agreement."*

6

7    76.    He adds at paragraph 25:

8

9    *"25.    In summary, the words that have been characterized by Mr Bobulinski as*
10   *assurances or reassurances, promises and 'clear, unambiguous, continuous*
11   *representations' were either (i) assurances that I would attempt or was*
12   *attempting to obtain a certain outcome for him that he wanted, or (ii) the latest*
13   *updates which he had been asking for and which were clearly subject to change*
14   *and a number of rapidly moving parts as the Company's financial position*
15   *continued to deteriorate. I believe that Mr Bobulinski was fully aware of this and*
16   *also appreciated the competing demands faced by the Company during this time."*

17

18   77.    Mr Roseman also confirms in cross-examination that the money proposed would have
19          come out of his pocket as a contribution *"to the pot"*, as he puts it.

20

21   **The Evidence of Mr Hugh Dickson**

22

23   78.    Mr Hugh Dickson, who is one of the two JOLs of the Company, provides background
24          evidence in his Fifth Affidavit dated 8 September 2017, and he explains how Mr
25          Bobulinski's claims came to be rejected. For reasons of brevity, it is not proposed to set
26          out at length the contents of Mr Dickson's evidence.

27

28   79.    Mr Dickson states at paragraph 10:

29

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 38 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJC Document 1468-4 Filed 04/24/19 Page 38 of 99 Page ID
#:1589

1         "10.    *Whilst the JOLs have admitted Mr Bobulinski's proof of debt claim in the amount*

2                    *of US$650,000 as the Principal Loan Amount, for the reasons set out in this*

3                    *Affidavit, the JOLs have determined that Mr Bobulinski does not rank as a*

4                    *secured creditor of the Company, nor is he entitled to apply a 2.5 times cash*

5                    *multiplier to his claim pursuant to the terms of his Note."*

6

7  80.    In Mr Dickson's Ninth Affidavit dated 19 October 2018, Mr Dickson states as follows at

8        paragraphs 5-9:

9

10      *"RAAD Productions, LLC*

11      5.  *As set out in further detail in paragraphs 17 to 26 of my fifth affidavit sworn on 8*

12           *September 2017 ("Dickson 5"), pursuant to an asset and securities purchase*

13           *agreement ("the APA") completed on 20 September 2016, the Company (acting by*

14           *the JOLs) sold such right, title and interest as the Company may have had in, inter*

15           *alia, the shares of China SNS Group Limited, Fanstang (Shanghai) Entertainment*

16           *Consulting Co. Ltd. and RAAD Productions LLC ("RAAD").*

17

18      6.  *Prior to completion of the APA, RAAD was not a subsidiary of the Company and*

19           *was in fact owned by three separate shareholders, being Hickory Grove, LLC, The*

20           *Hudson Holdings Trust and Tapirdo Enterprises, LLC (the "Former*

21           *Shareholders"). Based on my discussions with the Company's former Chief*

22           *Executive Officer, Adam Roseman, I understand that each of the Former*

23           *Shareholders held one third of the equity of RAAD and that Tapirdo Enterprises,*

24           *LLC is owned by Mr Roseman's wife and a family trust.*

25

26      7.  *As a condition precedent to completion of the APA, it was agreed that the former*

27           *Shareholders would transfer their shares in RAAD to the Company, with the*

28           *transfer ultimately taking place on 19 September 2016 pursuant to a Purchase and*

29           *Sale Agreement entered into between (i) the Former Shareholders, (ii) the*

Company and (iii) the JOLs (the "RAAD Transfer Agreement"). A copy of the RAAD Transfer Agreement is exhibited at pages 1 to 8 of Exhibited "HD-9".

8.  As noted in the RAAD Transfer Agreement, the consideration payable for the Transferred Interest (as defined in the RAAD Transfer Agreement) was US$10.

9.  As noted in paragraph 5 above, following completion of the RAAD Transfer Agreement on 19 September 2018, the Company's interest in the RAAD shares were transferred to Remark Media, Inc. ("Remark") pursuant to the terms of the APA dated 20 September 2018. The APA did not allocate any share of the consideration attributable to the Company's shareholding in RAAD, or indeed to any of the assets sold pursuant to the APA."

**The Experts**

81.  A Memorandum of California Law dated 4 August 2017 has been prepared and submitted by Mr Jeffrey Valle, a qualified and experienced Attorney of the State of California.

82.  Mr Valle makes the following central propositions at paragraphs 4-5:

"**Legal Argument**

3.  Under California's well established principles of waiver and promissory estoppel, Mr Bobulinski is entitled to the full 2.5x return on his loan of US$650,000 (US$1,625,000), and he is secured for the full amount pursuant to the Pledge Agreement.

*Waiver*

4.   The maturity date under the Note was indisputably waived, as evidenced by the parties' conduct and contemporaneous statements. Neither Bobulinski nor China Branding Group (CBG) took any action in relation to the conversion of Mr Bobulinski's loan amount to equity under Section 3.3 of the Note which is what is mandated to occur upon the maturity date. Neither party treated the Note as converted, Mr Bobulinski did not surrender his Note, the parties engaged in no negotiations of the terms of the conversion - all of which would have occurred had the maturity date not been waived. Instead, consistent with Section 3.1, Adam Roseman repeatedly told Mr Bobulinski he would get his 2.5x return and assured him the pending sale to Remark would accomplish the parties' agreement. Under Section 3.1 of the Note, because the maturity date was ignored and waived, Mr Bobulinski's principal loan amount of $650,000 converted to a preferred equity position with a 2.5x liquidation preference upon the liquidity event of the sale of CBG's assets to Remark."

83.   He proceeds to explain waiver in general terms at paragraph 5:

"5.   It is well established under California law that waiver is an intentional relinquishment of a known right and it may be implied through conduct manifesting an intention to waive. Gould v. Corinthian Colleges, Inc., 192 Cal. App. 4th 1176, 1179 (2011) (acceptance of benefits is conduct that supports a finding of waiver). Thus, a waiver may occur as the result of acts which are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. Crest Catering Co. v. Superior Court of Los Angeles Cty., 62 Cal. 2d 274, 278 (1965) (conduct waived privilege against disclosure of tax documents). See also, Biren v. Equality Emergency Medical Group, 102 Cal. App. 4th 125, 141 (2002) (where shareholder "behaved in a manner antithetical" to written approval provision, the provision was waived); Old Republic Ins. Co. v. FSR Brokerage, Inc., 80 Cal. App. 4th 666, 678-79 (2000) (conduct established waiver of jury trial; Hennefer v. Butcher, 182 Cal App 3d

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 04/24/24 Page 41 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 68-4 Filed 04/24/24 Page 37 of 99 Page #:145
#:1592

1      492, 503 (1986) (waiver of contractual right "may properly be implied from
2      conduct which is inconsistent with the exercise of that right.")

4  84.    At paragraph 6, Mr Valle relies upon the following assertions:

6    "6.    Both Mr Bobulinski's and Mr Roseman's conduct just before the Maturity Date
7      and in the days and months thereafter demonstrate that the parties waived the
8      maturity deadline. Since neither a Liquidity Event nor an equity financing had
9      been consummated by the maturity date, if the maturity date were going to be
10     enforced CBG and Mr Bobulinski would have begun negotiations on the terms of
11     the conversion of the Loan into equity securities as provided under Section 3.3.
12     That did not occur. Instead, Mr Roseman repeatedly and continuously assured Mr
13     Bobulinski that his interests were protected and he would get his 2.5x return,
14     which was provided under Section 3.1. Indeed, the communications between Mr
15     Roseman and Mr Bobulinski and their actions make clear that no one intended to
16     enforce the April 15, 2016 deadline or the conversion process.

17     •  In March 2016, a Letter of Intent had been signed by Remark, and Mr
18       Bobulinski continued to wire funds to CBG in March 2016 under the Note.
19       (TB Affidavit at 13.)

20     •  As of 2 April 2016 Mr Roseman promised Mr Bobulinski he was getting
21       his 2.5s return on his capital investment.

22     •  On 11 April 2016 – just four days before the Maturity Date – at Mr
23       Roseman's request, Mr Bobulinski signed an amendment to his Note and
24       Pledge Agreement reflecting the increase in the loan amount from the
25       original loan of $500,000 to the $650,000 that he actually loaned to CBG.
26       If the maturity date was going to be in effect there would have been no
27       reason for Mr Bobulinski to sign that amendment.

28     •  On 13 April 2016, Mr Roseman told Mr Bobulinski that he expected the
29       Remark deal would be funded and closed on May 10, less than one month
30       away.

- *After the Maturity Date had passed in April 2016. The parties did not discuss or initiate the process in relation to the conversion of Mr. Bobulinski's Note to equity securities under Section 3.3 because both parties anticipated the sale of CBG would happen within a few weeks and Mr. Bobulinski would be paid as agreed. Nor were any rights to key corporate and operational actions granted to Mr. Bobulinski as a "Creditor" pursuant to Section 3.3. Nor was Mr. Bobulinski asked to surrender his Note in exchange for share certificates pursuant to Section 3.4. The sale process ended up taking longer than anticipated, but Mr. Bobulinski reasonably believed that the maturity date was waived, and all of the conduct and statements from Mr. Roseman and CBG were consistent with this understanding and inconsistent with an intent to enforce the maturity date.*

- *Instead, Mr. Bobulinski helped facilitate the sale to Remark by, among other things, meeting with a SIG representative in an attempt to get its support for the deal and negotiating a reduction of the fee CBG owed its investment banker. If the maturity date had passed, this would not have been in his interest and he would have taken steps to block the sale to Remark.*

*In sum, the conduct of the parties was antithetical to the terms of Section 3.3 of the Note (the Maturity Date and negotiated conversion rights) and clearly demonstrates the parties' intent to waive those terms."*

85. He deals with promissory estoppel at paragraph 7:

"7. *California has adopted the Restatement Second of Contracts doctrine of promissory estoppel: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise... and which does induce action or forbearance is binding if injustice can be avoided only by enforcement*

of the promise." *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority, 23 Cal. 4th 305, 310 (2000) citing Rest. 2d Contracts, section 90."*

86.  Then at paragraph 9 Mr Valle summarises the elements:

"9.   *The elements of a promissory estoppel claim are (1) a clear promise and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance. Id. At p. 901. The contract measure of damages applies to claims based upon promissory estoppel. See Cooper v. State Farm, 177 Cal. App. 4th 876, 888 (2009) ("[D]amages [are] measured by the extent of the obligation assumed and not performed.")*

87.  In essential terms Mr Valle contends that both before and after the Maturity Date, Mr Roseman repeatedly promised Mr Bobulinski that he would receive an agreed upon 2.5x return on his loan on the sale of the Company to Remark and that in reliance on the unequivocal promise Mr Bobulinski *"waived his rights under Section 3.3 of the Note that allowed him to negotiate the terms and conditions of the conversion of his loan into equity securities and obtain the right to make key operational decisions"* (paragraph 12).

88.  He further claims that the reliance was reasonable and foreseeable.

89.  He then proceeds to state that Mr Bobulinski is a secured creditor in the Collateral previously described and indeed that he holds the only security interest in the Collateral, such that he is entitled to have his claim paid in full from the proceeds of the Collateral.

90.  Mr Valle also contends in paragraph 45 that Mr Bobulinski is entitled to claim the full amount of his legal costs *"pursuant to section 9 of the Promissory Note and section 9 of the Pledge Agreement."*

Exhibit 1                                                                 Page 41

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 44 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-4 Filed 04/24/19 Page 40 of 99 Page ID
#:1595

1

2    91.    An additional Report dated 1 September 2017 has been prepared by Mr Valle, in which

3        he sets out his professional background and experience.

4

5    92.    At paragraph 3.1 he takes issues with a particular aspect of Mr Dosker's opposing

6        Report:

7        "*3.1*    *The Terms of the Note Do Not Preclude Waiver: The Dosker Report states that*

8            *there could not have been a waiver of the maturity date without a writing, citing a*

9            *clause in the Note that states that no term of the Note may be waived or modified*

10          *except by a writing signed by the parties. (Dosker Report at p. 81-83) California*

11          *law is clear that even where a contract states it cannot be modified except by a*

12          *writing, that provision itself can be waived by conduct inconsistent with the*

13          *enforcement of the provision, just as the maturity date was waived by conduct of*

14          *both parties so inconsistent with the enforcement of the maturity date rights as to*

15          *induce a reasonable belief that such rights have been waived. See e.g. Wind*

16          *Dancer Prod. Grp. V. Walt Disney Pictures, 10 Cal. App. 5th 56,78, 80 (2017)*

17          *("The law is clear, however, that notwithstanding a provision in a written*

18          *contract that expressly precludes oral modification, the parties may, by their*

19          *words or conduct, waive the enforcement of a contract provision if the evidence*

20          *shows that was their intent"); MicroTechnologies, LLC v. Autonomy, Inc., 2017*

21          *WL 1848470, at \*16 (N.D. Cal. May 8, 2017) ("California law recognizes that*

22          *parties may impliedly waive or modify responsibilities under a contract through*

23          *conduct, even where the contract includes a clause requiring any modification to*

24          *be in writing."); Epic Med. Mgmt., LLC v. Paquette, 244 Cal. App. 4th 504, 512*

25          *(2015) ("As a general rule, if a contract provides that a writing is necessary to*

26          *amend it, the parties may, by their conduct, waive such a provision)."*

27

28    93.    He continues at paragraph 3.2 and 3.3:

29



Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 04/24/21 Page 45 of 104 Page ID
#:1596
Case 2:19-cv-02963-MWF-SSJ Document 146-8 Filed 02/08/21 Page 41 of 99 Page #: 149

1          "3.2    *The Execution of an Amendment Does Not Preclude Waiver*: *Mr. Dosker asserts*
2                *that the fact that Mr. Bobulinski signed an amendment to the Note and Pledge*
3                *Agreement precludes a finding that the parties waived the maturity date because*
4                *if the parties intended to waive the maturity date there would have been no reason*
5                *for Mr. Bobulinski to sign that amendment without causing that amendment to*
6                *change the maturity date. (Dosker Report at p. 82.) I disagree. Mr. Bobulinski*
7                *says that he signed the Amendment because Mr. Roseman told him he needed it*
8                *for the Cayman Court.*
9         3.3    *Mr. Bobulinski signed the Amendment relying on Mr. Roseman's assurance that*
10               *Mr. Bobulinski's interests were protected and he would get his 2.5x return under*
11               *Section 3.1 of the Note. The requested Amendment was signed just four days*
12               *before the maturity date of 15 April 2016 because Mr. Roseman said he needed*
13               *the document to file in the Cayman Court (TB Affidavit at 17). Thereafter, Mr.*
14               *Roseman assured Mr. Bobulinski the Remark deal would be closed soon, the*
15               *parties did not discuss or initiate the process in relation to the conversion of Mr.*
16               *Bobulinski's Note to equity securities under Sections 3.3 and 3.4, and Mr.*
17               *Bobulinski helped facilitate the sale to Remark."*

19   94.    He goes on to contend in paragraph 3.6 that since the waiver of the Maturity Date is
20       demonstrated by the conduct of both parties, the elements of mutual waiver are satisfied.

22   95.    He takes issue also with the assertion of Mr. Dosker, to the effect that as Mr. Valle
23       contends the focus is not on whether the promise in promissory estoppel is clear and
24       unambiguous but rather whether it is reasonable for the promisee to rely on the promise
25       (paragraph 4.2). This seems to the Court to be a little disingenuous.

27   96.    In any event, he states apparently in the alternative that the alleged statements made by
28       Mr. Roseman to Mr. Bobulinski are sufficiently definite to be considered clear and
29       unambiguous promises under California law.

1    97.    With regard to the status of RAAD, he asserts at paragraph 5.3 as follows:

3           *"According to CBG's Consolidated Financials as of December 31, 2015 and the*
4           *Secretary of State filing as of December 2014, those assets were held by CBG's United*
5           *States affiliate, RAAD Productions LLC, of which Mr. Roseman was the sole member or*
6           *manager. Under California law, a pledge by a parent of assets held by its affiliated entity*
7           *is enforceable where the Pledger is also an officer of the affiliated entity is enforceable*
8           *where the pledger is also an officer of the affiliated entity, thus creating an implied*
9           *consent. See, e.g., Wachovia Bank Nat'l Ass'n v. WL Homes, LLC (In re WL Homes,*
10          *LLC), 534 Fed. Appx. 165 (3d Cir. 2013); K.N.C. Wholesale, Inc, v. AWMCO, Inc., 56*
11          *Cal. App. 3d 315, 318-19 (1976). Moreover, under principles of estoppel, CBG, having*
12          *asserted that it owns these assets in the Pledge Agreement, should not be heard to argue*
13          *otherwise. See San Diego Mun. Credit Union v. Smith, 176 Cal. App. 3d 919, 922-23, 222*
14          *Cal. Rptr. 467, 468 (Ct. App. 1986) ("Whenever a party has, by his own statement or*
15          *conduct, intentionally and deliberately led another to believe a particular thing true and*
16          *to act upon such belief, he is not, in any litigation arising out of such statement or*
17          *conduct, permitted to contradict it.")"*

19   98.    Mr. Mark C. Dosker is likewise a qualified and experienced attorney of the State of
20          California.

22   99.    His legal position is found in a Report dated 1 September 2017. In his Executive
23          Summary he states *inter alia*:

25          *"Based on clear California law, the Appeal seeking establishment of a claim of*
26          *US$1,625,000 should be denied. No waiver has occurred under California law. And the*
27          *requirements of California law on promissory estoppel have not been met. Accordingly, a*
28          *court applying California law would view Mr. Bobulinski as a creditor with a claim*
29          *US$650,000.*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Page 41 of 98

Exhibit 1                    Page 44

1    *A Court applying California law would not view Mr. Bobulinski as a secured creditor as*
2    *to any portion of the Principal Loan Amount of US$650,000. His only potential security*
3    *interest would have been as to the identifiable proceeds (if any) of the sale of the*
4    *following assets (if any) of CBG which were located "in the United States" when CBG*
5    *entered liquidation: "content library", "license agreements", and "production*
6    *equipment". But a court applying California law would conclude that there are no such*
7    *identifiable proceeds; and in the alternative, that Mr. Bobulinski has not met*
8    *requirements of California law to show the existence of any such identifiable proceeds."*

11   100.   Mr. Dosker proceeds to endorse the position taken by the JOLs:

13   *"Analysis under California Law.*
14   *The parties to the Senior Secured Convertible Promissory Note ("Note") are China*
15   *Branding Group Limited ("CBG") and Mr. Tony Bobulinski. The parties agreed that the*
16   *Note is governed by California law. Appeal at Exhibit TB-1 Page 7 of 243 at Section*
17   *10.3.*
18   *In the February 2017 Notice of Rejection of Proof of Debt, the Joint Official Liquidators*
19   *("JOLs") stated, inter alia, as follows:*
20   *"The total principal claimed in the proof of debt is calculated on the basis that a*
21   *multiplier of 2.5 times should apply to the Principal Loan Amount, amounting to a total*
22   *claim amount of US$1,625,000. For the reasons set out below, the JOLs do not accept*
23   *that the multiplier will apply in these circumstances.*
24   *The JOLs have determined that such a claim would only be valid if the conditions set out*
25   *in clause 3.2 of the Note (Payment Upon Financing) were satisfied. Clause 3.2 of the*
26   *Note provides as follows:*
27   *'If a bona fide equity financing of the Borrower is consummated on or before the*
28   *Maturity Date, then the Borrower shall pay the Noteholder in cash two and one half (2.5)*
29   *times the amount of the Principal Loan Amount on or prior to the Maturity Date.' No*
30   *equity financing was obtained by the Company prior to the Maturity Date of the Note*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 48 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-3 Filed 04/24/19 Page 44 of 99 Page ID #:152
#:1599

1  *(being 14 April 2016) as envisaged by clause 3.2. Further, no Liquidity Event took place*
2  *prior to the Maturity Date as envisaged by clause 3.1, for the purpose of converting the*
3  *Principal Loan Amount into a new class of preferred equity securities. Therefore, neither*
4  *clauses 3.1 nor 3.2 have any application in these circumstances.*

6  *Clause 9 (Remedies) of the Note further provides that 'if an Event of Default described in*
7  *section 8.3 shall occur, <u>the Principal loan Amount shall become immediately</u> due and*
8  *<u>payable</u> without any notice, declaration or other act on the part of the Noteholder'*
9  *(emphasis added).*
10  *The written confirmation given by the Company to its creditors that it was unable to pay*
11  *its debts as they became due constituted an Event of Default under section 8.3 (e) of the*
12  *Note. Accordingly, the provisions of clause 9 of the Note were engaged with effect from*
13  *the date of that confirmation on 24 April 2016, following which, the Principal Loan*
14  *Amount became due and payable. Clause 9 does not provide for any multiplier to be*
15  *applied in such circumstances."*
16  *A court applying California law would reach the same conclusions regarding the Note as*
17  *stated above by the JOLs. This memorandum now turns to address issues of California*
18  *law pertinent to deciding the Appeal."*

20  101.  He goes on to state that the circumstances in this case do not establish any waiver. He
21        appears to accept that parties may by their conduct waive *"no unwritten waiver"* clause,
22        but that here as a matter of California law the evidence fails to show that waiver was the
23        parties' intent.

25  102.  He proceeds to place emphasis on the principle that it is a fundamental requirement of
26        California law that the whole of a contract is to be taken together, so as to give effect to
27        every part of it, if reasonably practicable, each clause helping to interpret the other.

29  103.  He further comments:

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1    *"In addition, in Spellman v. Dixon, (1967) 256 Cal. App. 2d 1, 5, 63 Cal. Rptr. 668, 668,*

2    *671, the court held that a valid waiver must be a clear expression made with full*

3    *knowledge of the facts and an intent to waive the right; doubtful cases will be decided*

4    *against the waiving party. See, e.g., Perini v. Perini, (1964) 225 Cal. App 2d 399, 37 Cal.*

5    *Rptr. 354; Greninger v. Fischer, (1947) 81 Cal. App 2 d 549, 554, 184 P.2d 694."*

6

7 104. The issue for the Court in these proceedings would therefore be whether there was a clear

8    expression of waiver made with full knowledge of the facts and an intent to waive.

9    Anything falling short of that standard would thus be insufficient.

10

11 105. With regard to the promissory estoppel argument, Mr. Dosker proceeds as follows:

12

13    *"Promissory Estoppel.*

14

15    *Regarding a cause of action for promissory estoppel, California courts have stated that*

16    *"to prevail on this claim, [a] plaintiff must prove (1) a promise clear and unambiguous*

17    *in its terms; (2) reliance by the party to whom the promise is made [;] (3) his reliance*

18    *must be both reasonable and foreseeable [;] and (4) the party asserting the estoppel must*

19    *be injured by his reliance. Garcia v. World Sav., FSB, (2010) 183 Cal. App. 4th 1031,*

20    *1037. The facts of the cases cited by Mr. Bobulinski's counsel are readily distinguished-*

21    *for example, in Moncada v. W. Coast Quart Corp., (2013) 221 Cal. App. 4th 768, 780, the*

22    *employer offered and later confirmed repeatedly in writing that it would pay a bonus to*

23    *the employees if they remain employed by the company during its sale process and the*

24    *employees, in reliance of such promise, missed other professional and residential*

25    *opportunities.*

26    *In the present case, CBG has never made a clear and unambiguous promise to pay a 2.5x*

27    *return to the creditor –although this is a key requirement of California law before the*

28    *doctrine of promissory estoppel might apply. See, e.g., State Ready Mix, Inc. v. Moffatt &*

29    *Nichol, (2015) 232 Cal. App 4th 1227 (concrete subcontractor, sued by a general*

30    *contractor for breach of contract and warranty after concrete failed to perform as*

1   *required, could not maintain a promissory estoppel claim for equitable indemnification*
2   *against an engineer based on the engineer's alleged review and approval of concrete mix*
3   *design, as there was no clear and ambiguous promise from the engineer even though he*
4   *approved the concrete mix design; the approval , without any active offer, did not*
5   *constitute a clear and unambiguous promise). The facts of the present case are even*
6   *further from showing an ambiguous promise than were the facts in the State Ready Mix*
7   *case.*
8   *In the present case, based on all information about communications provided by both Mr.*
9   *Bobulinski and Mr. Adam Roseman, CBG's Chief Executive Officer, it is clear that CBG*
10  *did not make a clear promise unambiguous in its terms regarding a 2.5x return in cash*
11  *after the maturity date. Indeed, the available information and evidence shows that what*
12  *Mr. Roseman allegedly said was not clear about whether a 2.5x return (or some other*
13  *amount) might be paid on terms different than provided for in the Note, what those*
14  *different terms might be, when it might be paid, on what conditions it might be paid, and*
15  *indeed who – CBG or Mr. Roseman personally – might pay it.*
16  *Moreover, it was not foreseeable to CBG that Mr. Bobulinski would reasonably rely on*
17  *what Mr. Bobulinski claims he perceived to be a "promise" resulting in him waiving his*
18  *conversion rights because CBG was not even aware that Mr. Bobulinski had purportedly*
19  *waived his conversion rights.*
20  *In addition, Mr. Bobulinski knew that CBG was in liquidation under the JOLs at certain*
21  *times pertinent to this matter, and therefore for that additional reason he could not have*
22  *reasonably relied on Mr. Roseman then having the authority to bind CBG nor could it*
23  *have been foreseeable to CBG that Mr. Bobulinski was so relying."*

25  106.  Mr Dosker proceeds with this comment:

27  *"Applying California law, the alleged fact that Mr Roseman promised that he personally*
28  *would pay Mr. Bobulinski if necessary readily shows that at least two of the required*
29  *elements of promissory estoppel are not met under California law. First, there was no*

1    *clear promise by CBG unambiguous in its terms. Second, Mr Bobulinski did not*
2    *reasonably rely on what he claims was a promise by CBG."*
3

4    107.    Mr. Dosker notes that there is an apparent error in the Pledge Agreement, identifying
5            China Branding Global Limited as a party rather than China Branding Group Limited.
6

7    108.    Assuming this to be simply an inconsequential error, he turns to the question of the extent
8            of the secured interest:

9            *"The Pledge Agreement defines the "Collateral" as "all assets (including intangible*
10           *assets) of the Pledgor in the United States, including without limitation its content*
11           *library, license agreements, and physical assets, such as production equipment." Appeal*
12           *at Exhibit TB-1 Page 13 of 243 at paragraph 2 (a).*

13           *But California's statutory enactment of the Uniform Commercial Code ("UCC") in the*
14           *California Commercial Code requires that, for purposes of pledging a security interest, a*
15           *description of collateral must reasonably identify what is described as the collateral.*
16           *Section 9108 (c) of the California Commercial Code specifically states that a description*
17           *of collateral as "all the debtor's assets" or "using words of similar import does not*
18           *reasonably identify the collateral." Cal. Comm. Code 9108 (c).*

19           *Such a statutorily insufficient general description is used in the Pledge Agreement as to*
20           *part of the collateral. A court applying California law would find the description in the*
21           *Pledge Agreement insufficient insofar as it refers to "all assets (including intangible*
22           *assets") and "physical assets". Accordingly, under California law, the Pledge*
23           *Agreement would not be effective to attach and enforce a security interest as to "all*
24           *assets" or the unspecified "physical assets". Cal. Comm. Code 9108 (c).*

25           *But a court applying California law would find the remainder of the collateral*
26           *description to be sufficient to attach to the following relatively specifically identified*
27           *assets (if any) "of Pledgor" which were located "in the United States". The "content*
28           *library", the "license agreements", and the "production equipment", See e.g., In re*
29           *Sport Shack, 383 F. Supp. 37 (N.D. Cal. 1974); Genger v. Albers, (1949) 90 Cal. App. 2d*

| 1 | | *52; Pacific States Sav. & Loan Co. v. Hoffman, (1933) 1334 Cal. App. 604, 25 P. 2d* |
| 2 | | *10007.* |
| 3 | | *To the extent that any "content library", license agreements" and/or "production* |
| 4 | | *equipment" existed but were not located "in the United States" as of the date the JOLs* |
| 5 | | *took control of CBG, or were assets of a subsidiary or affiliate of CBG rather than of* |
| 6 | | *CBG, they are not within the definition of "Collateral" and under California law the* |
| 7 | | *security interest created by the Pledge Agreement does not apply to such "content* |
| 8 | | *library", "license agreements" and/or "production equipment". Accordingly, a court* |
| 9 | | *applying California law would not recognize a security interest in such assets."* |

109. He also appears to question whether in terms of tracing Mr. Bobulinski has submitted any detailed evidence establishing identifiable proceeds of Collateral.

110. In Mr. Dosker's further Report dated 1 October 2018 he provides details as to his professional background and experience.

111. He reiterates an earlier point that by executing the amended Note the parties reaffirmed the *"no unwritten waiver"* term of the Note at the same time, when Mr. Bobulinski's counsel nonetheless claims in this matter that there was an unwritten waiver occurring.

112. Returning to the burden of proving promissory estoppel he states:

*"Regarding the Valle Report at paragraphs 4.2 through 4.6, it is suggested there that Mr. Bobulinski need not prove that CBG made a "promise clear and unambiguous in its terms" (notwithstanding Garcia) but rather merely a "promise" and that that somehow makes a difference here. I note several points in view of that suggestion.*

*First, if the party with the burden under California law (Mr. Bobulinski) cannot prove a clear and unambiguous promise then he cannot prove a promise for purposes of promissory estoppel as against CBG. As the Valle Report itself acknowledges in paragraph 4.1, the alleged "promise" may have been merely that Mr. Roseman would*

1          *"try to obtain the premium for" Mr. Bobulinski. And as I observed in my September 1,*

2          *2017 Report, the evidence clearly shows that Mr. Bobulinski testifies that on or around*

3          *22 April 2016 (after the Note's maturity date), Mr. Roseman "promised that he [Mr.*

4          *Roseman] would pay me [Mr. Bobulinski] out of his [Mr. Roseman's] share if*

5          *necessary" [in order for Mr. Bobulinski to receive 2.5 times the Principal Loan Amount*

6          *in the Note]. Affidavit of Tony Bobulinski dated 4 August 2017 at paragraph 21. As I*

7          *stated in my Report dated September 1, 2017, applying California law, the alleged fact*

8          *that Mr. Roseman promised that he personally would pay Mr. Bobulinski if necessary*

9          *readily shows that at least two of the required elements of promissory estoppel are not*

10        *met under California law: (1) there was no clear promise by CBG unambiguous in its*

11        *terms, and (2) Mr Bobulinski did not reasonably rely on what he claims was a promise by*

12        *CBG (as opposed to a promise by Mr. Roseman personally about Mr. Roseman's own*

13        *funds).*

15        *Second, the Valle Report is flat wrong where it states in paragraph 4.4 that "Notably, the*

16        *Federal Ninth Circuit Court of Appeals, in Greenfield v. Wells Fargo Bank, NA 2012 WL*

17        *10634254, at\*2-3 (C.D. Cal) noted that under California law..." (etc). Greenfield is not*

18        *an appellate case, neither from the ninth Circuit Court of Appeals nor from any other*

19        *Court of Appeals. The "(C.D. Cal.)" in the case citation means that it is a decision of the*

20        *United States District Court for the Central District of California, which is the lowest*

21        *level federal court and is located in Los Angeles. I have double-checked the Greenfield*

22        *opinion, and I confirm that indeed it is a decision from that court and not from the*

23        *federal Ninth Circuit Court of Appeals as wrongly stated in the Valle Report.*

25        *Third, the Valle Report cites various other non-precedential federal cases. But it is black-*

26        *letter law in the United States that issues of a state's law (like California's doctrine of*

27        *promissory estoppel) are to be decided by that state's court, and that on issues of states*

28        *law U.S federal courts must defer to the decisions of the highest court of the relevant*

29        *state. See, e.g., Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). The Valle Report*

30        *acknowledges at paragraph 4.4, in citing Greenfield, that there is no California Supreme*

1     *Court precedent suggesting that the "promise" to be proven is anything less than a*

2     *"clear and ambiguous" promise as stated by the California Court of Appeals in Garcia*

3     *and Laks. California law, and U.S. federal law too, is clear that on an issue of California*

4     *state law if the California Supreme Court has not spoken then the binding precedent is*

5     *that of the California Court of Appeals. See, e.g. Auto Equity Sales v. Superior Court, 57*

6     *Cal. 2d 450 (1962).*

7

8     *Fourth, even another California Court of Appeals case relied upon by the Valle Report*

9     *(in paragraph 4.5) shows that the element Mr. Bobulinski must prove about a promise is*

10    *the element of a "clear promise" (Moncada) or a "promise". The Valle Report, at*

11    *paragraph 4.9, refers to alleged promises Mr. Roseman made in "WhatsApp" instant*

12    *messaging communications on April 22, 2016 and May 22, 2016. My opinion is that,*

13    *under California law, the "WhatsApp" instant messages between Messrs. Roseman and*

14    *Bobulinski do not come anywhere close to meeting the standard for a promise for*

15    *purposes of the California law doctrine of promissory estoppel in order for Mr.*

16    *Bobulinski to overcome the plain written terms of the various comprehensive integrated*

17    *agreements between the parties."*

18

19   113.    Mr. Dosker also returns to the status as identified of the Collateral Pledges:

20

21    *"The cases cited in paragraph 5.3 of the Valle Report are inapposite here; for example,*

22    *dealing with situations in which the terms of the security agreement given by a corporate*

23    *parent had clearly sought to pledge the relevant asset of the corporate subsidiary — which*

24    *was money in a deposit account in the name of the subsidiary. Wachovia Bank Nat'l*

25    *Ass'n v. WL Homes, LLC (In re WL Homes LLC), 534 Fed. App 165 (3d Cir. 2013). The*

26    *issue there was accordingly not one about the intended scope of the pledge, but whether*

27    *knowledge and consent to pledge could be attributed to the subsidiary. By contrast, here,*

28    *the Pledge Agreement clearly states that what is pledged are assets of CBG- not assets of*

29    *any subsidiary of CBG. And paragraph 4 of the First Affidavit of Shing Tao, dated*

30    *September 24, 2018, confirms that as of the closing date of the APA transaction, CBG did*

1    *not own any license agreements or media content (which Shing Tao thinks are*
2    *synonymous with the phrases "content library" and "license agreements" used in the*
3    *Pledge Agreement). Since CBG did not own those, they are not within the scope of the*
4    *pledge in the Pledge Agreement."*

5

6    114.   Both witnesses were subject to cross-examination, However, from the perspective of the
7           Court at least this process did not take their expert evidence essentially any further.

8

9    115.   In terms of assisting the Court as to what needs to be proved to the standard of which the
10          Court must be satisfied, Mr. Dosker's evidence provided a more comprehensive and
11          reliable analytical basis. It is objective, it identifies the issues to be considered and it does
12          not continuously prejudge the outcome of the Court's findings.

13

14   116.   With great respect to Mr. Valle, Mr Dosker demonstrates more amply what in law
15          requires to be established, rather than simply providing reassurance as to what had
16          already purportedly been established, as Mr. Valle proceeds to do.

17

18   **The Appellant's Closing Submissions**

19

20   117.   The Appellant states at paragraph 6 of his Closing Submissions that he did not receive
21          legal advice in relation to the Note or the Pledge and that he relied on Mr. Roseman who
22          told him that Sheppard Mullin (the Company's US Attorneys) could document their
23          understanding and agreement, representing, and acting in the interests of, both the
24          Appellant and the Company.

25

26   118.   This is an illuminating comment, in that during the course of the hearing the Court had
27          occasion to remark that both Mr. Bobulinski and Mr. Roseman were in fact struggling to
28          address and explain the relevant documentation. In fact, both of them appear to have been
29          doing their best from their respective stand points in highly challenging circumstances.

30

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                                    Page 53

1  119.  At paragraph 7.4 it is stated that the Pledge was intended to be an effective pledge over
2       the content library licence agreements but of course that must be subject to objective
3       reality.
4
5  120.  It is also pointed out at paragraph 8 that the Note was not repayable on the Maturity Date
6       or at all (absent an Event of Default) and that the Loan did not bear interest.
7
8  121.  The Submissions continue at paragraphs 19-27:
9
10      *"19.   In autumn of 2015, the Appellant introduced his friend Mr Shing Tao to Mr
11              Roseman Mr Tao was the CEO and Chairman of the Remark Media Inc
12              ("Remark"), which was potentially interested in purchasing the Company's
13              business and assets.*
14      *20.    In February 2016, the Company needed cash to meet its payroll costs and Mr
15              Roseman asked the Appellant for a loan. Again the Appellant obliged. A further
16              $150,000 was lent on the terms of a Note dated 1 February 2016 ("Second
17              Note"), which was in the same terms (mutatis mutandis) as the Note.*
18      *21.    On 7 March 2016, Remark sent Mr Roseman a letter of intent ("Letter of Intent"),
19              which set out the principal terms of the transaction ("Sale") under which it or an
20              affiliate proposed to acquire the business of the Company and its subsidiaries.
21              The letter of intent provided under cl 1 (headed "Valuation") that Remark's
22              aggregate investment would include up to $7,500,000 in cash at closing and
23              $15,000,000 in securities. The securities were issued to the Company to purchase
24              up to 6.25 million shares in Remark common stock at an exercise price of $10 per
25              share.*
26      *22.    On 14 March 2016, Mr Roseman sent an email to the Company's directors,
27              calling a board meeting to discuss and approve resolutions concerning the
28              proposed Sale. He stated that the Letter of Intent provided for aggregate
29              consideration consisting of cash and warrants valued at $22,500,000.*
30

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

23. *The Appellant and Mr Roseman communicated extensively. Mr Roseman's evidence was that they had many conversations on the phone and several in person. In a series of messages sent by Mr Roseman to the Appellant by email and WhatsApp, and orally, Mr Roseman assured the Appellant that he would receive a 2.5x return on his loans to the Company. Thus on 21 March 2016, Mr Roseman informed the Appellant by WhatsApp message sent at 10:35 AM: you at 2.5x thx!". Mr Roseman made a similar promise in a WhatsApp message on 2 April 2016 at 7:24PM (Appellant: "I invested 650K @ 2.5 its 1.625MM", Mr Roseman: "Yep that's right and that's all cash"). Mr Roseman sent the Appellant an email on 3 April 2016, which listed "Cash Participants" and how much they would receive of the "Total Cash" of $7.50. The Appellant was included in the list as receiving $1.63. This refers to $1.625m of the cash consideration of $7.5m which was to be received by the Company from the Sale.*

24. *On 11 April 2016, the Appellant was asked to sign, and did sign, an amendment to the Note reflecting the increase in the loan amount from $500,000 to $650,000. Mr Roseman said that the documents were required so that a full set of financing documents could be submitted to the Court. Mr Roseman's evidence was that there was no suggestion in his exchanges with the Company's attorneys or the Appellant that the amendment was intended to have any effect other than to record an increase in the amount of the loan; and there was no intention to affect either the Company's or the Appellant's rights or obligations. No reference was made in the Amendment to the Second Note. Mr Roseman told the Appellant that the Sale could not move forward without the Appellant's sign off.*

25. *On or around 22 April 2016, Mr Roseman informed the Appellant in a telephone conversation that he would be paid his 2.5x return upon the close of the Sale to Remark.*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

26.    *On 24 April 2016, the Company informed its creditors that it was unable to pay its debts as they fall due. This constituted an Event of Default under cl 8.3 (e) of the Note, whereupon the Principal Loan Amount became immediately due and payable under cl 9 of Note.*

27.    *Mr Roseman repeated his promise to the Appellant in a WhatsApp message sent on 21 May 2016 at 6:17 PM: "we are on track for deal getting done and you getting your full payment."*

122.    It is of course critical to bear in mind that by 24 April 2016 the Maturity Date itself had already passed. This then gives rise in these proceedings to the real question as to the status and validity of that Maturity Date.

123.    The Submissions then helpfully set out the following chronology at paragraph 30-33:

"30.    *On 18 August 2016, an order was made to wind up the Company; Messrs. Dickson and Bennett were appointed as the JOLs; and their entry into the Asset and Securities Purchase Agreement ("Purchase Agreement") was sanctioned.*

31.    *The Purchase Agreement provided that the Company would apply the consideration it received in accordance with a Distribution Agreement, which provided that the Company's Noteholders subordinated their claims to the Company's unsecured creditors. The Distribution Agreement was executed by all of the Company's Noteholders other than the Appellant.*

32.    *On 20 September 2016, the Sale was effected by the Purchase Agreement. This was a Liquidity Event within the meaning of cl 3 of the Note. The Purchase Agreement stated that it was between the following parties:*

32.1.    *the Company (Seller);*

32.2.    *the JOLs;*

32.3.    *Seller Management (defined as Mr Roseman);*

32.4.   The Target Entities (defined in Schedule 1 as RAAD Productions LLC ("RAAD"), China SNS Group Ltd ("SNS"); and Fanstang (Shanghai) Entertainment Information Consulting Co Ltd ("Fanstang")

32.5.   Kankan Ltd ("Kankan"); and

32.6.   Remark.

33.   The Recitals stated that the Company owned 100% of the equity of the Target Entities, and that Remark owned 100% of the equity of Kankan."

124.   In fact, as we have seen, the true ownership of RAAD is rather more complex than that. On this point the evidence of Mr. Roseman is accepted as true.

125.   Thereafter the JOLs received cash of $5,710,096 constituted by the Purchase Consideration of $7,500,000 less Management Incentive Payments ($750,000), the cash portion of the Escrow Amounts ($375,000) and Indebtedness ($664,904), as set out in Schedule 2.02(a).

126.   Paragraph 36 and 37 then state:

"36.   Pursuant to the Purchase Agreement:

36.1.   Mr Roseman was paid a Management Incentive Payment of $172,349;

36.2.   Mr Roseman's company, Tapirdo Enterprises LLC ("Tapirdo"), which was a major shareholder and a noteholder of the Company, received payments of $269,528 and $50,000; and

36.3.   Tapirdo was entitled to receive to receive warrants.

37.   By a Proof of Debt dated 18 April 2017, the Appellant claimed $1,625,000 plus his legal costs as a secured creditor. On 14 June 2017, the JOLs rejected the Proof, save as to an unsecured amount of $650,000."

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 60 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-3 Filed 04/24/19 Page 56 of 99 Page ID
#:1611

127. With that composite background the Appellant then proceeds with his central argument as to the law of waiver.

128. At paragraph 38 – 41 the Appellant makes these statements:

"38. *As a matter of California law, waiver may be implied through conduct manifesting an intention to waive; or conduct which is inconsistent with the exercise of a contractual right. Waiver may occur as the result of an act which, according to its natural import, is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished.*

39. *The conduct of the Appellant and Mr Roseman manifested an intention to waive the Maturity Date. Their conduct, according to its natural import, was so inconsistent with the intent to enforce conversion under cl 3.3 as to induce a reasonable belief that the right to do so had been relinquished. The conduct of the Appellant and the Company included the following acts, omissions and statements.*

    39.1. *There was no respect in which either the Company or the Appellant treated the Principal Loan Amount as converted into equity securities in accordance with cl 3.3.*

    39.2. *Mr Roseman accepted that neither of the parties discussed conversion of the Principal Loan Amount into securities at any time, even though there should have been a discussion between the Company and the Appellant in relation to conversion.*

    39.3. *As Mr Roseman accepted, neither the Company nor the Appellant sought to engage in the process of "convert[ing] the Principal Loan Amount into equity securities of the Borrower on terms and conditions to be negotiated in good faith by the Borrower and the Noteholder", as required by cl 3.3.*

39.4. *Neither of the parties treated the Appellant as (or as part of) a committee "to which certain rights relating to key corporate and operational actions by the Company and other rights to be negotiated between the Company and the Creditors shall be granted by the Company", as required by cl 3.3. Nor, as Mr Roseman accepted, did the parties commence negotiations in relation to such rights.*

39.5. *The Appellant did not surrender his Note, as required by cl 3.4. The Company did not require the Appellant to surrender his Note or request that he do so.*

39.6. *The Company did not issue and/or deliver to the Appellant a certificate for the number of shares to which he was entitled upon conversion, as required by cl 3.4.*

39.7. *The Appellant took no steps to enforce his security under cl 11 of the Pledge after an Event of Default occurred.*

39.8. *The Appellant was told by Mr Roseman that the deal could not go ahead without the Appellant's consent, but the Appellant took no steps to block the Sale. The Appellant could have blocked the sale by virtue of his close relationship with Mr Tao, Remark's CEO and Chairman. Mr Tao told the Appellant that, if he had been made aware of Mr Roseman's assurances and asked not to proceed unless the Appellant's entitlement to a 2.5x return was made a condition of sale, Remark would not have proceeded with the Sale.*

39.9. *The Appellant did not inform Remark of the terms of cl 7 of the Pledge. Remark would have been potentially exposed to a tortious liability for interference with the Appellant's rights if it purchased the Company's assets without the Appellant's prior written consent.*

39.10. *Mr Roseman promised the Appellant on numerous occasions (including after the Maturity Date) that he would receive a return*

*of 2.5x. The only plausible explanation of this fact is that the Maturity Date was waived.*

40. *The parties' conduct in relation to the Amendment of the Note on 11 April 2016 is further powerful evidence of waiver. The Amendment was agreed 4 days before the Maturity Date of the Note (viz, 15 April 2016), and 9 1/2 months before the Maturity Date of the Second Note (viz, 1 February 2017). It cannot sensibly be suggested that, in agreeing to the Amendment, the Appellant was gratuitously giving up his right to a 2.5x return upon a sale before 1 February 2017. The evidence is clear in this regard. Mr Roseman said that the documents were required so that a full set of financing documents could be submitted to the Court, that the contemporaneous documents make it clear that the Appellant had increased his loans to the Company from $500,000 to $650,000, and that there was no intention to affect either the Company's or the Appellant's rights or obligations.*

41. *The only conceivable basis on which the Appellant would have agreed on 11 February 2016 to move the Maturity Date under the Second Note to 15 April 2016 from 1 February 2017 (and thereby, absent a waiver of the Maturity Date, deprive himself of a 2.5x return on the Second Note) is if it was understood that the Appellant would be entitled to a 2.5x return if the Sale took place after 15 April 2016. That is, if it was understood that the Maturity Date had been waived."*

129. The Court has formed the view that both Mr Bobulinski and Mr Roseman were honest individuals coping as best they could from their respective vantage points and situations with a stressful and unpromising financial situation. Neither has consciously sought to mislead this Court.

130. The issue however is whether on a balance of probabilities and applying the California law of waiver as the Court understands it to be the Appellant has proved his case as to

1      waiver. This is a probative matter of considerable difficulty for the Appellant, to which

2      the Court will return at a later point.

3

4   131.   It is also claimed in paragraph 43 that upon discharging the debts of the Company's

5      unsubordinated creditors in full there would remain a substantial surplus of

6      approximately $3,300,000 for subordinated unsecured creditors, and in any event the

7      Appellant's claim was secured.

8

9   132.   The Appellant's Submissions then turn to the intrinsically problematic issue of the nature

10      of the claim at paragraph 44-46:

11

12    *"44.*    *The JOLs submit that the Appellant's claim is "a claim to a shareholding in the*

13      *Company, and not to a debt claim owed by the Company", and that "someone*

14      *who claims to be a shareholder in a company is not entitled to lodge a proof of*

15      *debt claiming to be a creditor.*

16    *45.*    *The Appellant does not claim to be a shareholder. He claims qua creditor. The*

17      *Appellant was entitled under cl 3.1 to:*

18      *45.1.*    *conversion of the Principal Loan Amount into a new class of preferred*

19        *equity securities; and*

20      *45.2.*    *a liquidation preference in an amount of 2.5x the Principal Loan Amount.*

21        *This amount is claimed qua creditor.*

22    *46.*    *The JOLs' submission appears to be based on the premise that the Principal Loan*

23      *Amount automatically converted into shares upon the consummation of*

24      *the Liquidity Event on 20 September 2016, because cl 3.1 provides that the*

25      *Principal Loan Amount "shall automatically convert" into a new class of*

26      *preferred equity securities. This premise is flawed as a matter of law and*

27      *contractual construction. The Principal Loan amount did not convert into*

28      *shares."*

29

30   133.   The legal argument proceeds at paragraph 47 as follows:

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

"*As to the law:*

47.1.    *The law of the Cayman Islands, being the Company's place of incorporation, decides how the Company's shares may be transferred. This is not an issue of California law.*

47.2.    *Section 38 of the Companies Law (2018 Revision) (Definition of "member") provides as follows:*

> "*The subscribers of the memorandum of association of any company shall be deemed to have agreed to become members of the company whose memorandum they have subscribed, and upon the registration of the company shall be entered as members on the register of members hereinafter mentioned, and every other person who has agreed to become a member of a member of a company and whose name is entered on the register of members, shall be deemed to be a member of the company.*"
> (*underlining added*)

47.3.    *The equivalent provision of the (English) Companies Act 1985 was considered by the House of Lords in National Westminister Bank plc v Inland Revenue Commissioners [1995] 1 AC 119. Lord Templeman held (at 129) that the Act preserves the distinction in English law:*

> "*between an enforceable contract for the issue of shares (which contract is constituted by an allotment) and the issue of shares which is completed by registration. Allotment confers a right to be registered. Registration confers title. Without registration, an applicant is not the holder of a share or a member of the company: the share has not been issued to him...*
> *No person can be a shareholder until he is registered. A person who is not a shareholder by registration cannot claim that the share has been issued to him, but only that the company is bound by contract to issue a share to him. (underlining added)*

47.4     *The Appellant was not registered as a shareholder of the Company and no share was issued to him. He was not and is not a shareholder of the Company.*"

134.  The Appellant then seeks to counter the JOLs' predication of a necessary shareholding in this way at paragraph 50:

> "50.  *The JOLs also appear to contend that, because a liquidation preference is an amount payable on shares, the Appellant claims a liquidation preference qua shareholder. This conclusion does not follow from the premise, for two reasons. First, and as explained above, the Company did not convert the Principal Loan Amount into a new class of equity securities, so the Appellant is not a shareholder. Secondly, the Company's failure to convert the Principal Loan Amount into a new class of equity securities does not deprive the Appellant of the right to receive the amount which should have been paid, but was not paid, on those securities. The Appellant claims that amount qua creditor."*

135.  The Court finds some difficulty in accepting the proposition that one can have the benefits such as they may be which accrued from a shareholding without actually one becoming a shareholder oneself. The Court will return to this apparent contradiction at a later stage.

136.  The Appellant argues at paragraph 51 as to any written waiver requirement itself being waived:

> "51.  *The JOLs rely on cl 10.11 the Note, which provides that no term of the Note could be waived except by an instrument in writing signed by both of the parties. The JOLs accept that parties may by their conduct waive such a provision, where the evidence shows that it was their intent to do so. The parties' conduct which demonstrates that the parties intended to waive the Maturity Date also demonstrates that the parties intended to waive cl 10.11."*

137.   As in a number of contexts, the real question for the Court then becomes whether the Appellant has proved what the Appellant needs to prove in order to be successful in this Appeal. Ultimately it becomes a matter of evidence rather than simply a matter of law.

138.   Turning to the Appellant's alternative claim of promissory estoppel, the Submissions state at paragraphs 54-57:

"54.   The elements of promissory estoppel under California law are: (i) a promise clear and unambiguous in its terms; (ii) reliance by the person to whom the promise is made; (iii) the reliance must be reasonable and foreseeable; and (iv) the party asserting the estoppel must be injured by his reliance. Because promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application.

55.   As a matter of California law;

"The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden (underlining added).

56.   A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

57.   The doctrine of promissory estoppel applies in the present case. The 4 elements of promissory estoppel are present. Furthermore, Mr Roseman (on behalf of the Company) by his language and conduct led the Appellant to loss by disappointing the expectations upon which he acted. Mr Roseman made promises which he should reasonably have expected to induce action and forbearance on the part of the Appellant, and which did induce such action and forbearance; injustice can be avoided only by enforcement of the promise."

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

139.   Once again, the question arises as to whether Mr Roseman made a clear and unambiguous promise as distinct from merely expressing an aspiration. It is Mr. Bobulinski's task to prove the former, and in that regard his evidence is slender at best.

140.   There are then set out at paragraphs 59 and 60 references to instances of relevant communications, allegedly written and oral, with specified examples.

141.   However, although Mr Bobulinski's evidence is that it was crystal clear that Mr Roseman had promised him that he could be paid *"2.5 times"* and no doubt that is what Mr Bobulinski believed, nonetheless the Court has formed increasingly serious reservations as to whether in objective terms this was clearly and unambiguously the case.

142.   Finally, in this regard, the JOLs submit that Mr Roseman had no power to bind the Company after their appointment as JPLs on 2 June 2016, because they claim the appointment of the JPLs displaced Mr Roseman's powers as a director. The Appellant however contends that the express terms of the order appointing the JPLs do not point to that conclusion.

143.   In light of other findings of fact which the Court shall make in due course, it is strictly unnecessary to decide this particular issue.

144.   Turning to reliance on the alleged promises, the Appellant contends as follows at paragraph 65:

*"65.   The Appellant relied on Mr Roseman's promises in several respects. In particular, he forbore from taking any steps:*

> *65.1.   to convert the Principal Loan Amount into equity securities and acquire the benefits thereof, including rights relating to key corporate and operational actions;*

> *65.2.   to block the Sale absent more favourable terms, which he could have done by virtue of his close relationship with Mr Tao,*

*Remark's CEO and Chairman. Mr Tao told the Appellant that, if he had been made aware of Mr Roseman's assurances and asked not to proceed unless the Appellant's entitlement to a 2.5x return was made a condition of sale, Remark would not have proceeded with the Sale;*

65.3. *to enforce his security under cl 11 of the Pledge after an Event of Default occurred; and*

65.4. *to inform Remark of the terms of cl 7 of the Pledge. Remark would have been potentially exposed to a tortious liability for interference with the Appellant's rights if it purchased the Company's assets without the Appellant's prior written consent."*

145. This is of course alleged forbearance rather than alleged reliant action of any kind and with great respect to the high standards of Mr Isaacs Q.C.'s Submissions, they are essentially arguments from which inferences and conclusions are invited, but it is problematic to deduce that they are acts of forbearance that can be established on a genuine balance of probabilities.

146. The Appellant further contends that Mr Roseman was Chief Executive Officer and the Director with conduct of the sale, and that he was also a close and longstanding friend of the Appellant. Therefore reliance on such promises as he may have made, if any, was reasonable and foreseeable. The Appellant also places emphasis as he did previously on the express terms of the Order.

147. The problem here is that no discernible effort was made by the Appellant to check and to verify the factual basis of his assumptions above described. Ultimately this Court has difficulty in being guided and indeed persuaded by mere assumptions which are unsupported by adequate evidence.

148. Moving on to the subject of security, the Appellant states at paragraphs 71-72:

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 03/08/21 Page 69 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJC Document 148-3 Filed 04/24/19 Page 68 of 99 Page #:173
#:1620

"71.    The California Commercial Code ("CCC") requires that, for the purposes of pledging a security interest, a description of collateral must reasonably identify what is described. The JOLs accept that cl 2 of the Pledge reasonably identifies the Company's "content library" and "licence agreements" in the United States. However, they submit that the Appellant is not a secured creditor of the Company because the Company did not own any content library or licence agreements in the United States; this was in fact owned by RAAD.

72.     Mr Roseman said that the Note used the word "Secured" in its title because it was intended that the Appellant would be secured. Mr Roseman signed the Note intending that the Company's obligations thereunder were secured by the Collateral. He said "[t]here is no doubt in my mind" that the Pledge was intended to create security in the Appellant's favour; and that the Pledge was intended to be an effective pledge over the content library and licence agreement."

149.   The Argument is particularised at paragraphs 73-77:

"73.    By cl 6 of the Note and cl 5 of the Pledge, the Company represented and warranted to the Appellant as follows:
73.1.   it had the power and right to perform its obligations under the Pledge;
73.2.   the Pledge was a binding obligation of the Company, enforceable against the Company in accordance with its terms;
73.3.   at the time the Collateral becomes subject to the security interest created by the Pledge, it would be sole, direct, legal and beneficial owner thereof;
73.4.   the Pledge of the Collateral created a valid security interest in the Collateral; and
73.5.   the Company had full power and authority to pledge the Collateral pursuant to the Pledge.

74. *Having regard to these facts and matters (including its representations that the Pledge created a valid security interest in the Collateral, of which the Company was the owner and which the Company had the power to pledge, and that the Pledge was enforceable against the Company), the Appellant was led to believe by the Company that it owned the content library and licence agreements which were in fact owned by RAAD.*

75. *The Company is therefore estopped from denying that it owned those assets. The applicable principle is that:*

   *"Whenever a party has, by its own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."*

76. *Thus in Avco Delta Corporation Canada Ltd v United States (7ᵗʰ Cir 1972) 459 F 2d 436, the subsidiary of the parent company represented that property, actually owned by it, was owned by a second subsidiary. The second subsidiary entered into a security agreement with Avco using the property as collateral. Subsequently, the US obtained a tax lien upon the property against the first subsidiary. In holding that Avco's security interest had priority over the tax lien, the court relied on an estoppel theory based upon Avco's good faith belief that the collateral was owned by the second subsidiary, not the first subsidiary. So too here. The Appellant had a good faith belief that the content library and license agreements were owned by the Company, and the Company should be estopped from denying the same.*

77. *The doctrine of estoppel is designed to prevent injustice; it "operates to prevent one [party] from taking advantage of another." It would be unjust, and would allow the Company to take advantage of the Appellant, if the Company was permitted to contradict the Appellant's good faith belief that he had a valid*

---

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 71 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 145-3 Filed 04/24/19 Page 67 of 99 Page ID #:175
#:1622

1    *security interest in the content library and licence agreements which were owned*

2    *by RAAD."*

3

4    150.    An alternative argument based on the common roles of Mr. Roseman is then put in these

5            terms at paragraphs 78-83:

6

7    "78.    *Further or alternatively, the Appellant relies on the principle of California law*

8            *that a pledge by a company of assets held by an affiliated entity is enforceable*

9            *where the pledger is also an officer of the affiliated entity, thus creating an*

10           *implied consent.*

11   79.     *In Wachovia v WL Homes, Wachovia extended a loan to WL Homes. In exchange,*

12           *WL Homes granted Wachovia a security interest in the bank account of its*

13           *subsidiary, JLH. WL Homes filed a bankruptcy petition and Wachovia sought a*

14           *declaration that it had a security interest in the JLH bank account. To secure the*

15           *loan, WL Homes "pledged its interest in the JLH bank account as collateral to*

16           *Wachovia;" the security agreement provided that WL Homes "shall maintain its*

17           *JLH Insurance Co primary deposit account (the JLH Account") with Lender..."*

18           *(underlining added)*

19   80.     *The Court held that a debtor may pledge as security property it does not fully*

20           *own, and the consent of the owner is one way to give the debtor sufficient rights in*

21           *the property to pledge it as security. The president of the subsidiary, Wayne*

22           *Stelmar signed the pledge. The court said it looked to Stelmar's role and the*

23           *relationship between WL Homes and JLH to determine whether to impute*

24           *Stelmar's knowledge of the pledge to JLH. Stelmar had specific knowledge of the*

25           *pledge because he negotiated the loan agreement in which the security interest*

26           *was granted in his capacity as CFO to WL Homes. The pledge was within the*

27           *scope of Stelmar's duties as president of JLH and he was obliged to communicate*

28           *to JLH the fact that WL Homes had pledged JLH's account as collateral. So*

29           *Stelmar's knowledge of the pledge was to be imputed to JLH. That knowledge*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                    Page 69

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 04/24/21 Page 73 of 104 Page ID
#:1623
Case 2:19-cv-02963-MWF-SSJC Document 148-3 Filed 04/24/20 Page 68 of 99 Page #:176

1     *manifested consent. The Court therefore concluded that Wachovia had an*

2     *enforceable security interest.*

3

4  81.  *The principle set out in Wachovia v WL Homes applies to the present case. Mr*

5     *Roseman, the Company's CEO and the sole manager and director of RAAD, knew*

6     *the Company did not own any content library and licence agreements in the*

7     *United States. He caused the Company to pledge those assets, even though they*

8     *did not belong to the Company.*

9     *This is analogous to WL Homes pledging "its" bank account, which belonged to*

10     *its subsidiary. Mr Roseman had specific knowledge of the Pledge because he*

11     *caused the Company to enter into it, in his capacity as a director of the Company.*

12     *Knowledge of that fact was material to his duties to his other principal, RAAD.*

13     *The pledge was within the scope of his duties and he was obliged to communicate*

14     *to RAAD the fact that the Company had pledged RAAD's assets as collateral.*

15

16

17  82.  *The JOLs have adduced evidence that RAAD was not a subsidiary of the*

18     *Company at the time of the Pledge. In particular, Mr Dickson said that RAAD*

19     *was sold to the Company on 19 September 2016, pursuant to an agreement which*

20     *he exhibited. Mr Dickson said that he understood from Mr Roseman that Mr*

21     *Roseman had an interest in RAAD through Tapirdo, which owned one-third of the*

22     *equity of RAAD.*

23

24  83.  *Mr Dickson's fourth affidavit exhibited the JPLs' First Report to the Court dated*

25     *8 July 2016, which stated that RAAD was owned and controlled by Mr Roseman*

26     *and Mr Roche (another director of the Company). Indeed, the JOLs submit in*

27     *their Skeleton Argument that the shares in RAAD were held by MR Roseman and*

28     *another individual. This evidence and submission are inconsistent with the*

29     *evidence in Mr Dickson's fourth affidavit as to the ownership of RAAD."*

30

1    151.   The Appellant further raises the question of whether in fact RAAD was indeed a
2    subsidiary at the date of the Pledge. He continues at paragraph 85:

3

4    *"85.    In any event, the principle in Wachovia v WL Homes applies to RAAD, whether it*
5    *was a subsidiary or an affiliate of the Company at the date of the Pledge. A*
6    *Pledge by a company of assets held by its affiliated entity is enforceable where the*
7    *Pledger is also an officer of the affiliated entity, thus creating an implied consent.*
8    *In Wachovia v WL Homes, the Court assumed that parent companies and wholly*
9    *owned subsidiaries share the same interests. In so far as this is relevant to the*
10    *Court's reasoning, the same may be said of the Company and RAAD, having*
11    *regard to the facts (detailed in the two previous paragraphs) that the Company*
12    *and RAAD treated RAAD as a subsidiary of the Company; that RAAD was*
13    *responsible for the group's operations; and that RAAD's results were*
14    *consolidated into the group's financial statements."*

15

16    152.  An argument is then developed that under California law the proceeds of sale of the
17    Collateral can be traced, but since this course is all predicated on the legal and factual
18    viability of the waiver in any relevant, it is unnecessary at this stage to take this aspect of
19    the matter any further.

20

21    153.  The Appellant also submits that under Clause 3 of the Pledge the Collateral secured *inter*
22    *alia "premium on the Loan"* and all other obligations in respect of the Note and the
23    Pledge, and that those expressions are broad enough to cover the 2.5x return payable to
24    the Appellant.

25

26    **The Closing Submissions of the JOLs**

27

28    154.  The JOLs state at paragraph 4 of their Submissions:

29



*190123 In the Matter of China Branding Group Limited → FSD 52 of 2016 Judgment (RMJ)*

| 1 | | "4. | Having carefully considered the three Proofs of Debt submitted by Mr Bobulinski, |
| 2 | | | the JOLs considered that on balance Mr Bobulinski's claim was established as an |
| 3 | | | unsecured creditor of the Company in respect of the amount actually advanced by |
| 4 | | | him under his promissory note. However, the JOLs were not satisfied that the |
| 5 | | | claim for the balance of the claimed 2.5x multiplier in excess of the amount |
| 6 | | | actually advanced was established, or that Mr Bobulinski had established that he |
| 7 | | | was a secured creditor of the Company. Having considered and reviewed the |
| 8 | | | evidence submitted during the hearing and carefully considered Mr Bobulinski's |
| 9 | | | closing submissions; this remains the view of the JOLs." |

155. It appears to the Court to be entirely understandable that the JOLs should have adopted such a view. Nonetheless, it must be emphasised that the present hearing is of course a trial *de novo*.

156. They continue at paragraph 6 in relation to this hearing:

"6. The JOLs do not consider that, on the balance of probabilities, Mr Bobulinski has made out his case; as this Honourable Court put it in Re Ardon Maroon Asia Master Fund, Grand Court, 17 July 2018 (at paragraph 53 – effectively paraphrasing the Van Laun principle): "... the burden is upon the identified potential creditor to satisfy the liquidator, and upon appeal the Court, as to the creditor's claim". In any event, it would not be fair and equitable for Mr Bobulinski to be allowed to "scoop the pool" to the detriment of all other creditors by being treated as a secured creditor for the inflated sum of US$1,765,000, well in excess of the sum he actually advanced."

157. Having dealt with their various observations as to fact, alluded to earlier in this Judgment, the JOLs then turn to consideration of the Promissory Notes. They state at paragraph 40:

1        "40.    The TB Promissory Note is at [B/1/1]. As with the Promissory Notes of the other
2                Noteholders, it is convertible promissory i.e. convertible into shares in the
3                Company upon certain trigger events occurring. As noted above it is on the same
4                terms as the Promissory Notes of the other Noteholders with senior secured
5                convertible promissory notes. After some initial prevarication, Mr Bobulinski
6                confirmed in cross-examination that the terms of the TB Promissory Note
7                accurately recorded the agreement which he had reached with the Company."
8
9    158.    Equally significantly paragraphs 45-46 deal with the JOL's contention as to Clause 3.3:
10
11        "45.    Clause 3.3 provides that, if neither a Liquidity Event nor a bona fide equity
12                financing occurs prior to the Maturity Date, then the Note converts into shares,
13                the terms and conditions of which have to be negotiated and agreed between the
14                holder and the Company:
15                        "If neither (a) a Liquidity Event or (b) a bona fide equity financing of the
16                        Borrower has been consummated on or before the Maturity Date, then the
17                        Principal Loan Amount shall convert into equity securities of the
18                        Borrower on terms and conditions to be negotiated in good faith by the
19                        Borrower and the Noteholder."
20        46.     Clause 3.3 therefore requires an agreement to be reached between the Company
21                and the Noteholder as to the terms and conditions of the new shares. However, in
22                contrast to Clause 3.1, the conversion is not "automatic". The JOLs consider that
23                the better view must be that, if there is no such agreement reached and the
24                Maturity Date has passed, the Noteholder will simply have a claim for the
25                repayment of the Principal Loan Amount under the Note. Otherwise the
26                Noteholder would be in the unsatisfactory position of being able neither to receive
27                the new shares, nor to claim repayment of the Principal Loan Amount."
28
29    159.    The Court finds this to be a persuasive and attractive argument as well as a logical one.
30

190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)

160. At paragraph 53 the JOLs make the critical submission as to the importance in general of liquidators being able to rely on the written agreements entered into by the Company, and of only departing from that position *"where there is clear and cogent evidence to the requisite standard showing a subsequent agreement to vary or modify through informal communications."*

161. There follows at paragraph 55 the observation as to whether Mr Bobulinski should be able to rely on informal statements which were not recorded in any kind of agreement in order to enhance and elevate his claim above those of all other creditors and Noteholders *"and to claim virtually all of the remaining assets in the estate for himself."*

162. The JOLs then submit at paragraphs 57-58 that Mr Roseman was a very good witness, who gave credible evidence and did his best to assist the Court. The Court entirely agrees with that assessment.

163. The JOLs then make the fair and important point from their perspective at paragraph 59 that for the most part the JOLs do not consider that Mr. Bobulinski was untruthful in his evidence, the real question being whether the communications described by him are sufficient as a matter of law to give rise to binding legal rights and obligations.

164. Once again, the Court finds that Mr Bobulinski, was truthful and honest but that he may well have misapprehended and even misconceived the purport of the relevant communications. Ultimately the issue here is not whether Mr Bobulinski was honest, but whether clear and unambiguous promises were proven to be made to him.

165. Not only does Mr Bobulinski have a vested interest in these proceedings but also he found it necessary to allege that evidence given by Mr Roseman in relation to a telephone conversation between Mr Roseman and Mr Bobulinski on 22 April 2016 was untruthful and false. The Court is compelled to state at this juncture that it would find great

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1    difficulty in concluding that any aspect of Mr Roseman's testimony was untruthful and

2    false.

3

4    166.    The JOLs also argue at paragraph 60.3:

5

6           "60.3. *Thirdly*, the JOLs are very skeptical of Mr Bobulinski's assertion that he was not

7                  aware of the financial difficulties faced by the Company in 2016 ("I didn't believe

8                  the Company was in financial distress"). It was clear from Mr Roseman's

9                  evidence that these difficulties were manifest, and given that the evidence also

10                 shows that Mr Bobulinski stayed in close contact with Mr Roseman and obviously

11                 took a keen interest in the Company, it is inherently implausible that Mr

12                 Bobulinski was not well aware of these difficulties. Indeed, he was clearly aware

13                 that the Company needed to borrow further funds to meet its payroll since he

14                 himself advanced a further US$150,000 to the Company in February and March

15                 2016 for these purposes. It is also clear that Mr Bobulinski was kept closely

16                 informed of the decision of the Company to enter into provisional liquidation in

17                 the Cayman Islands. The Court should therefore conclude that Mr Bobulinski was

18                 aware of the serious financial difficulties which the Company was under in 2016,

19                 and of the entry of the Company into provisional liquidation and then official

20                 liquidation."

21

22   167.    With all due respect to Mr Bobulinski, who is a professional investor and business

23           person, it is highly improbable that Mr Bobulinski could not have been aware of the

24           Company's financial difficulties, given *inter alia* the Company's need to borrow further

25           funds from him. The Court notes that this is a matter of relevance to Mr Bobulinski's

26           realism and reliability as a witness rather than to his integrity as such.

27

28   168.    The JOLs at paragraph 61 invite the Court to accept the expert evidence of Mr Dosker

29           and indeed where there is any difference between the views expressed by Mr Dosker and

30           by Mr Valle to prefer those of Mr Dosker, who unlike Mr Valle is described as clearly

1       independent and impartial. As the Court has previously indicated, it has formed the view

2       that it has greater confidence in the expertise of Mr Dosker. Ultimately, however such

3       findings as there may be as to California law must then be applied to the facts as found by

4       the Court.

5

6   169.    There follows some criticism of the Appellant failing to take issue with Mr Dosker on

7       aspects of Mr Valles's evidence, giving him it is said no opportunity to defend his

8       opinion. While that may well be valid, the Court considers it important to note that both

9       expert witnesses were engaged in difficult and to a degree unfamiliar terrain at the

10      intersection of California law and Cayman Islands law.

11

12  170.    Perhaps more substantively, the JOLs point out that Mr Valle was as they saw it quite

13      clearly not independent, being Mr Bobulinski's own lawyer who had advised him in

14      connection with this very matter. They state at paragraph 64:

15

16       "64.    *Mr Valle. In contrast to Mr Dosker, it is respectfully suggested that Mr Valle's*

17               *evidence was not satisfactory. The difficulty with his evidence is that he was quite*

18               *clearly not independent, being Mr Bobulinski's own lawyer who had advised him*

19               *in connection with this very matter. He had been first instructed in October 2017*

20               *when Mr Bobulinski first made a claim and advised him in connection with that*

21               *claim and in relation to the subsequent proofs and the UCC filing. He had a*

22               *retainer in place with Mr Bobulinski. It was also clear from the manner in which*

23               *Mr Valle gave his evidence – in which he found it difficult to refrain from arguing*

24               *the facts and acting as an advocate for Mr Bobulinski's position – that in giving*

25               *evidence he was principally arguing the matter on behalf of his client."*

26

27  171.    Although the Court is grateful for Mr Valle's courteous assistance, the Court must also

28      recognise and bear in mind the force of these arguments in determining foreign law as a

29      matter of fact.

30

1    172.    The point is further explored in paragraph 66:

3    "*66.    The difficulty with Mr Valle's evidence was that he owed conflicting duties. On*
4    *the one hand, his evidence was supposed to be independent but, on the other*
5    *hand, as Mr Bobulinski's own lawyer acting in his matter and holding a retainer*
6    *from him, he was obliged to act in Mr Bobulinski's best interests. The existence of*
7    *this conflict means that it is impossible for the Court to know whether particular*
8    *views expressed by Mr Valle were his own genuine, independent views or whether*
9    *they represented advocacy on behalf of his client. In light of the manner in which*
10    *Mr Valle gave evidence, it seems likely that a substantial part of his evidence was*
11    *the latter.*"

13    173.    In this important regard the difficulty described is one of Mr Bobulinski's own making to
14    the extent that there is any conflict between the views of Mr Valle and Mr Dosker. The
15    Court considers it both prudent and correct to adopt and apply the views as to law
16    expressed by Mr Dosker.

18    174.    The Court now comes to what the JOLs describe as the two different legal theories upon
19    which the Appellant relies, the California law doctrine of waiver and promissory
20    estoppel.

22    175.    They provide an overview at paragraphs 71-73:

24    "*Waiver*
25    *71.1.    the Maturity Date of the TB Promissory Note of 14 April 2016 was waived;*
26    *71.2.    the subsequent sale of the Company's assets to Remark pursuant to the APA was*
27    *a "Liquidity Event" for the purposes of Clause 3.1 of the TB Promissory Note;*
28    *71.3.    as a result of the waiver of the Maturity Event, the occurrence of the Liquidity*
29    *Event caused the Principal Loan Amount owed to the Appellant to be*
30    *automatically converted to a new class of preferred equity securities in the*

|   | |
|---|---|
| 1 | *Company with a 2.5x liquidation preference, pursuant to Clause 3.1 of the TB* |
| 2 | *Promissory Note.* |
| 3 | 72. *The claim is summarized as follows in Mr Valle's first report:* |
| 4 | *"Under Section 3.1 of the Note, because the maturity date was ignored and* |
| 5 | *waived, [Mr Bobulinski's] principal loan amount of US$650,000 converted to a* |
| 6 | *preferred equity position with a 2.5x liquidation preference upon the liquidity* |
| 7 | *event of the sale of [the Company's] assets to Remark.* |
| 8 | 73. *Having heard the evidence at trial, the JOLs remain firmly of the view that this* |
| 9 | *claim is not close to being sufficiently established such that it could be properly* |
| 10 | *admitted as a claim by the JOLs in the liquidation. Mr Bobulinski is far from* |
| 11 | *having provided "sufficient proof" that the claim founded on the alleged waiver is* |
| 12 | *a "real debt"."* |
| 13 | |
| 14 | 176. In the instant case what is alleged is a bilateral waiver by conduct. This is argued against |
| 15 | as follows at paragraphs 76-77: |
| 16 | |
| 17 | *"76. In the present case, Mr Bobulinski's case is based on an alleged bilateral waiver* |
| 18 | *by conduct. In particular, it is his case that, upon the Maturity Date, it was* |
| 19 | *necessary for the parties, pursuant to Clause 3.3 of the TB Promissory Note, to* |
| 20 | *negotiate and agree the terms of the new shares into which Mr Bobulinski's Note* |
| 21 | *was to be converted. It is said that the parties did not do this, and that this is only* |
| 22 | *inconsistent with an intent to waive the Maturity Date in Clause 3.1.* |
| 23 | 77. *It appears to the JOLs that, in light of the evidence, there remains a fundamental* |
| 24 | *problem with this part of Mr Bobulinski's argument. This is that the failure by the* |
| 25 | *parties to enter into any negotiations pursuant to Clause 3.3 is equally, if not* |
| 26 | *more consistent, with the parties thinking that there was no basis on which Mr* |
| 27 | *Bobulinski would have wished or agreed to convert his debt to equity in* |
| 28 | *circumstances where the Company was insolvent and about to enter into* |
| 29 | *provisional liquidation following the presentation of a creditor's winding up* |
| 30 | *petition against the Company."* |

1

2    177.    This is essentially a commercial argument with which it would be hard to find fault.

3

4    178.    The following evidence is relied upon and then commented upon at paragraphs 79- 80:

5

6        *"79.    A telephone conversation then took place between Mr Roseman and Mr*

7        *Bobulinski on 22 April 2016. Mr Roseman gave clear evidence about this*

8        *conversation in his affirmation (para 16(b) [A/6/11] on which he was not*

9        *challenged in cross-examination. He said, referring to Mr Bobulinski's affidavit*

10       *at paras. 19-20:*

11

12         *"This is not an accurate representation of what took place on that telephone call.*

13         *During this telephone conversation, I informed Mr Bobulinski that there was no*

14         *way that the Noteholders and the Board of the Company (in particular the SIG-*

15         *appointed director) would allow Mr Bobulinski an extension of the maturity*

16         *deadline under the Note with no return and I also informed him, immediately after*

17         *being notified by Counsel, that his and the majority of the other Noteholders'*

18         *notes were maturing. I did not tell him that it was "unnecessary" to put a new*

19         *note in place and I certainly did not give him any assurances, but I told him that it*

20         *was 100% certain that the Noteholders and the Board would not consent to it and*

21         *it was just not possible commercially. I also confirm that this conversation took*

22         *place just after I had told Mr Bobulinski that his Note had expired, so he had no*

23         *reason to believe at that point, or now, that there was any extension of the Note or*

24         *waiver of any of its terms or anything similar. I simply made it clear that the*

25         *extension was not feasible at that time and that he and other Noteholders were*

26         *facing the same situation."*

27      80.    *In his cross-examination, Mr Bobulinski sought to claim that this evidence was*

28        *false, inaccurate or a "stretch". However, there is no reason to think that Mr*

29        *Roseman would have lied on this point. Unlike Mr Bobulinski, he has no financial*

30        *interest in the present litigation. Moreover, in circumstances where Mr Roseman*

1       was not challenged on this evidence in cross-examination, the Court is bound to
2       accept it. In any case, the evidence is credible and consistent with the
3       surrounding contemporary documents, as set out in para 17 of Mr Roseman's
4       affirmation [A/6/11]."

5

6

7   179.   Then there is a contrast made with Mr. Bobulinski's own evidence at paragraph 81:

8

9       "81.   In addition, Mr Bobulinski's own evidence about the conversation was
10      inconsistent and changing. In his affidavit (at para. 20) his position was simply
11      that there had been no discussion between himself and Mr Roseman about the
12      terms of any conversion of the surrender of a note or the surrender of the note.
13      However, in cross-examination, he claimed for the first time that he and Mr
14      Roseman had specifically said that they were not going to "take any action on the
15      notes based on the maturity date." This is a further reason why the JOLs consider
16      that the more accurate account of the conversation is likely to be that which was
17      given by Mr Roseman."

18

19  180.   Once again, it is open to the Court to conclude as it does that Mr Roseman's testimony is
20      the more sound and credible account.

21

22  181.   Then the further argument is made that it would have made no commercial sense
23      whatsoever for Mr Bobulinski to seek to convert his claim as a creditor into a
24      shareholding in the Company. By doing this, Mr Bobulinski would have subordinated his
25      position to other creditors of the Company in circumstances in which there is presently no
26      prospect of any distributions being made to the Company's shareholders (whether
27      preferred or otherwise).

28

29  182.   The JOLs elaborate at paragraphs 84-85:

30

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

"84.  In fact, it is clear from the evidence referred to above that the Company was in serious financial difficulties, that it was insolvent and that a winding up petition was presented on 28 April 2016. In these circumstances, the reasonable inference from the failure of the parties to seek to agree the terms of conversion of Mr Bobulinski's Note to shares was, not that the parties intended to waive the Maturity Date, but that there was no point in attempting to agree such terms as there was no rational basis on which Mr Bobulinski would have wished to convert the debt claim under his note to equity in an insolvent company which was the subject of a creditor's winding up petition.

85.  The position was well summarized by Mr Roseman in his evidence:

"Q. And you never commenced at any time having negotiations with Mr Bobulinski in relation to the conversion, did you? [A] No, I wouldn't have expected he would want to convert with the creditors being in front of the equity, but no, to answer your question, the answer is no."

183.  These are serious and substantial points of argument, to which with great respect the Appellant has given no significantly persuasive response.

184.  The JOLs reiterate that the conduct of the parties is more consistent with the Maturity Date remaining in place but that no steps would be taken to convert Mr Bobulinski's debt claim to equity, because this was obviously against his interests in circumstances where the Company was insolvent and where this would in any case have required permission from the Court.

185.  They then make this submission at paragraph 90:

"Clause 10.13

90.  The further point is that, in any case, Clause 10.13 of the Promissory Note [B/1/9] provides that:

---

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 84 of 104 Page ID
Case 2:19-cv-02965-MWF-SSJC Document 148-3 Filed 04/24/19 Page 80 of 99 Page ID #:188
#:1635

> 1  *"No failure to exercise and no delay in exercising on the part of the Noteholders,*
> 2  *of any right, remedy power or privilege hereunder shall operate as a waiver*
> 3  *thereof"*

91.  *Accordingly, contrary to Mr Bobulinski's case, on any interpretation of the*
*contract, a failure on his part to exercise any rights under the Promissory Note*
*would not give rise to a waiver in any event."*

186.  Once again, there seems to the Court to be merit in this point as well.

187.  With reference to Mr Roseman's authority to act on behalf of the Company, the
following propositions are found at paragraph 92:

> "92.  *Mr Roseman's evidence was that, prior to the appointment of the JOLs, he would*
> *have needed Board authority to enter into any agreement. Moreover, it is difficult*
> *to see how either the Company or Mr Roseman on its behalf could have agreed to*
> *waive the Maturity Date in the TB Promissory Note following the presentation of*
> *the winding up petition on 28 April 2016. This is because, by waiving the Maturity*
> *Date, the Company would in effect have been conferring on Mr Bobulinski a new,*
> *additional right under Clause 3.1 to convert his debt to shares in the event of a*
> *Liquidity Event occurring. However, following the presentation of the petition all*
> *dealings with the Company's shares were void without permission of the Court*
> *(which was not obtained) (section 99 of the Companies Law):"*

188.  All of this is surely consistent with practical common sense.

189.  As to the nature of waiver under the Promissory Note, the JOLs refer to the express
provision in the Note itself:

Case 2:20-cv-06759-RGK-JC Document 68-4 Filed 02/08/21 Page 85 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-5 Filed 04/24/19 Page 81 of 99 Page ID
#:1636

1         "*93.*     *The further point is that the terms of the Promissory Notes provide that the terms*
2                *of the Notes can only be waived in writing. Clause 10.11 [B/1/8] provides as*
3                *follows:*
4                "*No term of this Note may be waived, modified or amended except by an*
5                *instrument in writing signed by both of the parties hereto. Any waiver of the terms*
6                *hereof shall be effective only in the specific instance and for the specific purpose*
7                *given.*"

9 190.    While it is conceded that as a matter of California law such a provision itself is capable of

10        being waived, and only where the evidence shows that this was the parties' intention, the

11        JOLs state both that this requires evidence of conduct which is inconsistent with an

12        intention to enforce the clause, and that there is no specific evidence of any such conduct

13        in the present case.

15 191.    As in relation to a number of matters, the Court is of the view that while the Appellant

16        puts forward a plausible theory as to why his Appeal should succeed, the evidence to

17        support that theory is unfortunately and frequently lacking or deficient.

19 192.    The JOLs conclude this aspect by stating at paragraph 95:

21         "*95.*     *The final point on the question of whether there was a waiver is that, as a matter*
22                *of California law, if there is any doubt about the matter, there will be no waiver:*
23                "*doubtful cases will be decided against a waiver*". *In the present case, there is no*
24                *doubt, since it is clear that there was no waiver. But, even if there was any doubt*
25                *as to the position, then there would still no effective waiver as a matter of*
26                *California law.*"

28 193.    Ultimately, this case comes down to the quality of the evidence and not to the quality of
29        the theory.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

194.    The JOLs then turn to what the Court considers the paradox of the Appellant's case, stating at paragraphs 96-99:

"96.    *Even aside from the above points, in the JOLs' view, Mr Bobulinski's waiver claim is flawed for a further reason. This is because the claim based on Clause 3.1 is in any case a claim to a shareholding in the Company, and not to a debt claim owed by the Company. This is a fundamental difficulty with Mr Bobulinski's claim to be a creditor of the Company for the 2.5x multiplier pursuant to Clause 3.1.*

97.    *It should not need saying that someone who claims to be shareholder in a company is not entitled to lodge a proof of debt in the liquidation of the company claiming to be a creditor. Similarly, under the usual priority rules applicable in a liquidation, all creditors are required to be paid in full, before shareholders are entitled to receive anything (see section 140 (1) of the Companies Law).*

98.    *Clause 3.1 [B/1/3] provides that, upon a Liquidity Event on or before the Maturity Date, the loan amount under the Note "shall automatically convert into a new class of preferred equity securities (the "New Equity Securities") of [the Company]".*

99.    *Further, those shares carried with them a right to an "initial liquidation preference, prior and in preference to any distributions to any holder of equity securities, in the amount of two and one half (2.5) times the aggregate Principal Loan Amount".*

195.    Having outlined what they claim is the evolving history presented by the Appellant upon this issue, the JOLs then state their position in this way at paragraphs 105-107:

"105.    *Against this background, in his closing submissions (paragraph 45) Mr Bobulinski has now advanced a yet further variation ("the Closing Submissions Argument"). The argument which now appears to be advanced is that:*

105.1. *Mr Bobulinski is entitled under Clause 3.1 to the conversion of the Principal Loan Amount into a new class of preferred equity securities; and*

105.2. *he also has a claim, as a creditor, to a "liquidation preference" in an amount of 2.5x the Principal Loan Amount.*

106. *This argument appears to suppose that at the same time there was an entitlement to convert the Principal Loan Amount into shares and into a new debt claim debt for 2.5x the Principal Loan Amount. This argument makes little more sense than the previous versions.*

107. *The JOLs agree with the first point such that, if the Maturity Date had been waived, and a Liquidity Event had occurred, then Mr Bobulinski would have been entitled to the conversion of the Principal Loan Amount into new preferred shares. However, there is no basis for the argument that Mr Bobulinski would have an additional claim, as a creditor, to 2.5x the Principal Loan Amount."*

196. The JOLs examined the meaning of a liquidation preference at paragraphs 108-109:

"*108. In particular:*

108.1. *The "initial liquidation preference" conferred by Clause 3.1 is a right which attaches to the new shares issued under that clause on conversion of the Principal Loan Amount. Mr Valle rightly accepted this and it is in any event clear from the definition of "liquidation preference" under California law [C2/65].*

*"Liquidation price" or "liquidation preference" means amounts payable on shares of any class upon voluntary or involuntary dissolution, winding up or distribution of the entire assets of the corporation, including any*

1           *cumulative dividends accrued and unpaid, in priority to shares of another*
2           *class or classes."*

3   *108.2. It is thus a version of the usual right which attaches to preference shares issued*
4           *by a company which gives those shares priority over other classes of shares on a*
5           *liquidation or equivalent distribution event. Indeed, this is clear from the*
6           *language of Clause 3.1 which makes clear that the effect of the preference is to*
7           *give priority "in preference to any distributions to any holder of equity*
8           *securities".*

9   *108.3. The "initial liquidation preference" is therefore a right attaching to the shares*
10           *which gives the shares priority over other classes of shares on a liquidation or*
11           *analogous event. In other words, it is a priority right which governs the extent to*
12           *which the preference shares enjoy priority over other classes of shares on a*
13           *winding up or similar process.*

14   *109. It follows that the "initial liquidation preference" is not an*
15           *additional/freestanding debt claim which exists alongside the shares. Indeed, if*
16           *the draftsman had intended to create such a right under Clause 3.1 then he would*
17           *have used the same language which he used to create such a right under Clause*
18           *3.2 (see paragraph 43 above)."*

19

20

21 197. As the JOLs rightly state, it is difficult to see conceptually how there could be at the same
22      time a right to convert the Principal Loan Amount into new shares and also a right to
23      have a debt claim for 2.5x the Principal Loan Amount.

24

25 198. The Court is inevitably concerned with how in the context of the Companies Winding Up
26      Rules such opposing entitlements as debts and shares would relate to each other. Order
27      16, for example, deals with proof of debts in official liquidations and with creditors'
28      claims. It does not as such deal with shareholder claims at all.

29

199.  As the JOLs point out, the holder of the share conversion right plainly could not expect to receive both the return of capital on the nominal amount of the new shares issued and the 2.5x Principal Loan Amount as a debt. Some form of credit would arise to be given against the debt claim for the value of the shares, but for how much?

200.  With all due respect to the Appellant, this legal argument is unsustainable. The better and indeed more conservative view is that Mr Bobulinski in the circumstances as they evolved remained a creditor for at least the $650,000 which he advanced and for which he has been admitted. Whether or not ultimately he is admitted as a creditor for any greater sum will ultimately be decided in this Judgment.

201.  The manner in which the JOLs propose that this particular issue should be resolved is summarized at paragraph 112.1:

> "112.1 The JOLs do not say that Mr Bobulinski became a shareholder in the Company pursuant to Clause 3.1 – on the contrary, they say that Clause 3.1 does not apply because the Maturity Date was not waived and no Liquidity Event occurred before the Maturity Date. The JOLs say that Mr Bobulinski is a creditor for the US$650,000 amount which he advanced and for which he has been admitted;"

202.  Irrespective of all other issues in this Appeal, this appears to the Court to be an entirely sound and logical approach.

203.  The remaining matter to be considered therefore is one of formal legal priorities Paragraph 113 states:

> "113.  The final issue in relation to the waiver claim concerns, if it is right that the "initial liquidation preference" is some kind of additional/freestanding debt claim (and, as explained above the JOLs do not see how it can be), the priority of any such claim in the liquidation of the Company. This point is addressed only cursorily in Mr Bobulinski's closing submissions.

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

As to this:

113.1. Section 49 (g) of the Companies Law subordinates to other creditors, all claims of a shareholder against a company in liquidation in the capacity of shareholder. "The rationale of the section is to ensure that the rights of members as such do not compete with the rights of the general body of creditors": Soden v British & Commonwealth [1998] AC 298 at 324C.

113.2. The effect of section 49 (g) (which is in the same terms as equivalent provisions in the English Companies legislation) was recently summarized by Kawaley J in Re Herald Fund SPC:

"In my judgment section 49 (g) of the Companies Law, in asserting the priority of ordinary creditors' claims over shareholder claims (in the event of any competition between them) does indeed reflect a principle of fundamental character."

113.3. Any claim to an "initial liquidation preference", as right attaching to the shares as Mr Valle accepted and the California legislation makes clear, is a shareholder claim and not an ordinary creditor claim.

113.4. It follows that even if there some kind of additional/freestanding debt claim in respect of the initial liquidation preference, it would fall within section 49 (g) and therefore in any event be subordinated to the claims of the creditors of the Company (both subordinated and unsubordinated).

113.5. Contrary to paragraph 50 of Mr Bobulinski's submissions, the fact that the Company did not take the steps to register Mr Bobulinski as a shareholder does not mean that this claim to the "initial liquidation preference" is not a claim made in the capacity of a shareholder, or someone who claims to be entitled to be registered as a shareholder.

114. For all these reasons, Mr Bobulinski's claim to be a creditor for the 2.5 multiplier based on Clause 3.1 in any case fails, because the effect of that clause was to entitle Mr Bobulinski to shares with the 2.5x liquidation preference, not to a debt claim for the 2.5x multiplier. The JOLs consider

1     *that the other creditors of the Company (including the various*
2     *Noteholders) would be (rightly) aggrieved if Mr Bobulinski's claim for the*
3     *multiplier was to be admitted on the basis of this type of speculative (and*
4     *changing) argument."*

5

6 204. The Court agrees. It is perhaps unfortunate that in the course of this Appeal the Court has
7    had to address a number of legal issues which regrettably have no ultimate intrinsic merit.

8

9 205. The JOLs then move on to consider promissory estoppel, stating at paragraph 116:

10

11   *"116. As explained in Dosker 1.p. 6 [A/10/84], and as accepted by Mr Valle in cross-*
12      *examination, as a matter of California Law in order to establish a claim for*
13      *promissory estoppel, a party must prove the following:*
14    *116.1. that a promise was made which was clear and unambiguous in its terms;*
15    *116.2. that the party to whom the promise was made has relied on it;*
16    *116.3. that any reliance on the promise was reasonable and foreseeable; and*
17    *116.4. that the relevant party has been injured by his reliance on the promise."*

18

19 206. While the Court has every sympathy for the sincerity of Mr Bobulinski's position the
20    problem is that in the absence of at least some independent supporting evidence Mr
21    Bobulinski falls short of being able to establish the essential facts to which the law of
22    California can then effectively and dispositively be applied.

23

24 207. There is then additional exposition at paragraphs 122-124:

25

26   *"122. Mr Roseman explained in his evidence the nature of the difficult dynamic as*
27      *attempts were being made to conclude a deal:*
28     *"In this instance there were expectations of distributions that changed*
29     *consistently and that I was, at many points in time, based on those expectations*
30     *which were unclear to me, willing to help to accommodate Mr Bobulinski out of*

Case 2:20-cv-06759-RGK-SJC Document 68-4 Filed 02/08/21 Page 92 of 104 Page ID
Case 2:19-cv-02963-MWF-SSJ Document 148-1 Filed 04/24/19 Page 88 of 91 Page #:196
#:1643

my distributions based on the distribution expectation at that point in time, if Mr
Bobulinski was not made whole. That is correct."

"I told Mr Bobulinski clearly that based on the distribution process waterfall that
was expected at that point in time, which changed about five times between then
and closing, not based on my doing, but based on the consistent changing of the
waterfall based on the Cayman process, that, yes, at the point in time I expected
that everybody would have been paid [100] per cent of their proceeds at closing
and that I would have been willing, based on the expectations I had at that point in
time, to accommodate Mr Bobulinski out of my proceeds which, just so you know,
was my deferred salary and expenses that had been deferred for about three years
while my family, including two children, was living in a two-bedroomed apartment
with all my money drained going into the business. So yes, under those
circumstances the answer is yes."

123.    He also made clear that any deal depended, in particular, on agreement being
reached between Mr Bobulinski and Mr Roche:

"No. I was – he wouldn't have been entitled to it under the note but Mr Roach
[sic] was made aware by Mr Bobulinski and by myself, and I put the two of them
together and attempted to continue to put the two of them together. Mr Roach [sic]
understood that Mr Bobulinski wanted to see more and it was communicated to me
on numerous occasions that there was going to be an agreement and that Mr
Roach [sic] would come up with a solution for Mr Bobulinski, including
potentially purchasing his warrants, to get Mr Bobulinski to a point where he
would feel comfortable with the deal. I had certainly expected a negotiation would
take place, but Mr Roach [sic] stated very clearly that he would ensure that Mr
Bobulinski was taken care of at that point in time."

124.    Against, this context it is clear that Mr Roseman did not make any binding
promises to Mr Bobulinski that he definitely would receive the 2.5x multiplier in
cash and in full. There is no doubt that this is what Mr Bobulinski wanted and that

*Mr Roseman no doubt hoped it would be possible to satisfy those wishes, and indeed that at various times he may well have expected to be able to do so. However, the JOLs have not seen any evidence that Mr Roseman made a clear and unambiguous promise that the Company would definitely pay Mr Bobulinski the 2.5x multiplier in cash."*

208. The JOLs then make the supplementary point that monies received by Mr Bobulinski would potentially have come from a number of different sources – the other Noteholders and Mr Roseman: *"Any promise in order to be binding and effective would therefore necessarily have also to have been given by these parties, and not merely by the Company":* (paragraph 130)

209. With reference to the authority to make a promise in any event, the JOLs rely upon operation of law at paragraph 133:

*"133. There is also a further point. Insofar as Mr Bobulinski seeks to rely on exchanges which took place with Mr Roseman post 28 April 2016, then these will be ineffective as a result of the presentation of the winding up petition by Hickory Grove. Mr Bobulinski contends that his claim by reason of promissory estoppel for the 2.5x multiplier is secured over the Company's assets. However, the creation of any new secured claim against the Company's assets, after presentation of the petition, is void by reason of section 99 of the Companies Law. The creation of a new secured claim would involve a disposition of the Company's property is therefore voided by reason of section 99."*

210. Once again, this is a point which the Court considers as valid.

211. The JOLs perceptively state at paragraph 136:



*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

"136.    *The process of conversion of the Promissory Note to equity is provided for under Clause 3.3 As explained above, under this process the Principal Loan Amount would convert into shares in the Company. However, under general and long-standing principles of insolvency law, such shares would then rank behind the claims of all creditors in a winding up."*

212.     This is the basis for the JOLs commenting at paragraph 138 that it is far-fetched to think that Mr Bobulinski would even have sought to convert his existing debt claim into shares ranking behind other creditors: *"By doing so, he would inevitably have seriously prejudiced his own interests".*

213.     One way or another, the Court returns repeatedly to what it has already described as the paradox at the centre of the Appellant's case.

214.     The JOLs add in practical terms that it was not within Mr Bobulinski's power to prevent the sale to Remark from taking place even if he could do so; that would merely have served to cause loss to Mr Bobulinski himself. All of this serves to indicate that reliance on any promise that might have been made was highly improbable if not frankly inconceivable in any event.

215.     It is also asserted that any reliance was neither reasonable nor foreseeable. Paragraphs 141-142 state:

"141.    *As explained above, the supposed "promises" made in the course of informal Whatsapp exchanges between Mr Bobulinski and Mr Roseman were not of a nature that it would have been reasonable for Mr Bobulinski to rely on them, or so as to make it foreseeable that he would.*

142.    *Moreover, Mr Bobulinski was aware that the winding up petition had been presented on 28 April 2016, the JPLs had been appointed on 2 June 2016, with*

the JOLs' appointment subsequently taking effect on 18 August 2016. Accordingly, from 28 April 2016 onwards, it would not in any event have been reasonable or foreseeable for Mr Bobulinski to rely on assurances made by Mr Roseman in circumstances where the petition had been presented, and where the JPLs and subsequently the JOLs were appointed."

216.  There is then further comment as to there being no injury on Mr Bobulinski's part as a result of reliance. Paragraphs 144-145 state:

"144.  If Mr Bobulinski had exercised his conversion rights under Clause 3.3 of the Promissory Note, he would have received shares in the Company, ranking behind the claims of all creditors. In circumstances where the Company is insolvent, he would not therefore have had any economic interest in the liquidation of the Company. In fact, the Appellant is in a better position as a result of not having exercised his conversion rights, and therefore retaining a debt claim to the Principal Loan Amount, which has been admitted as an unsecured claim in the Company's liquidation by the JOLs.

145.  Similarly, there is no evidence to suggest that Mr Bobulinski would have been able to prevent the sale transaction with Remark from taking place (on the contrary) but, even if he had been able to do so, this would simply have caused him loss since there is no evidence that any other purchaser would have been willing to enter into a sale transaction on better terms."

217.  Although in slightly different guise, it is now clear that the same themes constantly reappear.

218. The Submissions then address the separate issue as to whether Mr Bobulinski's claim is secured over the assets of the Company in the hands of the JOLs pursuant to the terms of the Pledge.

219. In light of the conclusions to which the Court will come as to waiver and promissory estoppel, the Court is reluctant to pursue this aspect at inordinately extended length.

220. The first Submission made is that the Pledge does not reasonably identify the pledged Collateral contrary to the broad description of Collateral in section 9108 (c) of the Uniform Commercial Code ("the Code") as enacted. The part of the definition which purports to create a pledge over all assets "*in the United States*" would it is said not satisfy the requirements or section 9108 (c) so as effectively to create a security interest.

221. The second point is that there is no evidence that the Company had any assets falling within the operative part of the definition of Collateral in the Pledge, i.e., content library, license agreements, and physical assets such as production equipment in the United States. Instead, the JOLs maintain that the Company carries on business as an investment company. It was a parent company for the Group. As such, the Company had relatively few assets.

222. The JOLs emphasise that Mr. Roseman's evidence on this point was that the United States content was owned by RAAD. Mr Tao's evidence seems to be to the same effect.

223. Mr. Valle is said to have countered this by relying on a case called *Wachovia Bank v. WL Homes LLC,* a decision of the Third Circuit Court of Appeals on appeal from Delaware, and not of the Ninth Circuit on Appeal from California, and therefore not forming part of California law.

224. In that case they say that there was no dispute that the scope of the relevant pledge extended to the relevant assets of the subsidiary, but that by contrast the terms of the

1    Pledge do not even purport to create security over the assets of any of the Company's
2    subsidiaries.

3

4    225.    Furthermore, it is said that this decision concerned a subsidiary which was 100% owned
5            by the parent Company, and in contrast in the present case RAAD was not a subsidiary of
6            the company, and the Company itself held no interest at all in RAAD. It is then pointed
7            out that Mr Bobulinski did not cross-examine Mr Dosker on this aspect of his evidence.

8

9    226.    The argument continued at paragraph 166:

10

11           "166.    In his closing submissions, Mr Bobulinski once again advances a new argument
12                    based on a case called Avco Delta Corporation Canada Ltd v United States. This
13                    case was not referred to by Mr Valle, or even included in the bundles of US
14                    authorities, and it is not open to Mr Bobulinski to seek to rely on it. In any case,
15                    the new argument makes no sense. The JOLs agree that, under the terms of the
16                    Pledge the Company represented that it owned the Collateral, and that it was
17                    creating security over the Pledge. However, it did not represent that the
18                    Collateral included the content library and license agreements owned by RAAD.
19                    In this respect, paragraph 74 of Mr Bobulinski's closing submissions is a non
20                    sequitur because it does not follow from the fact that the Company was
21                    representing that it was the owner of the Collateral, that it was also representing
22                    that the content library and licence agreements formed part of that Collateral."

23

24   227.    The third point made is that the Pledge does not attach to the proceeds of sale, in that,
25           under California law section 9315 (2) of the Code a security interest attaches to pay
26           identifiable proceeds of Collateral, which it seems can extend to tracing.

27

28   228.    However, case law is then cited to support the proposition in paragraph 169 that the
29           burden of tracing rests with the secured creditor claiming a security interest in the

proceeds and it is satisfied by the submission of detailed, *"testimony or documentary evidence that establishes a transactional link between the proceeds and the collateral."*

229.   Mr Bobulinski's evidence it is claimed does not address this point, and that is correct.

230.   The position is summarises at paragraph 171 as follows:

> *"171.   As noted above, in fact, there is no evidence that the Pledge attached to any assets of the Company, But, even if it had attached to any "content library, licence agreement, and physical assets such as production equipment" of the Company in the United States, there is nothing to suggest that the proceeds of sale received under the APA are the identifiable proceeds of such assets. On the contrary, the proceeds of sale received under the APA were, if anything, attributable to the shares in the subsidiary companies being sold under the APA. As explained above, these assets were never located in the United States and, on any view, fall outside the scope of the Pledge."*

231.   As to the fourth issue, the point is taken that the Pledge only applies to liabilities under the Note. This highly technical submission is then developed at paragraphs 174-176:

> *"174.   Fourthly, to the extent that any liability of the Company arises as a matter of California law theories of promissory estoppel (which is in any case denied) rather than under the terms of the Promissory Note itself, then the liability is not in any case secured by the Pledge as a Secured Obligation (as defined) (see section 3 of the Pledge).*
>
> *175.   Mr Valle did not address this important point in either of his (two) reports. Mr Dosker, however, dealt with the point and expressed his view as follows:*

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1   "*Also outside the scope of the pledge in the Pledge Agreement is any alleged*
2   *promise by CBG not contained in the Note or the Pledge Agreement. Under*
3   *California law, as applied to the Note and the Pledge Agreement, whatever*
4   *alleged promise Mr Bobulinski now claims as the basis for his promissory*
5   *estoppel argument is not within the definition of "Secured Obligations" set forth*
6   *in Section 3 of the Pledge Agreement. So even if there was some such promise,*
7   *which in my opinion under California law there was not, its performance is not*
8   *secured.*"

9   176.   *Mr Dosker was not challenged, or even asked about, this evidence in cross-*
10          *examination. Accordingly, the Court should accept this evidence. This is*
11          *therefore a further reason why Mr Bobulinski's claim fails.*"

13  232.   On all of these matters which address whether Mr Bobulinski's continuing claim as a
14          creditor is secured or not, the Court prefers and accepts what it considers to be the
15          impartial and objective expert evidence of Mr Dosker over that of Mr Valle.

17  233.   What is also evident however is that such discussions and arrangements as there were
18          between Mr Bobulinski and Mr Roseman were conducted as longstanding friends and
19          even colleagues. The Court has already commented that this was a struggle for both of
20          them.

22  234.   The Court accepts the validity of the arguments made by the JOLs on this aspect of the
23          case, but it would be perhaps somewhat undesirable if ultimately such an acceptance
24          were to be technically determinative of this entire Appeal.

26  235.   In practice, however it will not prove necessary for this Court to resolve the entire case
27          on such an arcane basis.

28



*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Exhibit 1                                    Page 97

## The Findings of the Court

236.   The Court has set out the background to this matter along with the principal representations which have been made for two major reasons. First, Leading Counsel for both the Appellant and the JOLs have presented to this Court extensive and detailed material, and the Court has a responsibility to bear all of this information and assistance properly in mind. Secondly, because the burden of proof is placed upon the Appellant to establish and prove his case, it is critically important by way of overview to examine and determine the extent to which he may or may not have discharged that burden.

237.   There is no doubt that the Appellant has provided to the Company important and indeed critical financing, and that as Mr Isaacs Q.C. states at paragraph 23 of his Closing Submissions the Appellant and Mr Roseman communicated extensively. What is more in doubt is whether the Appellant actually received assurances from Mr Roseman that he would receive 2.5x return on his loans, and indeed even more specifically whether the Maturity Date was waived or alternatively a promise was made as to that return which now gives rise to a promissory estoppel.

238.   An additional issue which arises is more broadly as to the standing of the Appellant as either a creditor or a shareholder, or even conceptually as both.

239.   This Court has already indicated that it prefers the expert evidence of Mr. Dosker to that of Mr. Valle, and that it will adopt and apply Mr Dosker's interpretations and guidance as to California law.

240.   Quite apart from the Court finding Mr Dosker's account less directive and therefore more persuasive, the Court reminds itself of an additional difficulty in relation to Mr Valle.

241.   The principles are addressed in *The Ikarian Reefer* [1993] 2 Lloyd's Rep 68.

242.   Essentially an expert witness must be independent. In the case of Mr Valle however he has a history of having acted for Mr Bobulinski, and therefore it is impossible to disregard and to ignore the real possibility of Mr. Valle having conflicting duties to the Court and to his client. This comment is made not by way of any disparagement

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

1          whatsoever, but rather to affirm that the Court must exercise a high degree of care and
2          caution in such circumstances.

3   243.   Mr Dosker's evidence in comparison does not present itself in any other way than as
4          completely impartial.

5   244.   The issue as to waiver is whether there was a waiver of the Maturity Date and conversion
6          rights in the Promissory Note, amounting to an intentional relinquishment by Mr
7          Bobulinski and Mr Roseman mutually of a known right. Also there is the related issue of
8          whether by extension, the *"no unwritten waiver"* clause in the note was itself lawfully
9          and factually waived.

10  245.   Ultimately this is a simple but important matter of proof. Did the conduct in this case
11         manifest an intention to waive the Maturity Date?

12  246.   As to answering this question, it is only necessary to refer to the conduct and exchanges
13         of Mr Bobulinski and Mr Roseman, and to take into account the evidence of each of
14         them, to see that the Appellant's case is sadly sparse and lacking.

15  247.   Notwithstanding numerous telephone exchanges and such communications via
16         WhatsApp as have been made available, it is impossible to go beyond the position that
17         while Mr Bobulinski may well have believed that there was a waiver of some kind or
18         other, this was not a mutually agreed or recognised reality.

19  248.   Had Mr Bobulinski and Mr Roseman at any material time memorialised an agreed
20         understanding as to the efficacy of waiver in even the most modest and elementary terms,
21         then of course there would be some independent evidence to support Mr Bobulinski's
22         contentions on the point. However, no supporting evidence of any kind exists.

23  249.   The Court has every sympathy for the sincerity of Mr. Bobulinski's testimony, but the
24         Court has no alternative to concluding that no promises were made as to waiver or to
25         what has also been described above as to written waiver.

26  250.   The Court finds that Mr. Roseman was doing his best to find a financially satisfactory
27         way forward as best he knew how under stressful conditions. Moreover, and separate

*190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)*

Page 96 of 98

1     from that finding, the Court concludes that Mr Bobulinski's testimony on the issue does

2     not rise to the level of proof on a balance of probabilities.

3  251.   Turning to the alternative argument as to promissory estoppel, the Court accepts and

4     applies the legal definition described in Mr Dosker's Report dated 1 September 2017, at

5     page 6.

6  252.   For present practical purposes, the Court intends to focus on the question of whether the

7     Appellant can prove that there was a promise to pay a 2.5x return to Mr Bobulinski which

8     was clear and unambiguous in its terms.

9  253.   Once again, the Appellant's evidence falls short of the required standard of proof as to

10     there being a promise that was clear and unambiguous on which Mr Bobulinski even

11     relied at all.

12  254.   The factors are essentially the same factors which militated against there being a waiver.

13     Applying lengthy legal concepts and principles to what in fact transpired does not *per se*

14     elevate what transpired into something which it never was in the first place.

15  255.   The Court has elsewhere already touched upon some further aspects of the promissory

16     estoppel arguments. Suffice it to say that at this point the argument fails, and it does so

17     because the facts are not there to support it.

18  256.   In light of the findings of fact which the Court has made, it is unnecessary to go further

19     into the security and Pledge arguments which have arisen beyond what the Court has

20     already indicated to be its views of the facts in any event.

21  257.   An additional issue which causes some difficulty is as to the Appellant's claim to be a

22     creditor. The Appellant claims to be owed what he described as a liquidation preference

23     and yet he denies that by operation of Cayman Islands law he is or can be a shareholder,

24     which would disqualify his claim. In essence he argues that the Company's failure to

25     convert the Principal Loan Amount into a new class of equity securities does not deprive

26     the Appellant of the right to receive the amount which should have been paid, but was not

27     paid, on those securities, and he claims this amount *qua* creditor.

258. The JOLs on the other hand adopt what might perhaps be described as a more classical viewpoint, contending that the liquidation preference is a right attaching to the shares which gives the shares priority over other classes of shares on a liquidation or analogous event. Put another way, it is not then an additional/freestanding debt claim which exists alongside the shares.

259. The issue raised is one of some novelty. The Court has found that no waiver took place, and no promissory estoppel arose, whereby conversion of shares after a Maturity Date could be impeded or prevented. In that case, and based upon his accrued or at least notional shareholding, the Appellant as creditor could not make any further claim at all because such right as he claimed was a right attaching only to shares.

260. Accordingly, the Court has formed a view that the paradoxical nature of the Appellant's argument itself renders it entirely hopeless.

261. Looking at the matter as a whole, the Court formally reminds itself that its jurisdiction is concerned exclusively with proofs of debt in any official liquidation. The Court is not satisfied on a balance of probabilities that in these circumstances the Appellant has established the existence of a debt in the liquidation.

262. Alternatively, the Court concludes that even if there is a potential debt it is not a freestanding one but a debt which is first contingent on and which exists alongside the issue of shares, and that the issue of shares in fact never happened.

**Conclusion**

263. For all the reasons which have been considered and addressed above the Summons Application dated 5 July 2017 is declined.

_Robin McMillan_

**THE HON. MR. JUSTICE McMILLAN**
**JUDGE OF THE GRAND COURT**

_190123 In the Matter of China Branding Group Limited – FSD 52 of 2016 Judgment (RMJ)_

No. 309

**Default Costs Certificate (0.62, r.22(3))**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 52 OF 2016 (RMJ)**

**IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)**

**AND**

**IN THE MATTER OF CHINA BRANDING GROUP LIMITED (IN OFFICIAL LIQUIDATION)**

**<u>DEFAULT COSTS CERTIFICATE</u>**

**UPON** reading the application made by Hugh Dickson and David Bennett of Grant Thornton, the joint official liquidators (the "**JOLs**") of China Branding Group Limited (in Official Liquidation), dated 7 March 2019.

**AND BEING SATISFIED** that Mr Tony Bobulinski (the "**Paying Party**") has failed to complete and return the Bills of Costs served on him in respect of the Order for Costs made against him on 5 February 2019. (the **"Order for costs"**)

**IT IS HEREBY CERTIFIED** that the amount payable to the JOLs by the Paying Party pursuant to the Order for Costs made is the sum of $562,170.94.

DATED the   day of   2019.

FILED the  6th day of May 2019.

**REGISTRAR OF THE GRAND COURT
FINANCIAL SERVICES DIVISION**

8473558.2 D1731.111222

1